11TH CIR. CASE NO. 16-10763-E
M.D. FLA. CASE NO. 8:14-CV-01762-JSM-TBM

_____

# In the United States Court of Appeals
# for the Eleventh Circuit

_____

DR. MICHELLE G. SCOTT, M.D.

*Plaintiff–Appellant,*

v.

SARASOTA DOCTORS HOSPITAL, INC., ET AL.

*Defendants–Appellees.*

_____

**APPELLANT'S OPENING BRIEF**

_____

_____

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA**

_____

DOROTHY F. EASLEY, MS JD BCS APPEALS*
EASLEY APPELLATE PRACTICE PLLC
    1200 BRICKELL AVENUE, STE 1950
    MIAMI, FLORIDA 33131
    T: (305) 444-1599; 800-216-6185
    FLORIDA BAR DESIGNATED E-MAIL:
    administration@EasleyAppellate.com
    (primary)
    admin2@EasleyAppellate.com (secondary)
    www.easleyappellate.com

* Counsel of Record          Appellate Counsel for Appellant

*Scott vs. Sarasota Doctors Hospital, etc., et al,* 11th Cir. Case No. 16-10763

### APPELLANT DR. MICHELLE G. SCOTT, M.D.'S
### CERTIFICATE OF INTERESTED PERSONS & CORPORATE DISCLOSURE

To assist the Court in evaluating potential conflicts, the undersigned counsel, pursuant to Rule 26.1, Fed. R. App. P., and Eleventh Circuit Internal Operating Rules 5-2, 26.1-1, -2 and -3, hereby discloses that, based on the information provided to Appellant DR. MICHELLE G. SCOTT, and the review of the record:

a)      Sarasota Doctors Hospital, Inc. ("SDH") is a Florida Corporation D/B/A as Doctors Hospital of Sarasota with its principal office in Nashville, Tennessee.

b)      West Florida Phsyican Network, LLC D/B/A as Healthcare America ("WFPN") is a Florida LLC with its principal office in Nashville, Tennessee.

c)      EmCare, Inc., ("EmCare") is a foreign profit corporation doing business in the State of Florida with its principal place of business in Greenwood Village, Colorado.

d)      Dr. Michelle G. Scott is a natural person.

Appellant further certifies that the following persons and entities have some interest in the outcome of this case:

1.      Barr, John Mills,

        (*Pro Hac Vice* Trial Attorney for Defendant–Appellee EmCare)

2.      Easley, Dorothy F.,

C-2

(Appellate Attorney for Plaintiff–Appellant)

3.    Easley Appellate Practice PLLC

(Appellate Law Firm for Plaintiff–Appellant)

4.    Ford & Harrison, LLP

(Trial Law Firm for Defendants SDH and WFPN)

5.    Glenn Rasmussen Fogerty & Hooker, PA

(Law Firm for Mediator Mark A. Hanley)

6.    Grilli, Peter J.

(Mediator)

7.    Hanley, Mark

(Mediator)

8.    Jackson Lewis P.C.

(Trial Law Firm for Defendant–Appellee EmCare)

9.    Jaensch, Tracey K.

(Trial Attorney for Defendants–Appellees SDH and WFPN)

10.    Law Office of John M. Barr, P.C.

(Trial Law Firm for Defendant–Appellee EmCare)

11.    Lechner, Jay P.

(Trial Attorney for Defendant–Appellee EmCare)

12.    Lindberg, Merry E.

(Trial Attorney for Defendants–Appellees SDH and WFPN

C-3

*Scott vs. Sarasota Doctors Hospital, etc., et al,* 11th Cir. Case No. 16-10763

13.   Miles, Daniel Kent

      (Trial Attorney for Defendants SDH and WFPN)

14.   McCoun, The Honorable Thomas B. III,

      (United States Magistrate Judge)

15.   Moody, The Honorable James S. Jr.

      (United States District Judge)

16.   Peter J. Grilli, PA

      (Law Firm for Mediator Peter J. Grilli)

17.   Romano, Jay F.

      (Trial Attorney for Plaintiff–Appellant)

18.   Romano Law Center, PA

      (Trial Law Firm for Plaintiff–Appellant)

19.   Ransdell, Matthew Logan

      (Trial Attorney for Defendant–Appellee EmCare)

20.   Sisco, Dale R.

      (Mediator)

21.   Sisco—Law

      (Law Firm for Mediator Dale Sisco)

22.   Tilden, Jesse M.

      (Trial Attorney for Plaintiff–Appellant)

C-4

22.    Tilden & Prohidney, P.L.

(Trial Law Firm for Plaintiff–Appellant)

24.    Whittel & Melton

(Trial Law Firm for Defendant–Appellee EmCare)

Respectfully submitted,

BY:  /S/ DOROTHY F. EASLEY

C-5

*Scott vs. Sarasota Doctors Hospital, etc., et al,* 11th Cir. Case No. 16-10763

### STATEMENT REGARDING ORAL ARGUMENT

This appeal concerns the construction of "joint employment" under Title VII of the Civil Rights Act of 1964 and 1991, *as amended*, 42 U.S.C. § 2000e *et seq.* ("Title VII"), the Civil Rights Act of 1871, *as amended*, and the Florida Civil Rights Act of 1992, § 760.01 *et seq.,* Florida Statutes ("FCRA"). It also concerns summary judgment, jury verdict, and new trial standards concerning pretext and joint employment. What makes this appeal particularly interesting is the "staffing company as employer" business model being used by these defendants, which are national companies, to insulate themselves from the otherwise obligatory compliance with Title VII and related nondiscrimination statutes. Numerous federal courts, and of particular interest, the U.S. Court of Appeals for the Fourth Circuit and the National Labor Relations Board, have rejected that model and found similar businesses to be joint employers for purposes of the various Civil Rights statutes. This Circuit has not yet had the opportunity to address that issue within this factual context. For the above reasons and because it is always an honor to appear before this Court, we believe that Oral Argument would aid the Court's review of these important issues and we respectfully request it.

EASLEY APPELLATE PRACTICE, PLLC, 1200 BRICKELL AVE., SUITE 1950, MIAMI, FLORIDA 33131  305-444-1599  800-216-6185

*Scott vs. Sarasota Doctors Hospital, etc., et al,* 11th Cir. Case No. 16-10763

# TABLE OF CONTENTS

APPELLANT DR. MICHELLE G. SCOTT, M.D.'S CERTIFICATE OF INTERESTED PERSONS & CORPORATE DISCLOSURE ...................................................................... C-2

STATEMENT REGARDING ORAL ARGUMENT ................................................ C-6

TABLE OF CONTENTS .......................................................................................... i

TABLE OF AUTHORITIES ................................................................................... v

OTHER AUTHORITIES ...................................................................................... xvi

STATEMENT OF JURISDICTION ...................................................................... xvii

INTRODUCTION ................................................................................................ xvii

I.      STATEMENT OF THE ISSUES ............................................................... 1

ISSUE I: THE  GREAT WEIGHT OF THE EVIDENCE—IF NOT ALL THE EVIDENCE—IS THAT DOCTORS HOSPITAL CONTROLLED THE TERMS AND CONDITIONS OF DR. SCOTT'S EMPLOYMENT—FROM DR. SCOTT'S HIRING TO FIRING, AND EACH DAY IN BETWEEN—AND WAS, THUS, AN EMPLOYER OF DR. SCOTT. AS SUCH, THE VERDICT FINDING OTHERWISE WAS AGAINST THE GREAT WEIGHT OF THE EVIDENCE AND THE DENIAL OF NEW TRIAL WAS ERROR. ........................................................... 1

ISSUE II: SUMMARY JUDGMENT IN FAVOR OF EMCARE CONCLUDED THAT DR. SCOTT COULD NOT AS A MATTER OF LAW ESTABLISH PRETEXT FOR HER REMOVAL AND SIMULTANEOUS TERMINATION MERELY BECAUSE EMCARE AND DOCTORS HOSPITAL HAD AN AGREEMENT IN WHICH THE HOSPITAL COULD DEMAND THE

i

REMOVAL OF A HOSPITALIST. THAT WAS FACTUAL ERROR BECAUSE IT OVERLOOKED THE PARTIES' RELATIONSHIPS AND CONSTRUED THEM IN FAVOR OF EMCARE. THAT WAS LEGAL ERROR BECAUSE IT ERRONEOUSLY CONSTRUED THE ECONOMIC REALITIES OF EMPLOYMENT IN TODAY'S ECONOMY. SUMMARY JUDGMENT SHOULD BE REVERSED. ............................................................................. 1

ISSUE III: IT WAS LEGAL ERROR AND ABUSE OF DISCRETION TO EXCLUDE THE TESTIMONY OF ANOTHER FEMALE HOSPITALIST AT DOCTORS HOSPITAL, DR. VASILLE, WORKING AT THE SAME TIME AND UNDER THE SAME SUPERVISION AS DR. SCOTT. DR. VASILLE'S TESTIMONY WOULD HAVE CONCERNED INCIDENTS RELATED TO DOCTORS HOSPITAL CEO, MR. MEADE, AND THE TREATMENT AND CONTROL OF HER EMPLOYMENT TERMS AND CONDITIONS AND HER SUBSEQUENT CONSTRUCTIVE TERMINATION. ....................................................................... 1

II.    STATEMENT OF THE CASE AND FACTS ................................................. 1

A.    COURSE OF THE PROCEEDINGS AND DISPOSITION BELOW ....................................... 1

B.    STATEMENT OF THE FACTS ......................................................................... 4

   *1.    Following Doctors Hospital administrative team interviews and their approval, Dr. Scott was hired as a Doctors Hospital Hospitalist under a web of written agreements with various corporate entities with whom she had no interaction.* ....................................................................... 5

EASLEY APPELLATE PRACTICE, PLLC, 1200 BRICKELL AVE., SUITE 1950, MIAMI, FLORIDA 33131  305-444-1599  800-216-6185

*Scott vs. Sarasota Doctors Hospital, etc., et al,* 11th Cir. Case No. 16-10763

2.    *Through its policies, procedures, and evaluation committees, Doctors Hospital supervised and managed Dr. Scott and its other physicians in every meaningful way.* ........................................................................ 7

3.    *The Hospital CEO Meade decided, without any discussion with Dr. Scott, that Dr. Scott, the only woman Hospitalist, didn't "fit the culture" and the search for her replacement began. Then stopped. Began. Stopped again.* 8

4.    *Dr. Scott filed her Discrimination Charge and was fired shortly after.* ... 10

5.    *Less than 24 hours after the Hospital took Dr. Scott's badge and escorted her out of the Hospital, Dr. Scott received the call telling her she was fired.* ........................................................................ 12

C.    STANDARDS OF REVIEW ........................................................................ 14

III.    ARGUMENTS SUMMARY ........................................................................ 16

IV.    ARGUMENTS ........................................................................ 18

ISSUE I: THE GREAT WEIGHT OF THE EVIDENCE—IF NOT ALL THE EVIDENCE—IS THAT DOCTORS HOSPITAL CONTROLLED THE TERMS AND CONDITIONS OF DR. SCOTT'S EMPLOYMENT—FROM DR. SCOTT'S HIRING TO FIRING, AND EACH DAY IN BETWEEN—AND WAS, THUS, AN EMPLOYER OF DR. SCOTT. AS SUCH, THE VERDICT FINDING OTHERWISE WAS AGAINST THE GREAT WEIGHT OF THE EVIDENCE AND THE DENIAL OF NEW TRIAL WAS ERROR. ........................................................................ 18

ISSUE II: SUMMARY JUDGMENT IN FAVOR OF EMCARE CONCLUDED THAT DR.

iii

*Scott vs. Sarasota Doctors Hospital, etc., et al,* 11th Cir. Case No. 16-10763

SCOTT COULD NOT AS A MATTER OF LAW ESTABLISH PRETEXT FOR HER REMOVAL AND SIMULTANEOUS TERMINATION MERELY BECAUSE EMCARE AND DOCTORS HOSPITAL HAD AN AGREEMENT IN WHICH THE HOSPITAL COULD DEMAND THE REMOVAL OF A HOSPITALIST. THAT WAS FACTUAL ERROR BECAUSE IT OVERLOOKED THE PARTIES' RELATIONSHIPS AND CONSTRUED THEM IN FAVOR OF EMCARE. THAT WAS LEGAL ERROR BECAUSE IT ERRONEOUSLY CONSTRUED THE ECONOMIC REALITIES OF EMPLOYMENT IN TODAY'S ECONOMY. SUMMARY JUDGMENT SHOULD BE REVERSED. ............................................................................... 37

ISSUE III: IT WAS LEGAL ERROR AND ABUSE OF DISCRETION TO EXCLUDE THE TESTIMONY OF ANOTHER FEMALE HOSPITALIST AT DOCTORS HOSPITAL, DR. VASILLE, WORKING AT THE SAME TIME AND UNDER THE SAME SUPERVISION AS DR. SCOTT. DR. VASILLE'S TESTIMONY WOULD HAVE CONCERNED INCIDENTS RELATED TO DOCTORS HOSPITAL CEO, MR. MEADE, AND THE TREATMENT AND CONTROL OF HER EMPLOYMENT TERMS AND CONDITIONS AND HER SUBSEQUENT CONSTRUCTIVE TERMINATION. ................................................................... 46

CONCLUSION ............................................................................................... 52

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS ........................................... 53

CERTIFICATE OF SERVICE ................................................................................ 53

iv

*Scott vs. Sarasota Doctors Hospital, etc., et al,* 11th Cir. Case No. 16-10763

# TABLE OF AUTHORITIES

## CASES

*Alberty-Velez v. Corporacion de Puerto Rico*

  *Para La Difusion Publica*,

  361 F.3d 1 (1st Cir. 2004) ................................................................. 36

*Aleksick v. 7-Eleven, Inc.*,

  205 Cal. App. 4th 1176, 140 Cal. Rptr. 3d 796

  (4th Dist. 2012) ................................................................. 14

*Amlong & Amlong, P.A. v. Denny's, Inc.*,

  500 F.3d 1230 (11th Cir. 2007) ................................................................. 16

*\*Andrews v. Lakeshore Rehab. Hosp.*,

  140 F.3d 1405 (11th Cir. 1998) ................................................................. 40

*Ansell v. Green Acres Contracting Co.*,

  347 F.3d 515 (3d Cir. 2003) ................................................................. 48

*Ard v. Sw. Forest Indus.*,

  849 F.2d 517 (11th Cir. 1988) ................................................................. 15

EASLEY APPELLATE PRACTICE, PLLC, 1200 BRICKELL AVE., SUITE 1950, MIAMI, FLORIDA 33131  305-444-1599  800-216-6185

*Scott vs. Sarasota Doctors Hospital, etc., et al,* 11th Cir. Case No. 16-10763

*Ashkenazi v. S. Broward Hosp. Dist.,*

    607 F. App'x 958 (11th Cir. 2015) ..............................................................20, 34


*B&G Enters., Ltd. v. U.S.,*

    220 F.3d 1318 (Fed. Cir. 2000) .......................................................... 15


*Barfield v. N.Y.C. Health & Hospitalists Corp.,*

    432 F. Supp. 2d 390 (S.D.N.Y. 2006) .................................................. 35


*Bell v. Crowne Mgmt., LLC,*

    844 F. Supp. 2d 1222 (S.D. Ala. 2012) ............................................... 50


*Brock v. Superior Care, Inc.,*

    840 F.2d 1054 (2d Cir. 1988) ............................................................. 37


*\*Browning Ferris Industries of California,*

    362 NLRB No. 186 (Aug. 27, 2015) .......................................................*passim*


*\*Butler v. Drive Automotive Industries of America, Inc.,*

    793 F.3d 404 (4th Cir. 2015) .............................................................. 22

EASLEY APPELLATE PRACTICE, PLLC, 1200 BRICKELL AVE., SUITE 1950, MIAMI, FLORIDA 33131  305-444-1599  800-216-6185

*Cange v. Phila. Parking Auth.,*

No. 08-3480, 2010 WL 365468

(E.D. Pa. Feb. 1, 2010) ........................................................................ 50

*Capitol EMI Music,*

311 N.L.R.B. 997 (1993),

*enforced sub nom.*

*Capitol EMI Music, Inc. v. NLRB,*

23 F.3d 399 (4th Cir. 1994) (table) ...................................................... 41

*Carter v. Dutchess Community College,*

735 F.2d 8 (2d Cir. 1984) ...................................................................... 29

*Cheney v. Plainfield Healthcare Ctr.,*

612 F.3d 908 (7th Cir. 2010) ................................................................. 40

*Cobb v. Sun Papers, Inc.,*

673 F.2d 337 (11th Cir. 1982) ....................................................*passim*

*Cuddleback v. Fla. Bd. of Educ.,*

381 F.3d 1230 (11th Cir. 2004) ............................................................. 20

EASLEY APPELLATE PRACTICE, PLLC, 1200 BRICKELL AVE., SUITE 1950, MIAMI, FLORIDA 33131  305-444-1599  800-216-6185

*Scott vs. Sarasota Doctors Hospital, etc., et al,* 11th Cir. Case No. 16-10763

*Daniel v. Sargent & Lundy, LLC,*

   2012 WL 874419 (N.D. Ill. March 14, 2012)...................................................... 41


*Day v. Sears Holdings Corp.,*

  No. CV 11-09068 MMM(PJWx), 2013 WL

  1010547 (C.D. Cal. Mar. 13, 2013) ................................................................. 50


*Demers v. Adams Homes of Nw. Fla., Inc.,*

   321 F. App'x 847 (11th Cir. 2009) ........................................................... 16, 47


*\*EEOC v. Skanska Bldg., Inc.,*

   550 F. App'x 253 (6th Cir. 2013) ........................................................... 29, 30


*\*Estes v. Dick Smith Ford, Inc.,*

  856 F.2d 1097 (8th Cir.1988),

  *overruled in part on other grounds by*

  *Price Waterhouse v. Hopkins,*

  490 U.S. 228 (1989) ........................................................................................ 49


*Faush v. Tuesday Morning, Inc.,*

  808 F.3d 208 (3d Cir. 2015) ........................................................................... 28

viii

EASLEY APPELLATE PRACTICE, PLLC, 1200 BRICKELL AVE., SUITE 1950, MIAMI, FLORIDA 33131  305-444-1599  800-216-6185

*Fields v. Hallsville Indep. School Dist.,*

  906 F.2d 1017 (5th Cir. 1990) ........................................................ 34


*Fuentes v. Perskie,*

  32 F.3d 759 (3d Cir. 1994) ........................................................... 47


*Garcia v. Copenhaver, Bell & Associates, M.D.'s P.A.,*

  104 F.3d 1256 (11th Cir. 1997) .................................................... 20


*Goldsmith v. Bagby Elevator Co., Inc.,*

  513 F.3d 1261 (11th Cir. 2008) ..............................................*passim*


*Goudeau v. Dental Health Servs., Inc.,*

  901 F. Supp. 1139 (M.D. La. 1995) ............................................... 34


*Griffin v. Finkbeiner,*

  689 F.3d 584 (6th Cir. 2012) ....................................................... 50


*Griggs v. Duke Power Co.,*

  401 U.S. 424 (1971) .................................................................... 18


*Hasan v. Foley & Lardner LLP,*

  552 F.3d 520 (7th Cir. 2008) ....................................................... 50

EASLEY APPELLATE PRACTICE, PLLC, 1200 BRICKELL AVE., SUITE 1950, MIAMI, FLORIDA 33131  305-444-1599  800-216-6185

*Scott vs. Sarasota Doctors Hospital, etc., et al,* 11th Cir. Case No. 16-10763

*Hawkins v. Hennepin Tech, Ctr.,*

    900 F.2d 153 (8th Cir. 1990) ............................................................ 49


*\*Hayes v. Sebelius,*

    806 F. Supp. 2d 141 (D.D.C. 2011) ........................................... 49, 50


*Heyne v. Caruso,*

    69 F.3d 1475 (9th Cir. 1995) ............................................................ 49


*Hodgson v. Griffin & Brand,*

    471 F.2d 235 (5th Cir. 1973) ............................................................ 30


*Hurlbert v. St. Mary's Health Care Sys., Inc.,*

    439 F.3d 1286 (11th Cir. 2006) ....................................................... 44


*Johnson v. FFE Transp. Services, Inc.,*

    227 F. App'x 780 (11th Cir. 2007) ................................................. 15


*Kohls v. Beverly Enters. Wis., Inc.,*

    259 F.3d 799 (7th Cir. 2001) ............................................................ 44


*\*Layton v. DHL Exp. (USA), Inc.,*

    686 F.3d 1172 (11th Cir. 2012) ....................................................... 21

x

*Scott vs. Sarasota Doctors Hospital, etc., et al,* 11th Cir. Case No. 16-10763

*Leuenberger v. Spicer,*

  2016 WL 355090 (W.D. Va. Jan. 28, 2016) .................................................. 36


*Lichtenstein v. Univ. of Pittsburgh Med. Ctr.,*

  691 F.3d 294 (3d Cir. 2012) ........................................................... 44


*Lipphardt v. Durango Steakhouse of Brandon, Inc.,*

  267 F.3d 1183 (11th Cir. 2001) ...................................................... 15


*Lyes v. City of Riviera, Fla.,*

  166 F.3d 1332 (11th Cir. 1999) ...................................................... 20


*\*Magnunson v. Peak Tech. Servs., Inc.,*

  808 F.Supp. 500 (E.D. Va. 1992)

  *affirmed,*

  40 F.3d 1244 (4th Cir. 1994) ......................................................... 41


*Martinez–Mendoza v. Champion Int'l Corp.,*

  340 F.3d 1200 (11th Cir. 2003) ...................................................... 29


*McKenzie v. Davenport-Harris Funeral Home,*

  834 F.2d 930 (11th Cir. 1987) ....................................................... 20

EASLEY APPELLATE PRACTICE, PLLC, 1200 BRICKELL AVE., SUITE 1950, MIAMI, FLORIDA 33131  305-444-1599  800-216-6185

*Scott vs. Sarasota Doctors Hospital, etc., et al,* 11th Cir. Case No. 16-10763

*Moorer v. Baptist Mem'l Health Care Sys.,*

    398 F.3d 469 (6th Cir. 2005) ............................................................. 44


*Morgan v. Family Dollar Stores, Inc.,*

    551 F.3d 1233 n. 75 (11th Cir. 2008) ............................................. 16


*Mugavero v. Arms Acres, Inc.,*

    No. 03 Civ. 05724(PGG), 2009 WL 1904548

    (S.D.N.Y. July 1, 2009) ...................................................................... 50


*Nat'l R.R. Passenger Corp. v. Morgan,*

    536 U.S. 101 (2002) ............................................................................ 38


*Nuskey v. Hochberg,*

    723 F. Supp. 2d 229 (D.D.C. 2010) ............................................... 50


*Patel v. Wargo,*

    803 F.2d 632 (11th Cir. 1986) ......................................................... 14


*Perry v. State Farm Fire & Cas. Co.,*

    734 F.2d 1441 (11th Cir. 1984) ...................................................... 49

EASLEY APPELLATE PRACTICE, PLLC, 1200 BRICKELL AVE., SUITE 1950, MIAMI, FLORIDA 33131  305-444-1599  800-216-6185

*Scott vs. Sarasota Doctors Hospital, etc., et al,* 11th Cir. Case No. 16-10763

*Phillips v. Smalley Maintenance Services, Inc.,*

    711 F.2d 1524 (11th Cir. 1983) ....................................................... 47


*\*Proctor v. Fluor Enterprises, Inc.,*

    494 F.3d 1337 (11th Cir. 2007) ....................................................... 49


*\*Reich v. Circle C Investments,*

    998 F.2d 324 (5th Cir. 1993) ........................................................... 37


*Reich v. Priba Corp.,*

    890 F. Supp. 586 (N.D. Tex. 2005) ................................................. 37


*Richardson v. Century Products, Inc.,*

    163 F. Supp. 2d 771 (N.D. Ohio 2001) .......................................... 29


*\*Rollins v. State of Fla. Dep't of Law Enforcement,*

    868 F.2d 397 (11th Cir. 1989) ......................................................... 38


*Rudin v. Lincoln Land Community Coll,*

    420 F.3d 712 (7th Cir.2005) ........................................................... 44


*Rutherford Food Corp. v. McComb,*

    331 U.S. 722 (1947) ........................................................................ 20

EASLEY APPELLATE PRACTICE, PLLC, 1200 BRICKELL AVE., SUITE 1950, MIAMI, FLORIDA 33131  305-444-1599  800-216-6185

*Scott vs. Sarasota Doctors Hospital, etc., et al,* 11th Cir. Case No. 16-10763

*Salamon v. Our Lady of Victory Hosp.,*

514 F.3d 217 (2d Cir. 2008) ............................................. 34


*Shah v. Deaconess Hosp.,*

355 F.3d 496 (6th Cir. 2004) ............................................. 35


*Shehab v. N.Y. State Dept. of Transp.,*

251 F. App'x 9 (2d Cir. 2007) ............................................. 14


*Smith v. City of New Smyrna Beach,*

588 F. App'x 965 (11th Cir. 2014) ....................................... *passim*


*Solano v. A Navas Party Production, Inc.,*

728 F. Supp. 2d 1334 (S.D. Fla. 2010) .................................. 14


*Sprint/United Management Co. v. Mendelsohn,*

552 U.S. 379 (2008) ....................................................... 50


*St. Charles Foods, Inc. v. America's Favorite Chicken Co.,*

198 F.3d 815 (11th Cir. 1999) ......................................... 16, 39


*Stanfield v. Answering Serv., Inc.,*

867 F.2d 1290 (11th Cir. 1989) ........................................ 45

xiv

*Scott vs. Sarasota Doctors Hospital, etc., et al,* 11th Cir. Case No. 16-10763

*Tex. Dept. of Cmty. Affairs v. Burdine,*

  450 U.S. 248 (1981) ........................................................................ 38


*Tolan v. Cotton,*

  __ U.S. __, 134 S. Ct. 1861, 1868 (2014) .................................................*passim*


*U.S. for Use & Benefit of Weyerhaeuser Co. v. Bucon Const. Co.,*

  430 F.2d 420 (5th Cir. 1970) ........................................................... 15


*U.S. Postal Serv. v. Aikens,*

  460 U.S. 711 n. 3 (1983)................................................................... 47


*\*Virgo v. Riviera Beach Assoc's, Ltd.,*

  30 F.3d 1350 (11th Cir. 1994)...................................................20, 24


*Whatley v. CNA Ins. Co.,*

  189 F.3d 1310 (11th Cir. 1999).......................................................... 15


*Wilson v. B/E Aerospace, Inc.,*

  376 F.3d 1079 (11th Cir. 2004).......................................................... 38


*Wolff v. Allstate Life Ins. Co.,*

  985 F.2d 1524 (11th Cir. 1993)......................................................... 14

EASLEY APPELLATE PRACTICE, PLLC, 1200 BRICKELL AVE., SUITE 1950, MIAMI, FLORIDA 33131  305-444-1599  800-216-6185

*Scott vs. Sarasota Doctors Hospital, etc., et al,* 11th Cir. Case No. 16-10763

*Zelaya v. UNICCO Serv. Co.,*

  682 F. Supp. 2d 28 (D.D.C. 2010) ...................................................................... 50

## OTHER AUTHORITIES

*Department of Labor Regulations, 29 C.F.R.§ 825.106 ................................................ 36

Federal Rules of Civil Procedure 59 .................................................................... 4

Federal Rules of Civil Procedure 60 .................................................................... 4

Federal Rules of Evidence, Rule 404 ............................................................... 46-47

Florida Civil Rights Act ..........................................................................*passim*

Title 28 U.S.C. § 1291 (2015) ........................................................................xviii

Title VII of the Civil Rights Act of 1964 and 1991,

  *as amended,*

  42 U.S.C. § 2000e *et seq.* ........................................................................*passim*

EASLEY APPELLATE PRACTICE, PLLC, 1200 BRICKELL AVE., SUITE 1950, MIAMI, FLORIDA 33131  305-444-1599  800-216-6185

## STATEMENT OF JURISDICTION

Under 28 U.S.C. § 1291 (2015) the Court has jurisdiction to review these orders and final judgment.

## INTRODUCTION[1]

This is a timely appeal of an order granting summary judgment in favor of EmCare, Inc. ("Emcare"), and a jury's finding that Doctors Hospital of Sarasota ("Doctors Hospital" or the "Hospital"), the only remaining defendant at trial, was not Dr. Scott's joint employer. The orders, all nonfinal rulings and partial judgments were rendered final by the subsequent entry of the January 22, 2016 Final Judgment. This matter also includes by timely amended notice of appeal the appeal of the order denying new trial motion. DE166; DE170.

Appellant Dr. Michelle G. Scott, M.D. ("Dr. Scott"), is a board-certified medical doctor, specializing in internal medicine [DE100 at 15; DE66-3 at 2], who worked as a Hospitalist at Doctors Hospital under a series of agreements between herself, the Hospital, and EmCare, Inc. DE150-2 at 118, 175; DE100 at 16; DE137 Trial Exs. 3 and 4; DE64-3 at 2–12. Dr. Scott sued the Hospital and EmCare after she was removed

---

[1] DE__ at __ refers to the record on appeal by document CM/ECF Document Entry <u>Number</u> at <u>Page Number</u>. All emphasis is added unless otherwise noted. The parties will be referred to as they were below unless otherwise set forth herein. As the non-movant on summary judgment and as the movant for new trial based on the verdict against the great weight of the evidence, the facts are presented with both sides, but are to be viewed in the light most favorable to Dr. Scott.

*Scott vs. Sarasota Doctors Hospital, etc., et al,* 11th Cir. Case No. 16-10763

and fired shortly after she filed a Charge of Discrimination alleging disparate treatment based on gender, she complained to the Hospital's Human Relations ("HR") Department about it, and EmCare was informed. DE1. Because the district court concluded that as a matter of law Dr. Scott could not show EmCare's reasons were pretextual and because the jury incongruously found the Hospital could not be Hospitalist Dr. Scott's joint employer, she timely appealed.

EASLEY APPELLATE PRACTICE, PLLC, 1200 BRICKELL AVE., SUITE 1950, MIAMI, FLORIDA 33131  305-444-1599  800-216-6185

*Scott vs. Sarasota Doctors Hospital, etc., et al,* 11th Cir. Case No. 16-10763

# I. STATEMENT OF THE ISSUES

**ISSUE I:** THE GREAT WEIGHT OF THE EVIDENCE—IF NOT ALL THE EVIDENCE—IS THAT DOCTORS HOSPITAL CONTROLLED THE TERMS AND CONDITIONS OF DR. SCOTT'S EMPLOYMENT—FROM DR. SCOTT'S HIRING TO FIRING, AND EACH DAY IN BETWEEN—AND WAS, THUS, AN EMPLOYER OF DR. SCOTT. AS SUCH, THE VERDICT FINDING OTHERWISE WAS AGAINST THE GREAT WEIGHT OF THE EVIDENCE AND THE DENIAL OF NEW TRIAL WAS ERROR.

**ISSUE II:** SUMMARY JUDGMENT IN FAVOR OF EMCARE CONCLUDED THAT DR. SCOTT COULD NOT AS A MATTER OF LAW ESTABLISH PRETEXT FOR HER REMOVAL AND SIMULTANEOUS TERMINATION MERELY BECAUSE EMCARE AND DOCTORS HOSPITAL HAD AN AGREEMENT IN WHICH THE HOSPITAL COULD DEMAND THE REMOVAL OF A HOSPITALIST. THAT WAS FACTUAL ERROR BECAUSE IT OVERLOOKED THE PARTIES' RELATIONSHIPS AND CONSTRUED THEM IN FAVOR OF EMCARE. THAT WAS LEGAL ERROR BECAUSE IT ERRONEOUSLY CONSTRUED THE ECONOMIC REALITIES OF EMPLOYMENT IN TODAY'S ECONOMY. SUMMARY JUDGMENT SHOULD BE REVERSED.

**ISSUE III:** IT WAS LEGAL ERROR AND ABUSE OF DISCRETION TO EXCLUDE THE TESTIMONY OF ANOTHER FEMALE HOSPITALIST AT DOCTORS HOSPITAL, DR. VASILLE, WORKING AT THE SAME TIME AND UNDER THE SAME SUPERVISION AS DR. SCOTT. DR. VASILLE'S TESTIMONY WOULD HAVE CONCERNED INCIDENTS RELATED TO DOCTORS HOSPITAL CEO, MR. MEADE, AND THE TREATMENT AND CONTROL OF HER EMPLOYMENT TERMS AND CONDITIONS AND HER SUBSEQUENT CONSTRUCTIVE TERMINATION.

# II. STATEMENT OF THE CASE AND FACTS

## A.    COURSE OF THE PROCEEDINGS AND DISPOSITION BELOW

On July 7, 2014, Dr. Scott sued the Hospital, EmCare, and Inpatient Services of Florida ("Inpatient") for disparate treatment and retaliation, alleging violations of Title VII of the Civil Rights Act of 1964 and 1991, *as amended*, 42 U.S.C. § 2000e *et seq.* ("Title VII"), the Civil Rights Act of 1871, *as amended*, and the Florida Civil Rights Act of 1992, § 760.01 *et seq.,* Florida Statutes ("FCRA"). DE1. Inpatient Services was

EASLEY APPELLATE PRACTICE, PLLC, 1200 BRICKELL AVE., SUITE 1950, MIAMI, FLORIDA 33131   305-444-1599   800-216-6185

later removed as a defendant on the assertion that it had no employment relationship with Dr. Scott. DE1-1; DE100.

**Dr. Scott's complaint alleged**: She was employed full-time as a physician Hospitalist at the Hospital under a contract with an EmCare affiliate, Inpatient Services. DE1 at 3–4. She suffered disparate treatment based on her gender, primarily at the hands of the Hospital's CEO Bob Meade ("Meade"), who "wanted her gone." DE1 at 4–5. In contrast to her case, the purported behavior complaints against a male Hospitalist were addressed differently than when they involved a female employee. DE1 at 5–7. In light of this, Dr. Scott filed a Charge of Discrimination with the Florida Commission on Human Relations on September 23, 2013 (the "Discrimination Charge" or "Charge"). DE1 at 7; DE150-2 at 146, 221; DE66-4 at 44–45; DE137 Trial Ex. 17. One week later, concluding that the Hospital wasn't taking her complaint seriously and was "treat[ting her] like a third-class citizen," she went to the Hospital's HR Department, on October 3, 2013, on the advice of her attorney, to discuss her Charge and her treatment. DE1 at 7–8. A mere few hours later, the Hospital took Dr. Scott's badge and ordered her to leave Hospital premises. DE1 at 8. The very next morning, she received a call from EmCare informing her that her contract was terminated. DE1 at 8. On October 7, 2013, she filed an additional charge against the Hospital and EmCare for Retaliation (the "Retaliation EEOC Charge"). DE137 Trial Ex. 18.

EASLEY APPELLATE PRACTICE, PLLC, 1200 BRICKELL AVE., SUITE 1950, MIAMI, FLORIDA 33131  305-444-1599  800-216-6185

**Summary judgment rulings:** In November 2015, the court granted EmCare's motion for summary judgment on Dr. Scott's retaliation claim, concluding Dr. Scott failed as a matter of law to show evidence of pretext because EmCare was required to "remove Dr. Scott immediately upon the Hospital's Demand" per the Parties' Services Agreement. DE90 at 25. The court denied the Hospital's motion for summary judgment, seeing there were issues of fact regarding Dr. Scott's gender and retaliation claims and whether the Hospital and EmCare acted as her joint employer. DE90 at 25.

**At trial**: Dr. Scott, Dr. Schandorf, the Hospital administrators, EmCare administrators, and Dr. Mitteldorf, the male hospitalist Dr. Scott alleged was treated more leniently, all testified.[2] Excluded from testifying was Dr. Tracey Vasille, another female full-time hospitalist at the Hospital, who would have testified about her relationship with the Hospital and its CEO Meade, and their discriminatory treatment of her. DE150-2 at 93–95. The Hospital's objection as not being "relevant" was sustained. DE150-2 at 105, 112.

**The jury:** The court instructed the jury that it must decide whether Dr. Scott was an employee of Doctors Hospital as well as an employee of EmCare in light of the "economic realities of the entire relationship between the parties" and instructed the jury on the "economic realities" eleven-factor test. DE162 at 9; DE139. As to Dr.

---

[2] DE150-1; DE150-2; DE150-3. Their testimony is outlined in the statement of facts.

EASLEY APPELLATE PRACTICE, PLLC, 1200 BRICKELL AVE., SUITE 1950, MIAMI, FLORIDA 33131  305-444-1599  800-216-6185

Scott's discrimination and retaliation claims, the court instructed on the facts that Dr. Scott had to prove by a preponderance of the evidence, as well as the considerations for the determination of damages. DE162 at 10–22; DE139.

**The verdict:** EmCare now released on summary judgment, the jury returned a verdict in favor of the Hospital on January 22, 2016, finding it was not a joint employer of Dr. Scott. DE154 at 5; DE162 at 30. Because the jury answered 'No' to this first question on the verdict form, the jury never reached the questions that followed about discrimination, retaliation, and damages. DE154.

**New trial motion:** On February 19, 2016, Dr. Scott timely moved for new trial under Fed. R. Civ. P. 59(a) and 60, contending the no joint employment verdict was against the great weight of the evidence that the Hospital and EmCare worked as joint employers, regardless of labels and contractual screens. DE152 at 6–17. Dr. Scott also contended a new trial was warranted by the exclusion of Dr. Vasille's "me-too testimony." DE152 at 17–19. After the Hospitals responded, the court denied the new trial motion on March 7, 2016. DE166. On March 11, 2016, Dr. Scott timely amended her notice of appeal to include that order. DE170.

## B.    STATEMENT OF THE FACTS

Dr. Scott is a medical doctor board certified in internal medicine [DE100 at 15; DE66-3 at 2]; she received her doctorate in medicine from Northwestern University in

1991 and completed her residency at Loyola Hospital in 1994. DE 150-2 at 114. She

has worked much of her career as a Hospitalist [DE137 Trial Ex. 1; DE66-3 at 3–4], a

hospital-based primary-care physician who provides "services on behalf of the hospital"

using the hospital's facilities. *See* DE150-1 at 113–14.

1.    **Following Doctors Hospital administrative team interviews and their approval, Dr. Scott was hired as a Doctors Hospital Hospitalist under a web of written agreements with various corporate entities with whom she had no interaction.**

Dr. Michael Schandorf initially interviewed Dr. Scott telephonically for the

Hospitalist position at Doctors Hospital. DE150-1 at 103, 132; DE64-2 at 6. Dr.

Schandorf is a Doctors Hospital Hospitalist and serves as the Hospital's onsite Medical

Director, formally placed at the Hospital through EmCare. DE150-1 at 99; DE170 at

21; DE66-5 at 3, 12. He is currently the Hospital's Medical Staff President and Medical

Executive Committee Chair, and he has broad oversight of the Hospital's medicine and

surgery departments. DE150-1 at 100–01.

After determining Dr. Scott would be a "good fit" for the Hospital, Dr.

Schandorf brought her into the Hospital to interview with the Hospital's administration

team, to tour the Hospital, and to meet other Hospital hospitalists. DE150-1 at 104;

DE66-5 at 9. The Hospital's CEO, Robert Meade [DE150-2 at 28], and other members

of the so-called "C-Suite" attended that interview. DE150-2 at 72, 117, 181; DE150-1

at 194. Dr. Schandorf was not at that interview. *Id.* As he always did for each candidate,

he spoke with the Hospital administrators after they interviewed Dr. Scott to get their impressions and any concerns. DE150-1 at 194.

The Hospital administrators, not EmCare, approved Dr. Schandorf extending an offer of employment to Dr. Scott. DE66-5 at 9; DE150-1 at 105, 194; DE66-5 at 5–6, 9.

Then, in November 2011, Dr. Scott was placed at the Hospital as one of its full-time Hospitalists, but under a written Employment Agreement with Inpatient Services, an EmCare affiliate (the "Employment Agreement"). *See* DE150-2 at 118, 175; DE100 at 16; DE137 Trial Exs. 3 and 4; DE64-3 at 2–12; DE170 at 21; DE66 at 4. Through West Florida Division, Inc., a division of Hospital Corporation of America and the Hospital's parent company, the Hospital had a staffing agreement with EmCare to staff its emergency department and hospitalist program. DE150-2 at 29–31; DE137 Trial Ex. 61. The Hospital-EmCare agreement required EmCare to remove any medical provider from the Hospital that the Hospital requested.[3] The Employment Agreement did not require that EmCare terminate Dr. Scott altogether from every hospital it staffed; just from the hospital with whom Dr. Scott was providing services. DE137 Trial Ex. 3.

After signing a written Employment Agreement with EmCare, Dr. Scott had no further contact with EmCare or its affiliate, did not visit EmCare's offices, and, with the

---

[3]  DE137 Trial Ex. 60. Dr. Scott's written Employment Agreement authorized EmCare to terminate her immediately if, among other reasons, "the appropriate authorities of a hospital at which Employee is providing services request that Employee no longer provide such services at the hospital." DE137 Trial Ex. 3.

exception of Dr. Schandorf, had no further interactions with any EmCare employee or representative until her termination. DE150-2 at 119; DE150-2 at 179. Dr. Scott worked continuously full-time at the Hospital, seven days on, seven days off, for a minimum of 180 hours per month. DE 150-2 at 130, 175; DE170 at 22.

At Doctors Hospital, Dr. Scott was held in high regard; Dr. Schandorf described her as a "very efficient, very competent physician" and he had "no problems with her medical management at all." DE150-1 at 135; *see also* DE150-1 at 102. She carried heavy responsibilities at the Hospital which, as both Dr. Schandorf and Dr. Scott readily admitted, were quite stressful. DE150-2 at 120; DE66-5 at 10.

**2.    Through its policies, procedures, and evaluation committees, Doctors Hospital supervised and managed Dr. Scott and its other physicians in every meaningful way.**

Doctor's Hospital required that Dr. Scott and its other hospitalists, physicians, and medical staff follow all internal policies and procedures. DE150-2 at 32, 78, 170–72. The Hospital also had a "Behavior and Citizenship Policy" setting the standards for and right to control ("the Board <u>requires</u>") all working at the Hospital and outlining the Hospital's steps to investigate complaints of behavior and citizenship. DE150-1 at 107–08, 146, 2014; DE137 Trial Ex. 30.

The Policy called for written documentation of an incident, a discussion with the physician, an opportunity for the physician to respond in writing, and then a

EASLEY APPELLATE PRACTICE, PLLC, 1200 BRICKELL AVE., SUITE 1950, MIAMI, FLORIDA 33131  305-444-1599  800-216-6185

determination of whether disruptive conduct occurred. DE150-1 at 146; DE137 Trial Ex. 30.

The Hospital's Quality Department assisted in overseeing outcomes and results and dealing with medical staff issues regarding credentialing, as well as investigating and referring to the medical staff any leadership issues related to poor communication. DE150-3 at 95–97. Hospitalists' clinical performances were measured by meeting the metrics that the Hospital and EmCare set. DE150-2 at 7.

### 3. The Hospital CEO Meade decided, without any discussion with Dr. Scott, that Dr. Scott, the only woman Hospitalist, didn't "fit the culture" and the search for her replacement began. Then stopped. Began. Stopped again.

At the time CEO Meade deemed Dr. Scott's actions did not fit the Hospital's "culture", there was no incident documentation per the Hospital's "Behavior and Citizenship Policy" or opportunity for Dr. Scott to respond; rather, Dr. Schandorf informed Dr. Scott that Meade "wanted her gone."[4]

Dr. Scott received an e-mail from Dr. Schandorf on August 1, 2013 that she was

---

[4] DE150-2 at 121–22. At trial the Hospital and EmCare proffered purported complaints regarding Dr. Scott's behavior [DE150-3 at 57–73, 81–88, 108–13], but none were written up while Dr. Scott was employed [DE150-2 at 129–30, 170, 184–203], Dr. Scott had no opportunity to respond to them [*id.*], and Dr. Schandorf only testified that, in early 2012, he began <u>hearing</u> general, informal complaints about Dr. Scott sometimes acting abrupt or curt with patients and nurses that were characteristic of the high-stress environment that Hospitalists work in. DE150-1 at 138–40. Notably, the defendants' report presented at trial was run <u>December 14, 2015</u>—long after Dr. Scott was terminated. DE137 Trial Ex. 66. Also specious under the Hospital's Policy, because the purported complaints were run long after her termination, Dr. Scott was obviously never given an opportunity to respond to them. DE150-2 at 171, 184–203.

being demoted—transitioned into a 'part time/as needed' position—and that a male physician would take her place. DE150-2 at 135; DE150-1 at 167. Having received no other complaints, Dr. Scott was surprised and asked why. DE150-2 at 137. Dr. Schandorf responded Hospital CEO Meade had shared with him his belief that "they always revert back to their original behavior; she understood "they" to mean female physicians. DE150-2 at 137.

After Dr. Scott's male replacement reneged on his contract, however, she was informed she'd remain in her full-time position at the Hospital. DE150-2 at 138. She understood that meant she was staying. A few weeks later, no new verbal or written complaints received, Dr. Scott was surprised when introduced to a second male physician interviewing as her replacement. DE150-2 at 139.

Given the incidents she'd observed and known of, involving both male and female doctors in her position, Dr. Scott felt she was being replaced because of her gender; so she had a long conversation with Dr. Schandorf about the differences in treatment. DE150-2 at 143; DE151-1 at 167–68. They discussed what had previously happened with another female hospitalist, Dr. Tracey Vasille; Meade's dislike of Dr. Vasille, like his dislike for Dr. Scott; the different treatment of male hospitalist Dr. Mitteldorf, against whom numerous, persistent written complaints had been lodged, yet who'd been given the opportunity to attend anger management courses and given a 90-

day termination notice. DE150-1 at 19–21, 128–31; DE150-2 at 38, 144.; DE150-2 at 38. Dr. Scott had not been offered any of these resources. *See* DE150-1 at 169. Not a class to assist with perceived behavior problems, not even identification of what conduct the Hospital wanted her to correct. She never received a written warning, and still remained on the Hospital's Peer Review Committee. DE150-1 at 169. Dr. Schandorf's ultimate reply was that the Hospital could fire her at will. DE150-2 at 145.

**4.     Dr. Scott filed her Discrimination Charge and was fired shortly after.**

Concerned she was subjected to gender discrimination and skeptical of whether the Hospital or EmCare would help her in light of their close financial connection and Dr. Schandorf's apathy toward her concerns, Dr. Scott contacted a lawyer and, upon his advice, filed a Charge of Discrimination. DE150-2 at 146, 216–18, 221. Her Charge stated CEO Meade was subjecting her to gender discrimination, and she was being treated differently than male comparators regarding the terms and conditions of her employment. DE137 Trial Ex. 17.

Dr. Scott was then off for seven days per her typical work schedule, and returned to work at the Hospital after filing her Charge. DE150-2 at 146–47. A few days after her Charge was filed, Dr. Schandorf suggested out of the blue on October 3, 2013 that she take an open Hospitalist position that had become available in Venice, Florida, some 20 miles away. DE150-2 at 146–47, 222. She understood this to be Dr. Schandorf

EASLEY APPELLATE PRACTICE, PLLC, 1200 BRICKELL AVE., SUITE 1950, MIAMI, FLORIDA 33131  305-444-1599  800-216-6185

telling her to find another job, that minds were made up, and that they weren't going to take her gender Discrimination Charge seriously. DE150-2 at 222. Dr. Scott responded by asking whether Dr. Schandorf was aware of her Discrimination Charge and whether anyone was taking it seriously. DE150-2 at 147. He stated he wasn't. DE150-2 at 148.

Dr. Scott further testified she was upset that the Hospital was not acting on and investigating her Charge; so, on her lawyer's advice, she went to the Hospital's HR Department to further advance her Charge of Discrimination. DE150-2 at 25, 148; DE150-2 at 25. There, she asked the Hospital's HR generalist, June Ripley, about the Charge and further reported she felt she was being treated differently because she was female. DE150-2 at 25, 149. Dr. Scott admitted being upset during that conversation, that she believed the Hospital was discriminating against her, treating her unfairly, and wholly ignoring her discrimination complaints. DE150-2 at 149–50.

Dr. Scott's HR visit and complaints were then reported to Theresa Levering, the Hospital's HR Vice President. DE150-2 at 24–26. But Levering was already aware of Dr. Scott's Charge and allegations of gender discrimination, and had already reported them to CEO Meade. DE150-2 at 17–19, 26–27, 53–54.

Still, Levering instructed Ripley not to investigate the Charge, but to document Dr. Scott's visit to HR as an "incident"; then Levering promptly reported Dr. Scott's HR visit "incident" directly to Meade. DE150-2 at 26. Meade did not instruct anyone to

investigate the Charge; instead, he demanded Dr. Scott's removal from the Hospital. DE150-2 at 55. Meade then personally called Dr. Stern, EmCare's Executive Vice President [DE150-3 at 14], described Dr. Scott's visit to HR, characterized Dr. Scott as "hostile and aggressive", and demanded her removal. DE150-2 at 55.

Meade also advised EmCare's Dr. Stern during his call of Dr. Scott's Discrimination Charge. DE150-2 at 55. In a follow-up e-mail to Dr. Stern, Meade demanded Dr. Scott's removal and proffered that, because of her behavior in HR that morning and the "contentious interactions," she did not fit the culture. DE137 Trial Ex. 21.

Meade then promptly called Dr. Schandorf and instructed him to take Dr. Scott's badge and tell her to go home. DE150-1 at 170, 174. This all occurred the same day. Meade stayed busy that day.

No one in the Hospital's or EmCare's HR was ever instructed to investigate Dr. Scott's Discrimination Charge. EmCare employees testified at trial that no one at EmCare investigated Dr. Scott's complaints of discrimination or CEO Meade's allegations against Dr. Scott in the hours before her termination. DE150-1 at 242–43; DE150-2 at 5, 8, 24.

**5.    Less than 24 hours after the Hospital took Dr. Scott's badge and escorted her out of the Hospital, Dr. Scott received the call telling her she was fired.**

At lunch that same day, Dr. Schandorf approached Dr. Scott, walked her out of

EASLEY APPELLATE PRACTICE, PLLC, 1200 BRICKELL AVE., SUITE 1950, MIAMI, FLORIDA 33131  305-444-1599  800-216-6185

the Hospital lounge, walked her out of the Hospital, and asked for her badge. DE150-2 at 151–52; DE150-1 at 171–72.

Dr. Schandorf's last words to her were, "Michelle, we weren't going to fire you anyway." DE150-2 at 152.  But the next day, October 4, 2013, at 9 o'clock in the morning, Dr. Scott received a telephone call from Ted Haumesser, EmCare's Director of Client Administration. DE150-2 at 152, DE150-1 at 220, 238. Though the Hospital had functionally already terminated her employment,[5] Haumesser told Dr. Scott that she was fired. *Id.*

Like the rest of EmCare, Dr. Scott had never met Haumesser or Dr. Stern or anyone else at the EmCare offices before that day. DE150-2 at 152–53; DE150-1 at 222, 238, DE150-2 at 4. She received a termination letter from EmCare dated October 3, 2013, stating EmCare was terminating its Agreement with her pursuant to § 10.A.(iii).9 of their Agreement, which, according to EmCare, authorized EmCare to terminate the Agreement upon the Hospital's request. DE137 Trial Ex. 22. Dr. Scott filed an additional charge against the Hospital and against EmCare on October 7, 2013 for retaliation related to her removal and termination. DE137 Trial Ex. 18.

It was a stressful time. Dr. Scott had never before been fired. DE150-2 at 153. She'd brought forth her Charge of Discrimination to HR on the advice of her lawyer,

---

[5]  EmCare's Haumesser conceded he merely had "dotted line authority". As he described it, he was "simply the delivery boy." DE150-1 at 228–29.

expecting at least *some* investigation; instead, she was escorted from the Hospital, her badge taken, and summarily fired, first by the Hospital, and then by Emcare, in less than 24 hours after discussing her Charge. DE150-2 at 153.

After extensive searching for some seven months, Dr. Scott secured temporary employment with Linde Healthcare. DE150-2 at 154–55. September of that year, she secured a permanent full-time position at Venice Hospital through Island Hospitalist Group, where she still works today. DE150-2 at 155, 160. She earns less at Venice Hospital than she did at Doctors Hospital, and has to drive about 30 more miles each day. DE150-2 at 156–62. All remaining pertinent facts are set forth in the Arguments sections.

## C.    STANDARDS OF REVIEW

Title VII employer or employee status is a question of law and is reviewed de novo.[6] Denial of a motion for new trial is reviewed for "a clear abuse of discretion,"[7] but "[a] judge should grant a motion for new trial when the verdict is against the clear weight of the evidence or will result in a miscarriage of justice, even though there may

---

[6] *See Cobb v. Sun Papers, Inc.*, 673 F.2d 337, 339 (11th Cir. 1982) (employee status under Title VII is question of federal law); *see also Shehab v. N.Y. State Dept. of Transp.*, 251 F. App'x 9, 10 (2d Cir. 2007) (de novo review on question of law of Title VII employer); *Patel v. Wargo*, 803 F.2d 632, 634 (11th Cir. 1986) (while historical facts form basis of determination that one is joint employer, question of whether one is joint employer to come within meaning of FLSA is question of law); *Solano v. A Navas Party Production, Inc.*, 728 F. Supp. 2d 1334, 1340 (S.D. Fla. 2010) (same); *Aleksick v. 7-Eleven, Inc.*, 205 Cal. App. 4th 1176, 140 Cal. Rptr. 3d 796 (4th Dist. 2012) (same).
[7] *Wolff v. Allstate Life Ins. Co.*, 985 F.2d 1524, 1528 (11th Cir. 1993).

be substantial evidence which would prevent the direction of a verdict."[8] "Because it is critical that a judge does not merely substitute his judgment for that of the jury, 'new trials should not be granted on evidentiary grounds unless, at a minimum, the verdict is against the great-not merely the greater-weight of the evidence.'"[9]

Because employer–employee status is a question of law subject to de novo review,[10] where a jury misconceives the legal effect of the great weight of the joint employer evidence before it, review of that issue cannot logically be merely discretion. Unlike motions for judgment as a matter of law, courts can, on motions for new trial, properly consider the weight of the evidence, including whether the jury misapprehended the evidence; courts are not limited to considering just evidence sufficiency.[11]

The grant or denial of summary judgment is reviewed de novo.[12] Summary judgment is appropriate only if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.[13] The court must view all evidence and all factual inferences reasonably drawn from the evidence in the light most favorable to

---

[8] *Lipphardt v. Durango Steakhouse of Brandon, Inc.*, 267 F.3d 1183, 1186 (11th Cir. 2001); *U.S. for Use & Benefit of Weyerhaeuser Co. v. Bucon Const. Co.*, 430 F.2d 420, 423 (5th Cir. 1970).

[9] *Johnson v. FFE Transp. Services, Inc.*, 227 F. App'x 780, 782 (11th Cir. 2007) (quoting *Lipphardt*, 267 F.3d at 1186).

[10] *See* fn. 5, *supra.*

[11] *See, e.g., Ard v. Sw. Forest Indus.*, 849 F.2d 517, 520 (11th Cir. 1988).

[12] *B&G Enters., Ltd. v. U.S.*, 220 F.3d 1318, 1322 (Fed. Cir. 2000).

[13] *Whatley v. CNA Ins. Co.*, 189 F.3d 1310, 1313 (11th Cir. 1999).

EASLEY APPELLATE PRACTICE, PLLC, 1200 BRICKELL AVE., SUITE 1950, MIAMI, FLORIDA 33131  305-444-1599  800-216-6185

the nonmoving party, here Dr. Scott.[14]

Appellate courts review a district court's decisions regarding inclusion or exclusion of evidence under an abuse-of-discretion standard, reversing where the district court has made a clear error of judgment or applied the wrong legal standard.[15] Courts reverse where the moving party establishes a substantial prejudicial effect.[16]

## III. ARGUMENTS SUMMARY

We recognize that reversals for motions for new trial are not common, but the district court here erred in three material respects. First, the court erred in not granting a new trial because the great, not just greater, weight of the evidence is that Doctors Hospital was a joint employer. Doctors Hospital and EmCare have carefully structured their operating agreements to label their medical care providers as independent contractors rather than employees to attain a competitive advantage in the market without having to comply with law, but their extensive controls and supervision show they're employers in every material way. The cases are legion that courts look past the fictional labels and contracts and instead look to the economic realities of the relationship and the right to control, which, in this case, is set forth right in Doctors

---

[14]  *St. Charles Foods, Inc. v. America's Favorite Chicken Co.*, 198 F.3d 815, 819 (11th Cir. 1999).

[15]  *See Amlong & Amlong, P.A. v. Denny's, Inc.*, 500 F.3d 1230, 1238 (11th Cir. 2007).

[16]  *Goldsmith v. Bagby Elevator Co., Inc.*, 513 F.3d 1261, 1276 (11th Cir. 2008); *Morgan v. Family Dollar Stores, Inc.*, 551 F.3d 1233, 1281 n. 75 (11th Cir. 2008); *Demers v. Adams Homes of Nw. Fla., Inc.*, 321 F. App'x 847, 853 (11th Cir. 2009).

EASLEY APPELLATE PRACTICE, PLLC, 1200 BRICKELL AVE., SUITE 1950, MIAMI, FLORIDA 33131  305-444-1599  800-216-6185

Hospital's own Policies and Procedures that were, in fact, exercised. The great weight of the evidence is that Doctors Hospital was an employer or Dr. Scott. The law is that the control doesn't have to be exclusive. Here, in every "economic realities" way, the Hospital controlled the terms and conditions of Dr. Scott's employment—from her interviewing to her hiring through her firing and each day in between. On this record, the conclusion that Doctors Hospital was not a joint employer is flatly against the great weight of the evidence. EmCare was a joint employer too.

Second, summary judgment was erroneously granted in favor of Dr. Scott's joint employer EmCare merely because EmCare and Doctors Hospital's contracts stated on paper that EmCare was required to remove Dr. Scott from the Hospital upon the Hospital's request for three reasons. First, this ignored the "economic realities" of the Hospital's control of Dr. Scott's employment and, second, this ignored EmCare's knowledge of Dr. Scott's legally-protected conduct of which the Hospital was complaining. Third, even if we don't infer on summary judgment that the Hospital was part of Dr. Scott's firing, summary judgment still ignored that EmCare also terminated its own Agreement with Dr. Scott promptly after Dr. Scott's filing and EmCare's learning of her Charge of Discrimination, and the contract's plain language shows no requirement for that. The short time-span between EmCare's learning of Dr. Scott's Charge and termination of Dr. Scott's entire Agreement is, as a matter of law, too

EASLEY APPELLATE PRACTICE, PLLC, 1200 BRICKELL AVE., SUITE 1950, MIAMI, FLORIDA 33131  305-444-1599  800-216-6185

remarkable to view as mere coincidence and too material to ignore on summary judgment.

The third main error is the exclusion on relevancy grounds of Dr. Vasille's testimony that was highly relevant to Dr. Scott's gender discrimination and joint employment issues. Dr. Vasille, as another female Hospitalist at Doctors Hospital around the same time and under the same oversight of CEO Meade, would have testified to similar incidents of Meade's control and treatment of her and her medical judgment, and her subsequent constructive termination. This was highly relevant to Dr. Scott's gender discrimination claim and joint employment with a common decision maker theories of liability.

## IV. ARGUMENTS

**ISSUE I: THE GREAT WEIGHT OF THE EVIDENCE—IF NOT ALL THE EVIDENCE--IS THAT DOCTORS HOSPITAL CONTROLLED THE TERMS AND CONDITIONS OF DR. SCOTT'S EMPLOYMENT—FROM DR. SCOTT'S HIRING TO FIRING, AND EACH DAY IN BETWEEN—AND WAS THUS AN EMPLOYER OF DR. SCOTT. AS SUCH, THE VERDICT FINDING OTHERWISE WAS AGAINST THE GREAT WEIGHT OF THE EVIDENCE AND THE DENIAL OF NEW TRIAL WAS ERROR.**

Title VII of the 1964 Civil Rights Act prohibits employment discrimination in the broadest possible terms; as the Supreme Court explained in *Griggs v. Duke Power Co.*, 401 U.S. 424, 429–31 (1971), "[t]he objective of Congress in the enactment of Title VII is . . . to achieve equality of employment opportunities . . . [by] the removal of artificial, arbitrary, and unnecessary barriers to employment." The surveys are many

EASLEY APPELLATE PRACTICE, PLLC, 1200 BRICKELL AVE., SUITE 1950, MIAMI, FLORIDA 33131  305-444-1599  800-216-6185

that gender equality is still not realized and still woefully behind today. As such, courts do, and must, liberally interpret the provisions of Title VII to advance the achievement of these goals. *Id.*

As a threshold matter, we recognize that damages are not a basis for reversal of a verdict that never reached them. It does merit underscoring, however, that Dr. Scott's damages are material. Never fired before, upon diligently searching for about seven months to get part-time temporary employment, she later found a full time position at Venice Hospital, where she still works today without issues. DE150-2 at 154–55; DE150-2 at 155, 160. Despite this professional woman's highly respected medical abilities and talents as a Hospitalist, which even Doctors Hospital recognized, she now has to drive 30 more miles to earn less. DE150-2 at 156–62. She was made an example of what happens to professional women having the temerity to complain of discrimination through appropriate legal channels, with expectations of legal protection while they voice their complaints. On this record, no professional woman, whether firefighter, lawyer or doctor, would dare utter a word again lest she suffer the same fate as here. This is legally and morally wrong.

Further, because summary judgment was entered in favor of EmCare on solely pretext, the joint employment arguments here are primarily focused on Doctors Hospital without waiver of more argument as to EmCare should summary judgment be

EASLEY APPELLATE PRACTICE, PLLC, 1200 BRICKELL AVE., SUITE 1950, MIAMI, FLORIDA 33131  305-444-1599  800-216-6185

*Scott vs. Sarasota Doctors Hospital, etc., et al,* 11th Cir. Case No. 16-10763

reversed.

The U.S. Court of Appeals for the Eleventh Circuit liberally interprets "employer" under Title VII, consistent with Title VII's purposes,[17] and has adopted a hybrid "economic realities" test that looks at the employment relationship through the lens of work reality.[18] "[I]t is the economic realities of the relationship viewed in light of the common law principles of agency and the right of the employer to control the employee that are determinative." *Cobb*, 673 F.2d at 341. Courts predominantly apply standards that the National Labor Relations Board ("NLRB") promulgates when deciding whether two entities should be treated as joint employers under Title VII.[19]

The "joint employer" economic realities test looks at eleven factors:

(1) the nature and degree of control over the employee and who exercises that control;
(2) the degree of supervision, direct or indirect, of the employee's work;
(3) who exercises the power to determine the employee's pay rate or method of payment;
(4) who has the right, directly or indirectly, to hire, fire, or modify the employee's employment conditions;
(5) who is responsible for preparing the payroll and paying wages;

---

[17] *Virgo v. Riviera Beach Assoc's, Ltd.*, 30 F.3d 1350, 1359 (11th Cir. 1994); *Lyes v. City of Riviera, Fla.*, 166 F.3d 1332, 1341 (11th Cir. 1999); *McKenzie v. Davenport-Harris Funeral Home*, 834 F.2d 930, 933 (11th Cir. 1987).
[18] *See Cobb*, 673 F.2d at 340–41; *Cuddeback v. Fla. Bd. of Educ.*, 381 F.3d 1230, 1234 (11th Cir. 2004); *Ashkenazi v. S. Broward Hosp. Dist.*, 607 F. App'x 958, 961 (11th Cir. 2015).
[19] *Virgo*, 30 F.3d 1350. Courts also regularly look to decisions defining employer-employee relationships under other laws such as the ADEA and Labor and Social Security Acts. *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 723 (1947); *Garcia v. Copenhaver, Bell & Associates, M.D.'s P.A.*, 104 F.3d 1256, 1265 (11th Cir. 1997).

(6) who made the investment in the equipment and facilities the employee uses;
(7) who has the opportunity for profit and loss;
(8) the employment's permanence and exclusiveness;
(9) the degree of skill the job requires;
(10) the ownership of the property or facilities where the employee works;
(11) the performance of a specialty job within the production line integral.[20]

These are the factors the jury was instructed to consider here. DE139 at 8–9; DE162 at 9. It was also instructed that all the circumstances surrounding the work relationship were essential and that no single factor was determinative, but that the most important factor was the extent of the right to control the means and manner of the worker's performance. DE139 at 9, DE162 at 9–10; *Cobb*, 673 F.2d at 339.

The Hospital's argument for escaping Title VII joint employer liability turned on pointing the finger at EmCare, while EmCare pointed it right back at the Hospital and claimed it couldn't be liable for the Hospital's decisions, both relying on a web of agreements. *See* DE66. This has, to date, served as a successful business model for these two national businesses[21] to control the terms and conditions of employment without Title VII compliance, for competitive business advantage. The arguments of both defendants miss the law and beg the question in a *joint* employment case, which is not who had more control so the "winner" with less control escapes any responsibility

---

[20] *See Cobb*, 673 F.2d at 340.
[21] *See* Appellees' Certificates of Interested Persons, showing their national reach.

EASLEY APPELLATE PRACTICE, PLLC, 1200 BRICKELL AVE., SUITE 1950, MIAMI, FLORIDA 33131  305-444-1599  800-216-6185

for complying with discrimination laws.[22] The Title VII joint employment question is whether the Hospital itself is **an** employer under Title VII of Dr. Scott, not whether it's the **sole** employer, such that they must comply with Title VII standards, and the great weight of the evidence here is the Hospital controlled the means and manner of Dr. Scott's work performance, and the Hospital, along with EmCare, was an employer of Dr. Scott in every meaningful way and they had to comply with Title VII.

Two recent cases provide helpful guidance on this. The first is *Butler v. Drive Automotive Industries of America, Inc.*, 793 F.3d 404, 408 (4th Cir. 2015), in which the U.S. Court of Appeals for the Fourth Circuit held the district court erred in granting summary judgment to a manufacturer on the basis that the manufacturer did not employ the plaintiff within the meaning of Title VII. This was so—even though that plaintiff wore the staffing company's, not the manufacturer's, uniform, parked in the staffing company's parking lot, received her pay from the staffing company, and the staffing company had ultimate responsibility for discipline and termination; it was the manufacturer that set the work schedule and arranged portions of the plaintiff's training; and the plaintiff worked on the floor of the manufacturer's factory. *Id.* at 406-08.

The Fourth Circuit held that as a matter of law for purposes of Title VII the

---

[22] *See, e.g., Layton v. DHL Exp. (USA), Inc.*, 686 F.3d 1172, 1177 (11th Cir. 2012) (question in FLSA cases not which employer is employee more dependent on; "the focus of each inquiry must be on each employment relationship as it exists between the worker and the party asserted to be a joint employer").

EASLEY APPELLATE PRACTICE, PLLC, 1200 BRICKELL AVE., SUITE 1950, MIAMI, FLORIDA 33131  305-444-1599  800-216-6185

manufacturer was the plaintiff's joint employer because the manufacturer, like the Hospital here, "exhibited a high degree of control over the terms of [the plaintiff's] employment;" it even emailed the staffing company, just as the Hospital's CEO Meade emailed EmCare, stating the plaintiff should be "add[ed] to the list for replacement" and the staffing company then terminated the plaintiff soon after. *Id* at 415.

Although the staffing company in *Butler*, like EmCare here, "formally fired [the plaintiff]," the Fourth Circuit explained that did not matter because the manufacturer, like the Hospital here, had "effective control" over her employment (here, both the exercise of actual and contractually retained control), and especially so given that staffing company's manager's testimony that he "could not recall an instance" when the staffing company declined a request from the manufacturer to discipline or terminate a staffing-company employee. *Id*. Like *Butler*, EmCare's Haumesser conceded he merely had "dotted line authority"; he was "simply the delivery boy." DE150-1 at 228–29.

Second, the Fourth Circuit underscored that the manufacturer, just like the Hospital here onsite, exercised "day-to-day supervision" of the plaintiff on the manufacturer's factory floor, not the staffing company. *Id*. Third, the Fourth Circuit noted that, although the plaintiff wore a staffing-company uniform, she and other staffing-company employees "performed the same tasks, and used the same equipment" as the manufacturer's employees, reflecting "little or no effective difference between the

work performed by the two sets of employees." *Id*. Here too, Dr. Scott was a <u>Hospitalist</u> working at the <u>Hospital</u> seeing the <u>Hospital's patients</u>. As Dr. Schandorf explained it, Hospitalists do not have their own patients, and by definition saw <u>the Hospital's patients</u> on behalf of <u>the Hospital</u>. DE150-1 at 113–14.

Fourth, *Butler* concluded plaintiff's "labor was not tangential or peripheral to [the manufacturing company]" because "[the plaintiff] performed the same tasks as [the manufacturer's] employees and produced goods that were [the manufacturer's] core business" [*id.*], just as Dr. Scott's provided Hospitalist medical care that was central to the Hospital's business of medical care. *Butler* is on "on all fours".

*Browning Ferris Industries of California*, 362 NLRB No. 186 (Aug. 27, 2015), is also directly on point, where the NLRB focused on the control the purported employer exercised and the purported employer's rights under its agreement to control employment, and concluded Browning Ferris was a joint employer.[23] *Browning Ferris* concerned employees of Leadpoint Business Services assigned to work at Browning Ferris. Like Doctors' Hospital's Policies and Procedures and onsite supervision, Browning Ferris retained significant control over who Leadpoint could place at the Browning Ferris facility. Under their agreement, Browning Ferris could require

---

[23] *See also Virgo v. Riviera Beach Assocs. Ltd.*, 30 F.3d 1350, 1361 (11th Cir. 1994) (actual control is factor to be considered when deciding "joint employer" issue, but "the authority or power to control is also highly relevant.").

EASLEY APPELLATE PRACTICE, PLLC, 1200 BRICKELL AVE., SUITE 1950, MIAMI, FLORIDA 33131   305-444-1599   800-216-6185

Leadpoint meet or exceed Browning Ferris' own standard procedures, could prohibit the hiring of workers that Browning Ferris deemed to be ineligible for rehire, could reject any worker for any or no reason at all, had the right to discontinue the use of any assigned personnel, and the record established there were two specific instances where Browning Ferris reported misconduct and requested immediate dismissal. Although Leadpoint conducted its own investigation before it removed the employees from the facility, which EmCare did not even do here, the NLRB concluded the outcome was still "preordained." *Id.* at *2, *18.

The NLRB concluded Browning Ferris exercised "control over the processes that shape the day-to-day work" of the employees, stating: "the fact that many of [Browning Ferris'] directives are communicated through Leadpoint supervisors hardly disguises the fact that [Browning Ferris] alone is making these decisions." Leadpoint selected which employee would work a particular shift (here the Hospital did chose which employee would work), but Browning Ferris made the core staffing and operations decisions that defined the employees' work days, *id.* at *18–19, just as the Hospital made them here.

Even though that staffing company, Leadpoint, determined pay rates, administered payments, retained payroll records, and provided and administered benefits, the NLRB concluded the effective ceiling Browning Ferris put on wages,

EASLEY APPELLATE PRACTICE, PLLC, 1200 BRICKELL AVE., SUITE 1950, MIAMI, FLORIDA 33131  305-444-1599  800-216-6185

coupled with an apparent requirement Browning Ferris approve pay increases, showed Browning Ferris played a significant role in determining employees' wages. *Browning Ferris* at 19-*20.

   *Butler* and *Browning Ferris* show just how badly this jury misconceived the legal effect of the great weight of the joint employment evidence and the court below exacerbated the error in denying a new trial. The Hospital's opposition merely pointed to selectively harvested snippets of testimony to paint a skewed record, but the great weight of, indeed overwhelming, evidence was that Doctors Hospital controlled the hiring and firing and everything in between of this <u>*onsite Hospitalist*</u>, Dr. Scott, and its other Hospitalists seeing <u>the Hospital's</u> patients. DE150-1 at 113–14. Dr. Scott's employment, as a matter of common sense and law, began and ended with the Hospital, which, at a minimum, was a joint employer with EmCare. Like *Butler* and *Browning Ferris*, Dr. Schandorf testified his role of hiring new hospitalists for Doctors Hospital consisted of screening to see if they were a "good fit", not for EmCare, but for the Hospital. DE150-1 at 103, 132, 191–93.  Dr. Scott was then brought not to EmCare, but to <u>the Hospital</u> for an interview with <u>the Hospital's administrative team</u>, including Meade and other members of the Hospital C-Suite. DE150-1 at 104, 194; DE150-2 at 72, 117, 181. No one from EmCare was involved in the final screening, interviewing, and hiring process; EmCare set up contracts. DE150-1 at 104-05, 194; DE150-2 at 117.

EASLEY APPELLATE PRACTICE, PLLC, 1200 BRICKELL AVE., SUITE 1950, MIAMI, FLORIDA 33131  305-444-1599  800-216-6185

With no input from EmCare, the Hospital administrators approved Dr. Schandorf extending the offer of employment to Dr. Scott. DE66-5 at 9; DE150-1 at 194. And Dr. Schandorf confirmed this was the general hiring process. *See* DE150-1 at 105, 194; DE66-5 at 5–6, 9. The Hospital directly controlled hiring; only after the Hospital approved Dr. Scott was she hired as a full time Hospitalist. DE150-2 at 118, 175.

Second, the overwhelming evidence is the Hospital controlled Dr. Scott's firing after she filed her EEOC Charge. With the understanding the Hospital no longer wanted Dr. Scott on staff, Dr. Schandorf was to look for her replacement. DE150-1 at 163–64. Dr. Scott was finally told about it, but Dr. Schandorf replied the Hospital's CEO Meade expressed his belief "they always revert back to their original behavior." DE150-2 at 137. It was the Hospital's CEO Meade, after the filing of Dr. Scott's Charge and her reaching out to HR, who demanded her removal. DE150-2 at 19. Meade called EmCare's Dr. Stern, demanded that Dr. Scott be terminated. DE150-2 at 55.  As Dr. Stern described it, EmCare decisions were "really mainly about the fact that . . . [EmCare was] being requested to terminate [Dr. Scott]." DE150-3 at 40. Indeed, the next morning, October 4, 2013 at 9 a.m., Dr. Scott received the call from EmCare's Ted Haumesser that she was fired. DE150-2 at 152, DE150-1 at 220, 238. Meade called Dr. Schandorf with orders to take her badge and tell her to go home. DE150-1 at 170, 174. No EmCare investigation.

EASLEY APPELLATE PRACTICE, PLLC, 1200 BRICKELL AVE., SUITE 1950, MIAMI, FLORIDA 33131  305-444-1599  800-216-6185

A comparison of the virtually identical Hospital Meade's email to EmCare and EmCare's termination letter to Dr. Scott the very same day further shows the Hospital's control over her termination.

| What Meade wrote to EmCare | What EmCare wrote to Dr. Scott |
|---|---|
| Due to **ongoing behavior issues** with [Dr. Scott], I am requesting that she be removed from our facility. Her behavior in our HR department this morning coupled with numerous **contentious interactions** with staff and patients lead us to believe that she is not a fit with our culture here at [the Hospital]. DE137 Trial Ex. 21. | Due to the **ongoing behavioral concerns** and your **contentious interactions** with patients, this letter shall constitute formal notice of Company's decision to termination the Agreement pursuant to § 10.A.(iii).9, which authorizes the Company to terminate the agreement upon request from the hospital. DE137 Trial Ex. 22. |

EmCare swiftly terminated Dr. Scott with no investigation or consultation. DE150-2 at 8, 45; DE150-1 at 242–43, 181.

Any suggestion the Hospital did not control the hiring and firing of Dr. Scott and other Hospitalists strains credulity. The Hospital's agreement with EmCare provided that each of EmCare's representatives "[m]ust be accepted by the Facility's [Doctors Hospital] Chief Executive Office; said acceptance may be withdrawn immediately by the Facility's [Doctors Hospital] Chief Executive Officer in his or her reasonable discretion at any time." DE137 Trial Ex. 61 at 4. As the U.S. Court of Appeals for the Third Circuit explained in *Faush v. Tuesday Morning, Inc.*, 808 F.3d 208, 216 (3d Cir. 2015) (ERISA action applying Title VII joint employer test), the fact that the putative employer, if unhappy with a temporary employee for any reason, has the power to

demand a replacement and prevent the ejected employee from returning to the store defeats <u>any</u> argument that it was not an employer.[24]

Appellees may contend there was some control, but not enough to make them joint employers. But the law in this and other Circuits is that a purported employer takes an active role in the control of employees "when it decides such things as how to design the employees management structure and whether a worker should be disciplined or retained." *Martinez–Mendoza v. Champion Int'l Corp.,* 340 F.3d 1200, 1209–10 (11th Cir. 2003). The Hospital's joint employer control needn't be direct; it can be indirect (for example, exercised through the intermediary employer) and indirect is still sufficient to the employee's economic dependence. *See Torres-Lopez,* 111 F.3d at 643. The Hospital joint employer need not exercise exclusive control, more control than, or even the same control as the intermediary employer to exercise sufficient control.[25]

We have here that and more. The Hospital CEO Meade and the Hospital effected supervision through speaking to Dr. Schandorf, rather than directly to the Hospitalists, which doesn't negate their supervision or control over the workers. It's firmly-settled in this Circuit that supervision is present irrespective of whether the orders are

---

[24] *See also EEOC v. Skanska Bldg., Inc.*, 550 F. App'x 253 (6th Cir. 2013); *Richardson v. Century Products, Inc., 163 F. Supp. 2d 771, 775 (N.D. Ohio 2001)* (fact that purported employer determines position that needed filled and required qualifications and tells agency the hours an individual would be required to work permits inference that employee was an employee of both).

[25] *See, e.g., Carter v. Dutchess Community College, 735 F.2d 8, 11–12 (2d Cir. 1984).*

EASLEY APPELLATE PRACTICE, PLLC, 1200 BRICKELL AVE., SUITE 1950, MIAMI, FLORIDA 33131  305-444-1599  800-216-6185

communicated directly to the laborer or indirectly through a contractor.[26] Once Doctors Hospital's administration approved the hiring of its Hospitalists, Doctors Hospital required them to follow all the Hospital's internal policies and procedures. DE150-1 at 107–80, 146, 214; DE150-2 at 32, 78, 170–72; DE137 Trial Ex. 30. Dr. Schandorf played his supervisory role of Hospitalists primarily on the Hospital's behalf, and making sure the Hospital and EmCare's programs were jointly implemented.[27] Hospitalists were managed and reviewed by the Hospital's evaluation committee with others who worked at the Hospital, placed there through EmCare. *Id.*; DE150-3 at 100. The Hospital's "PI Council Review" Quality Committee, consisting of physicians, hospital staff, middle managers and chief officers, reviewed policies, procedures, outcomes, and results. DE150-3 at 100. Dr. Schandorf was that Committee's chairperson and he signed the Hospital's Behavior and Citizenship policy and Incident Report policy "as a member of the leadership that oversaw the medical staff," not in his role with EmCare. DE150-3 at 100, DE150-1 at 105–07; DE137 Trial Exs. 30, 31.

    Further, Dr. Schandorf played multiple roles in the Hospital administration,

---

[26] *Hodgson v. Griffin & Brand, 471 F.2d 235, 238 (5th Cir. 1973)* (binding precedent that putative employer's field supervisors were constantly in the field giving commands to contractors, contributing to court's finding of joint employment).

[27] *EEOC v. Skanska Bldg., Inc.*, 550 Fed. Appx. 253 (6th Cir. 2013), Skanska, a general contractor, contracted with a subcontractor, C-1, to provide operators for the construction site. The agreement stated the owner of C-1 would supervise the operators, but Skanska could remove an operator from the site. The Sixth Circuit found that in reality, Skanska had control over the operators as it removed C-1 operators from the site without any challenge, did not report complaints to C-1, and did not consult with C-1.

EASLEY APPELLATE PRACTICE, PLLC, 1200 BRICKELL AVE., SUITE 1950, MIAMI, FLORIDA 33131  305-444-1599  800-216-6185

having <u>nothing</u> to do with the staffing agency EmCare, including <u>the Hospital's</u> Chief of Medicine. DE150-1 at 205–6. <u>The Hospital's</u> Quality Department assisted the medical staff in oversight and with medical staff issues regarding credentialing and accreditation requirements. DE150-3 at 95–97. <u>The Hospital</u> investigated and referred to the medical staff any leadership issues related to Hospitalists' poor communication. DE150-3 at 95–97. The Hospitalists' clinical performances were measured by meeting <u>the Hospital</u> metrics, as well as metrics set by EmCare. DE150-2 at 7. <u>The Hospital</u> and EmCare also had a collaborative approach to solving problems in which the administrative team would approve the steps Dr. Schandorf would take. DE150-1 at 124–28; *see also* DE150-1 at 86–87, 115–17 (Schandorf met monthly with the Hospital administration).

Even the evidence at trial of the ways in which the purported complaints about Dr. Scott and Dr. Mitteldorf were handled further showed the Hospital's control and supervision and that EmCare was not the sole driver of these employee management issues. The Hospital was. As complaints against Dr. Mitteldorf mounted over the course of several years, Dr. Schandorf sought and received the approval of the Hospital's Meade and administration to have Dr. Mitteldorf attend anger management classes. DE150-1 at 128–31. When that didn't work, again after seeking and receiving the Hospital's Meade and administration approval, Dr. Mitteldorf was provided with a 90-

day termination notice. DE150-1 at 131, 217. Yet again, after getting the Hospital approval, Mitteldorf was finally terminated. DE150-1 at 131, 217.

The Hospital didn't even pretend to follow its own policies regarding Dr. Scott that it followed for Dr. Mittledorf, going to the heart of her discrimination complaint. The Hospital deprived Dr. Scott of the very procedures and resources it gave Dr. Mitteldorf, never gave her a written complaint to respond to; she'd only been informed of one incident verbally; the incidents proffered at trial were never written up while Dr. Scott was there; and Dr. Schandorf even recognized those incidents, even if true, didn't warrant an investigation at the time. *See* DE150-1 at 19–21, 123–41, 131, 163, 169, 217; DE150-2 at 38–41, 128–37; DE150-3 at 19–20, 123–31. DE150-2 at 137.

The Hospital's governance controlled Dr. Scott's employment and supervised her work. Complaints or concerns with hospitalists were always brought to the Hospital's CEO Meade and administration. DE150-1 at 19–21, 123–41, 163, 217; DE150-2 at 38–41, 128–37; DE150-3 at 19–20, 123–31. DE150-2 at 137.

The best evidence of that is the incident in which Dr. Scott was removed from treating an oncology patient. That verbal complaint concerned an 83-year-old oncology patient admitted under Dr. Scott who'd been diagnosed with advanced myelodysplastic syndrome ("bone marrow failure disorder") and yet the oncologist had still placed the patient on an aggressive chemotherapy treatment and had further increased it. DE150-2

EASLEY APPELLATE PRACTICE, PLLC, 1200 BRICKELL AVE., SUITE 1950, MIAMI, FLORIDA 33131  305-444-1599  800-216-6185

at 123–24. As Dr. Scott explained, chemotherapy attacks the patient's bone marrow, and this advanced-oncology patient had no bone marrow to begin with. DE150-2 at 124. Dr. Scott further explained: Especially in an 83-year-old patient, this was incurable apart from a bone-marrow transplant, which this patient would simply not have been given due to age and advanced cancer, and the chemotherapy was only making the patient worse and hastening her death. DE150-2 at 125–27. Concerned the Hospital was more interested in the financial upside of these expensive treatments, Dr. Scott felt ethically obligated to tell the patient the true nature of her illness and the ultimate inability of the intense chemotherapy to cure her too-progressed bone marrow disease. *Id.* The oncologist's response: complain to the Hospital's CEO Meade, and Meade, with no written complaint and no opportunity for Dr. Scott to respond, instructed she be removed from seeing any of that oncologist's patients; the Hospital complied.[28] This was even though Dr. Schandorf testified that, from a medical standpoint, he could understand and agree with Dr. Scott. DE150-1 at 158.

The oncology incident only supported joint employment. The Hospital's

---

[28] DE150-1 at 144; DE150-2 at 58; DE150-3 at 121. Meade relayed the incident to Dr. Schandorf. DE150-1 at 144, 151—58. Dr. Scott was verbally informed about a second incident involving an encounter at the nurses' station, but was never given any details, let alone a written complaint or opportunity to respond as the Hospitals' Policies and Procedures required. *See* DE150-1 at 150–51; DE150-2 at 122, 184, 196; DE137 Trial Ex. 30. Dr. Schandorf didn't even know who the nurses involved were, didn't speak to them, didn't know the channels through which it was reported, and whether it was even written down. DE150-1 at 150–51. He only heard about it <u>from Meade</u>. *Id.*

EASLEY APPELLATE PRACTICE, PLLC, 1200 BRICKELL AVE., SUITE 1950, MIAMI, FLORIDA 33131  305-444-1599  800-216-6185

reassignment of Dr. Scott went far beyond standard health and safety concerns, or ensuring worker qualifications, or accreditation requirements; it was the Hospital exercising _actual control_ over Dr. Scott's exercise of her educated _medical judgment_.[29] The Hospital's CEO Meade took steps to ensure compliance with its culture and control over _how_ Dr. Scott exercised her medical judgment in the work done.[30] Even Hospital CEO Meade repeatedly testified at trial about the Hospital's the requirement that Hospitalists conform to its culture and both retained and actual control:

> [A]ll of the folks that come in the hospital that are either employed or contracted are required to fit our culture and exhibit certain appropriate mannerisms. DE150-2 at 32–33.

> Not so much her actual clinical treatment of the patients that I'm aware of, . . . but mostly our concern from the administrative perspective . . . we really focus on the culture at the hospital—we were quite concerned about the way she was interacting with pretty much all concerned. *Id.* at 44.

> [W]e stress the culture of the hospital from the workplace environment probably more than most places. *Id.* at 83.

As to the next critical factor of joint employment--exclusive and permanent

---

[29] *See, e.g.,* _Salamon v. Our Lady of Victory Hosp._, 514 F.3d 217, 231 (2d Cir. 2008) (reasonable fact finder could conclude quality assurance standards extended beyond mere health and safety concerns or ensuring physician's qualifications); *cf. Ashkenazi v. S. Broward Hosp. Dist.*, 607 F. App'x 958, 964 (11th Cir. 2015) (physician independent contractor where hospital's instructions were motivated and involved only steps to ensure patient safety and avoid professional liability).

[30] _Goudeau v. Dental Health Servs., Inc._, 901 F. Supp. 1139, 1142 (M.D. La. 1995) ("The right to control an employee's work means the right to direct the work of the individual not only as to the result, but also as to the details by which that result is achieved.") *citing* _Fields v. Hallsville Indep. School Dist.,_ 906 F.2d 1017, 1019 (5th Cir. 1990)._

work--all the evidence here was that Dr. Scott's work at the Hospital was onsite, permanent and exclusive. She was not a physician with Hospital privileges to treat her own patients when and how she deemed appropriate;[31] Hospitalists by definition see the Hospital's patients on behalf of the Hospital. DE150-1 at 113–14. Though she worked some part-time hours at Blake, she still maintained her regular full-time schedule at the Hospital.[32]

Further, Dr. Scott and the other Hospitalists were integral to the Hospital's operations. Hospital CEO Meade's own testimony established that. "That would be our hospitalists and our ER doctors, our pathologists. Folks that really touch most all of the patients in the facility, that core group." DE150-2 at 37. Dr. Scott also served on various Hospital committees onsite, including its Patient Care Review Committee that reviewed issues and complaints regarding quality of Hospital patient care by both physicians and nurses there. DE150-2 at 172–73; DE150-3 at 94.

Any argument that EmCare controlled scheduling and payment only supports joint employment. While EmCare now has a separate division that made the schedules at the time when Dr. Scott worked in the Hospital, Dr. Schandorf was doing so for the

---

[31] *Cf. Shah v. Deaconess Hosp.*, 355 F.3d 496, 500 (6th Cir. 2004) (physician is not an employee at hospital where he sees his own patients).

[32] *See, e.g., Barfield v. N.Y.C. Health & Hospitals Corp.*, 432 F. Supp. 2d 390, 393 (S.D.N.Y. 2006) ("[A]lthough the referral agencies contracted with numerous clients and remained free to send their employees to assignments at any of those other facilities, the referral agencies generally did not shift as a unit from one putative joint employer to another.").

EASLEY APPELLATE PRACTICE, PLLC, 1200 BRICKELL AVE., SUITE 1950, MIAMI, FLORIDA 33131  305-444-1599  800-216-6185

Hospitalists at the Hospital,[33] and scheduled them to conform to the Hospital's demands. DE150-1 at 115. The evidence for payroll and wages was similar; EmCare did them, but based on what the Hospitalists did in the Hospital, and paid different rates depending on the respective hospital and the patients they saw at the respective hospital. DE137 Exhibit 4; DE150-3 at 5–6. EmCare acted more as a payroll administrator, not an entity with control over payments, and not Dr. Scott's sole employer.[34]

The Hospital pointing to the measly $2,000 that EmCare gave Hospitalists for education and uniforms is outweighed by the millions and millions of dollars the Hospital must spend on its buildings, fixtures, equipment, maintenance and repairs. EmCare provided uniforms while the Hospital provided the actual facility and equipment that it owned and that were necessary for Dr. Scott to do her work and see the Hospital's patients.[35] Further, the Hospital had the opportunity for profit and loss and, even though a physician is a highly-skilled professional, Dr. Scott only saw the

---

[33] DE150-1 at 115. Notably, as it further shows joint employment, EmCare subsequently changed that.

[34] *See, e.g.*, *Leuenberger v. Spicer*, 2016 WL 355090, at *13 (W.D. Va. Jan. 28, 2016) (following *Butler* to find county's role in managing benefits, disbursing pay, maintaining employment records; and providing her with space, was akin to a payroll administrator, not an employer with control). *See also* Department of Labor Regulations, 29 C.F.R.§ 825.106(b) (citing as classic examples of joint employment relationships temporary placement agencies and professional employer organization contracts).

[35] *Cf.* *Alberty-Velez v. Corporacion de Puerto Rico Para La Difusion Publica*, 361 F.3d 1, 8 (1st Cir. 2004) (plaintiff provided equipment necessary to perform *her job* as a television host, purported employer provided cameras and equipment for other people to do their jobs).

EASLEY APPELLATE PRACTICE, PLLC, 1200 BRICKELL AVE., SUITE 1950, MIAMI, FLORIDA 33131  305-444-1599  800-216-6185

Hospital's patients that came there. DE150-1 at 113–14. Dr. Scott depended on the Hospital business for the opportunity to render her services.[36] And the Hospital set the "culture" that the Hospital represents to all as being what attracts its patients.[37]

Returning to *Butler*, *supra*, that staffing company formally fired that employee, and the manufacturer was still deemed to have as a matter of law "effective control" over employment. Returning to *Browning Ferris*, *supra*, that manufacturer retained control over whom Leadpoint could hire to work at its facility and had requested immediate dismissal. Like *Butler* and *Browning Ferris*, the great weight of the evidence is also that the Hospital had control over and supervised Dr. Scott and its other hospitalists. Denying a new trial where the jury found no joint employment was legal error because it misconceived the legal effect of the evidence and was an abuse of discretion because the great weight of, if not overwhelming, evidence was that Doctors Hospital controlled the terms and conditions of Dr. Scott's employment and was the venue of her employment from hiring to firing and each day in between.

ISSUE II. SUMMARY JUDGMENT IN FAVOR OF EMCARE CONCLUDED THAT DR. SCOTT
    COULD NOT AS A MATTER OF LAW ESTABLISH PRETEXT FOR HER REMOVAL AND
    SIMULTANEOUS TERMINATION MERELY BECAUSE EMCARE AND DOCTORS

---

[36] *Cf. Brock v. Superior Care, Inc.*, 840 F.2d 1054, 1059 (2d Cir. 1988) (where nurses depend on someone else to find job assignments, nurses not use skills independently).

[37] DE150-2 at 62–63. *See Reich v. Circle C Investments*, 998 F.2d 324, 328 (5th Cir. 1993) (employer "has a significant role in drawing customers to its nightclubs" as it is responsible for advertisement, location, business hours, maintenance of facilities, aesthetics, and inventory); *Reich v. Priba Corp.*, 890 F. Supp. 586, 593 (N.D. Tex. 2005).

HOSPITAL HAD AN AGREEMENT IN WHICH THE HOSPITAL COULD DEMAND THE REMOVAL OF A HOSPITALIST. THAT WAS FACTUAL ERROR BECAUSE IT OVERLOOKED THE PARTIES' RELATIONSHIPS AND CONSTRUED THEM IN FAVOR OF EMCARE. THAT WAS LEGAL ERROR BECAUSE IT ERRONEOUSLY CONSTRUED THE ECONOMIC REALITIES OF EMPLOYMENT IN TODAY'S ECONOMY. SUMMARY JUDGMENT SHOULD BE REVERSED.

Briefly, Title VII's retaliation provision makes it unlawful "to discriminate against any individual . . . because [s]he has opposed any practice made an unlawful employment practice by" the Act. 42 U.S.C. § 2000e–3(a). Reporting sex discrimination is a protected activity,[38] and no less so even if the complaint is informal.[39] Both Dr. Scott's formal EEOC complaint for discrimination and her complaint to the Hospital's HR and to EmCare that she was being discriminated against qualify as protected. *Id.*

Next, once EmCare proffered a legitimate, non-retaliatory reason for termination, Dr. Scott could show this reason was mere pretext either directly by showing that a "discriminatory reason more likely motivated the employer, or indirectly by showing that the employer's proffered explanation is unworthy of credence."[40] But, as Dr. Scott was the summary judgment non-movant, the court had to view all evidence

---

[38] *See* 42 U.S.C. § 2000e–5; *Nat'l R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 117 (2002).

[39] *Rollins v. State of Fla. Dep't of Law Enforcement,* 868 F.2d 397, 400 (11th Cir. 1989).

[40] *Tex. Dept. of Cmty. Affairs v. Burdine,* 450 U.S. 248, 253 (1981). In "some cases[, ] the plaintiff's initial evidence, combined with effective cross-examination of the defendant, will suffice to discredit the defendant's explanation." *Id.* at 255 n. 10; *see also Wilson v. B/E Aerospace, Inc.,* 376 F.3d 1079, 1088 (11th Cir. 2004).

EASLEY APPELLATE PRACTICE, PLLC, 1200 BRICKELL AVE., SUITE 1950, MIAMI, FLORIDA 33131  305-444-1599  800-216-6185

and all factual inferences reasonably drawn from the evidence in the light most favorable to her.[41]

Here, in EmCare's termination letter it sent Dr. Scott, EmCare stated it was terminating its agreement (parroting Doctors Hospital) "due to ongoing behavioral concerns and your contentious interactions with staff and patients" pursuant to their agreement, which allows it to terminate upon written request from the hospital. *See* DE66 at 8; DE66-9. The evidence before the lower court, however, including EmCare's answers to interrogatories, tended to show (*all* that is required for summary judgment)—if not establish—that, but for Dr. Scott's engagement in the protected activity, EmCare would not have removed her from the Hospital nor terminated her contract. *See* DE66-5 at 21–22, 24–25, 34, 45–46, 48–49; DE66-6 at 9–10, 13, 18; DE66-7 at 24. That presented an issue of material fact.

EmCare knew of Dr. Scott's complaints about discrimination and swiftly acquiesced and removed her from the Hospital, and almost-simultaneously terminated her contract with no inquiry or investigation at all. *See id.* The lower court reasoned that, because EmCare's contract with the Hospital provided that EmCare was required to remove a hospitalist from the Hospital upon the Hospital's demand, Scott could not show pretext. DE90 at 25. But that misses a key piece here.

---

[41] *Tolan v. Cotton,* ___ U.S. ___, 134 S. Ct. 1861, 1868 (2014) (per curiam); *St. Charles Foods, Inc. v. America's Favorite Chicken Co.*, 198 F.3d 815, 819 (11th Cir. 1999).

EASLEY APPELLATE PRACTICE, PLLC, 1200 BRICKELL AVE., SUITE 1950, MIAMI, FLORIDA 33131  305-444-1599  800-216-6185

There was no contractual requirement that EmCare *had to* terminate Dr. Scott's Agreement with EmCare altogether. *See* DE64-3 at 89; DE137 Trial Ex. 3. Shortly after Dr. Scott filed her charge of discrimination and alerted the Hospital and Dr. Schandorf of it, and after CEO Meade and EmCare were also informed, Dr. Scott was swiftly removed *and* almost-simultaneously terminated from the Hospital and EmCare with no investigation, and that was the adverse employment action. *See* DE79 at 18–19. Further, the presence of a contractual provision allowing for a person's removal from her venue of employment doesn't excuse illegal behavior, behavior like terminating a person for filing a charge of discrimination.[42] If that were true, courts would have been allowing employers to require that employees contract away all statutory protections against discrimination as conditions of employment. There's no court that allows that.[43] The district court "fail[ed] to credit evidence that contradicted some of its key factual conclusions" and "improperly 'weighed the evidence' and resolved disputed issues in favor of the moving party", EmCare.[44]

The district court allowed EmCare on summary judgment to point the finger at

---

[42] *See, e.g.*, *Cheney v. Plainfield Healthcare Ctr.*, 612 F.3d 908, 914 (7th Cir. 2010) (noting Title VII does not contain a good-faith defense that allows an employer to make race-based work assignments in line with state law providing long-term care residents to choose their provides in conflict with Title VII ). The extent to which a contract did authorize such conduct, courts would swiftly deem that provision illegal.

[43] *See* *Andrews v. Lakeshore Rehab. Hosp.*, 140 F.3d 1405, 1406 (11th Cir. 1998) for scholarly discussion of this principle.

[44] *Tolan*, 134 S. Ct. at 1866 (brackets omitted) (quoting *Anderson*, 477 U.S. at 249, 106 S. Ct. 2505).

EASLEY APPELLATE PRACTICE, PLLC, 1200 BRICKELL AVE., SUITE 1950, MIAMI, FLORIDA 33131  305-444-1599  800-216-6185

the Hospital and accepted EmCare's inferences that EmCare's contract allowed for EmCare's termination of Dr. Scott without any investigation, and the district court wholly ignored the joint employment context of the Hospital's and EmCare's joint conduct. Meaning, in cases similar to this, wherein an agency supplies individuals to work for a facility, agencies like EmCare are not simply excused from any discriminatory wrongdoing behind a veil of contractual terms. *See Capitol EMI Music,* 311 N.L.R.B. 997 (1993), *enforced sub nom. Capitol EMI Music, Inc. v. NLRB,* 23 F.3d 399 (4th Cir. 1994) (table) (stating staffing firm would be liable if staffing firm knew or should have known that the other employer acted for unlawful reasons, and if the staffing firm "acquiesced in the unlawful action by failing to protest it or to exercise any contractual right it might possess to resist it.").[45]

The district court overlooked that even *EmCare's own exhibits to its own Motion to Dismiss showed that EmCare knew about the EEOC charge and that Dr. Scott went to HR to complain about the same conduct and concerns that made up her EEOC charge*. See DE66-5 at 21–25, 34, 45–49; DE66-6 at 9–18; DE66-7 at 24.[46] The court

---

[45] *Id.* at 1000; *see also Magnunson v. Peak Tech. Servs., Inc.*, 808 F.Supp. 500 (E.D. Va. 1992) *aff'd*, 40 F.3d 1244 (4th Cir. 1994) (staffing firm could be held liable for car dealership's harassment if staffing firm knew of harassment and failed to take corrective action; sufficient evidence to support retaliatory discharge claim against staffing firm for its later termination).

[46] *Cf. Daniel v. Sargent & Lundy, LLC*, 2012 WL 874419 (N.D. Ill. March 14, 2012) (summary judgment proper where employment agency had no indication it was being asked to remove an employee for illegal reason).

EASLEY APPELLATE PRACTICE, PLLC, 1200 BRICKELL AVE., SUITE 1950, MIAMI, FLORIDA 33131  305-444-1599  800-216-6185

also overlooked that the deposition testimony showed the Hospital's CEO Meade and Dr. Schandorf both <u>knew</u> of the already-filed EEOC charge before Dr. Scott was terminated. DE79-5 at 8–9; DE66-5 at 24; DE66-7 at 24. The deposition testimony also showed that both of these individuals spoke to Dr. Stern at **EmCare** about this just before Dr. Scott's termination. DE66-7 at 24. *EmCare's Dr. Stern testified the Hospital's CEO Meade told him about an EEOC complaint and that he then spoke with Ms. Leonard, COO of South Division, and repeated the conversation, then even spoke with someone in the legal department*. DE66-6 at 9–18.

This Court's recent decision in *Smith v. City of New Smyrna Beach*, 588 F. App'x 965 (11th Cir. 2014) is especially instructive on the error in granting summary judgment in favor of EmCare here with knowledge of Dr. Scott's Charge so clearly established,. In *Smith*, the city argued the protected activity—Smith's complaints about the discrimination she faced as a female firefighter—was not was casually related to the fire chief and city manager's decisions to suspend and then terminate Smith, which the City had claimed were based on investigations into specific incidents regarding insubordination and cursing. *Id.* at 977–78. This Court held that Smith presented sufficient evidence for a reasonable jury to find that the city's reasons for Smith's termination were pretextual and that the adverse employment action would not have occurred in the absence of the protected activity. *Id.* at 977–78, 982. Noteworthy, there

EASLEY APPELLATE PRACTICE, PLLC, 1200 BRICKELL AVE., SUITE 1950, MIAMI, FLORIDA 33131  305-444-1599  800-216-6185

was evidence that at the same time that Smith complained to the City Manager and the HR director of the harassment and discrimination, which was related to the Chief, the Chief and the City Manager decided to suspend Smith and then terminate her. *Id.* at 982. Evidence was also presented that, when Smith had earlier complained to the Deputy Chief, he had warned her that doing so would make her life difficult going forward. *Id.* at 981–82.

> This Court explained that temporal proximity was important:

> Based on the strong temporal proximity between Smith's protected activity and the investigations and disciplinary activity that led to her eventual termination, as well as the evidence that the City's reasons were pretextual and [the Deputy's Chief's] admission that a complaint about discrimination would lead to retaliation, a reasonable jury could have concluded that Smith would not have been terminated in the absence of her protected activity.

*Id.* at 982. As with *Smith*, Dr. Scott was highly qualified, her removal had nothing to do with her medical care, she could have continued working as a hospitalist for EmCare [DE66-5 at 21], she was terminated within hours of her Charge of Discrimination, EmCare had actual knowledge of her Charge, and her contract with EmCare did not require her complete termination. DE64-3 at 8-9. Dr. Schandorf testified Dr. Scott was an experienced physician who could handle a hefty workload and pressures, while interacting with the other medical and nursing staff. DE66-5 at 10. EmCare was so confident in her abilities that she had been earlier asked to help establish a hospitalist program at a different hospital, Blake. DE66-5 at 10. And further calling into question

the credibility of EmCare's proffered reason, before the Hospital's CEO Meade demanded she be removed, the concerns were merely that she wasn't a good fit for the Hospital.[47] Like *Smyth*, the close temporal proximity between Dr. Scott's complaints of discrimination and termination supported pretext, and certainly on summary judgment.[48]

Summary judgment in EmCare's favor was also error because an employer's deviation from its own standard procedures can evidence pretext.[49] Here, while Dr. Scott was summarily fired, other Hospitalists received 90-day notice before they would be terminated. *See* DE65-6 at 5, 17–18. Even EmCare's own motion for summary judgment conceded that, when the Hospital had earlier considered replacing Dr. Scott— before Dr. Scott had complained about discrimination—she would have been given the 90-day notice. DE66 at 6.

---

[47] DE66-5 at 21; DE66-6 at 6. Any purported complaints or incidents occurred long before the day that Dr. Scott went to HR to complain about discrimination and, as Dr. Schandorf stated, everything was going fine until the morning Dr. Scott went to HR. DE66-5 at 24. All the Defendants' post-litigation complaints were not even presented until <u>after</u> Dr. Scott's termination in direct violation of the Defendants' policies that a physician against whom a complaint is lodged have an opportunity to review the complaint reduced to writing and to respond in writing.

[48] DE66-5 at 23, 49. *See also Hurlbert v. St. Mary's Health Care Sys., Inc.*, 439 F.3d 1286, 1298 (11th Cir. 2006) (two weeks is evidence of pretext); *Lichtenstein v. Univ. of Pittsburgh Med. Ctr.*, 691 F.3d 294, 311 (3d Cir. 2012); *Moorer v. Baptist Mem'l Health Care Sys.,* 398 F.3d 469, 488–90 (6th Cir. 2005); *Kohls v. Beverly Enters. Wis., 259 F.3d 799 (7th Cir. 2001).*

[49] *Hurlbert v. St. Mary's Health Care Sys., Inc.*, 439 F.3d 1286, 1299 (11th Cir. 2006) (FMLA); *Rudin v. Lincoln Land Community Coll, 420 F.3d 712, 727 (7th Cir.2005)* ("An employer's failure to follow its own internal employment procedures can constitute evidence of pretext.").

Also, EmCare had no written reports or complaints about Dr. Scott.[50] EmCare's Dr. Stern conceded he had no documents about the conversations he had with the Hospital's CEO Meade regarding Dr. Scott. DE66-6 at 6. Dr. Stern didn't "really remember" what any purported complaints were about or even who they were from. DE66-6 at 6–8. Dr. Scott was informed of only one complaint, which Dr. Schandorf, the only person who discussed any incident with Dr. Scott, sympathized with and agreed with Dr. Scott's position on, and considered so unimportant as to be a mere misunderstanding. DE66-3 at 16–17.

Even further calling into question EmCare's proffered reason, EmCare's own letter terminating Dr. Scott's contract was practically identical to Meade's email to Dr. Stern requesting her removal. *See* DE66 at 8. And Dr. Schandorf's statement to Dr. Scott that he wished she hadn't gone to HR to complain about the discrimination because he knew it "was not good" [*See*DE66-5 at 25, 34] supported the reasonable inference that he knew she'd be terminated for engaging in a protected activity.

EmCare may suggest it was going to place Dr. Scott at Blake, but EmCare's termination letter, its standard termination letter, sent to Dr. Scott stated the opposite: that EmCare was terminating its agreement, "effective October 3, 2013" with her and, citing to § 10.A.(iii).9 of her agreement, that EmCare could do so upon request from the

---

[50] DE66-5 at 24. *Stanfield v. Answering Serv., Inc.*, 867 F.2d 1290, 1294 (11th Cir. 1989) (lack of complaints or disciplinary reports may support a finding of pretext).

Hospital. DE66-9. EmCare even wished Dr. Scott well in future endeavors. DE66-9.

None of the above facts supported releasing EmCare on summary judgment. *See Tolan; Smith.* A reasonable jury could conclude that EmCare's explanation of its reason for removing Dr. Scott and terminating her contract was pretext, and further conclude that EmCare and Doctors Hospital were joint employers.

**ISSUE III:** **IT WAS LEGAL ERROR AND ABUSE OF DISCRETION TO EXCLUDE THE TESTIMONY OF ANOTHER FEMALE HOSPITALIST AT DOCTORS HOSPITAL, DR. VASILLE, WORKING AT THE SAME TIME AND UNDER THE SAME SUPERVISION AS DR. SCOTT. DR. VASILLE'S TESTIMONY WOULD HAVE CONCERNED INCIDENTS RELATED TO DOCTORS HOSPITAL CEO, MR. MEADE, AND THE TREATMENT AND CONTROL OF HER EMPLOYMENT TERMS AND CONDITIONS AND HER SUBSEQUENT CONSTRUCTIVE TERMINATION.**

During trial, Dr. Scott attempted to introduce Dr. Tracey Vasille's testimony to support that she was also victim of gender discrimination while at Doctors Hospital, at the hands of Meade. Doctors Hospital objected to that testimony entirely.[51] It was error to exclude it for three reasons.

First, it was relevant to discriminatory intent, and Federal Rule of Evidence 404(b) states that "[e]vidence of other crimes, wrongs, or acts . . . may . . . be admissible for . . . purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." F.R.E. 404(b). The Supreme

---

[51] Dr. Scott identified Dr. Vasille, from the very outset of the discovery process, as a similarly situated female hospitalist who had also experienced discrimination at the Hospital. DE1 at 7; DE64-2 at 19; DE64-8 at 24; DE66-3 at 83; DE75-9 at 2. Dr. Vasille was not, however, deposed.

Court has stated that, as in any case, when one attempts to prove discriminatory intent, "the trier of fact should consider all the evidence." *U.S. Postal Serv. v. Aikens*, 460 U.S. 711, 714 n. 3 (1983).

Evidence of an employer's past discriminatory or retaliatory behavior toward other employees is relevant and not unfairly prejudicial to whether an employer discriminated or retaliated against a plaintiff—the so-called "me-too evidence".[52] This is due in part to the fact that those discriminated against will often not be able to rebut a plausible cover-up with direct evidence, as "[t]here will seldom be 'eyewitness' testimony as to the employer's mental processes." *Aikens*, 460 U.S. at 716.

Second, in addition to demonstrating discriminatory intent, discussed more below, Dr. Vasille's testimony was probative of the issue of Doctors Hospital control and whether it was a joint employer of Dr. Scott. In *Bagby*, a Title VII and civil rights statute racial discrimination and retaliation suit, the trial court admitted me-too evidence from four employees, each of whom had been discharged in circumstances very different from that plaintiff's, in order to, among other things, demonstrate the intent of a common decision maker.[53] Following *Bagby*, in *Demers v. Adams Homes of Nw.*

---

[52] *See, e.g.*, *Goldsmith v. Bagby Elevator Co., Inc.*, 513 F.3d 1261, 1285 (11th Cir. 2008).
[53] *Id.* at 1286; *see also Phillips v. Smalley Maintenance Services, Inc.*, 711 F.2d 1524, 1532 (11th Cir. 1983) (same); *Fuentes v. Perskie*, 32 F.3d 759, 765 (3d Cir. 1994); *Ansell v. Green Acres Contracting Co.*, 347 F.3d 515, 521–22 (3d Cir. 2003).

*Florida, Inc.*, 321 F. App'x 847, 853–54 (11th Cir. 2009)—an employee-vs-independent contractor case—this Court allowed me-too evidence by three former employees as both probative that a certain individual was a <u>common decision maker</u> and probative of his discriminatory intent. The employer had argued the individual who made the discriminatory comment was not the person who decided to fire the employee. *Id.* at 854.

Likewise, Dr. Vasille's testimony would have been probative of the common decision maker "joint employment" issue because Dr. Vasille's testimony would have tended to prove that the Hospital's Meade was the common decision maker controlling her employment and that the Hospital was a joint employer of Hospitalists. *See* DE150-2 at 99–110. The proffer of Dr. Vasille's testimony went to Meade's role—as the CEO of Doctors Hospital and with control over her firing—and to her decision to leave Doctors Hospital. *See* DE150-2 at 99–110. Evidence of her treatment and experience was highly probative of these issues and rebutted the Hospital's contention that EmCare controlled the terms and conditions of the Hospitalist's employment.

Dr. Vasille's testimony would have presented the jury with another Hospitalist whose employment, like Dr. Scott's employment, Meade and the Hospital controlled. Because it would have added appreciable weight to Dr. Scott's case and its exclusion hampered the jury's understanding of the joint employment realities, exclusion of Dr.

Vasille's testimony had a substantial prejudicial effect.[54]

Dr. Vasille's testimony would have also presented the jury with another female hospitalist subject to the same control as Dr. Scott, who experienced the same outcome—the end of employment as a full time Hospitalist at Doctors Hospital. The jury didn't hear a complete story of the Hospital regime in control of the Hospitalists at Doctors Hospital, and the exclusion of Dr. Vasille's testimony was error.[55]

Third, the lower court rejected this evidence on the erroneous basis that it was not relevant. DE150-2 at 105 ("I just don't see how it's relevant."). The U.S. District Court for the District of Columbia has provided a helpful summary of the relevant considerations to be taken into account when determining whether me-too evidence should be admitted in *Hayes v. Sebelius*, 806 F. Supp. 2d 141, 144–45 (D.D.C. 2011) (citing *Goldsmith v. Bagby Elevator Co., Inc.*, 513 F.3d 1261 (11th Cir. 2008)). Courts

---

[54] *Cf. Perry v. State Farm Fire & Cas. Co.*, 734 F.2d 1441, 1446 (11th Cir. 1984) (exclusion of evidence harmless where it would not have added appreciable weight).

[55] *See Proctor v. Fluor Enterprises, Inc.*, 494 F.3d 1337 (11th Cir. 2007) (holding district court committed reversible error in excluding defendant's evidence of control, custody, and supervision of the plaintiff under borrowed servant doctrine, and thus precluded the jury from considering the defense); *Estes v. Dick Smith Ford, Inc.*, 856 F.2d 1097, 1103 (8th Cir.1988), *overruled in part on other grounds by Price Waterhouse v. Hopkins,* 490 U.S. 228 (1989) (background evidence of employer's discriminatory policies or practices "may be critical for the jury's assessment of whether a given employer was more likely than not to have acted from an unlawful motive"); *Hawkins v. Hennepin Tech, Ctr.*, 900 F.2d 153, 155 (8th Cir. 1990); *Heyne v. Caruso,* 69 F.3d 1475 (9th Cir. 1995) ("The probative value of the employer's sexual harassment of other female employees is especially high because of the inherent difficulty of proving state of mind.").

EASLEY APPELLATE PRACTICE, PLLC, 1200 BRICKELL AVE., SUITE 1950, MIAMI, FLORIDA 33131  305-444-1599  800-216-6185

generally look at (1) whether past discriminatory or retaliatory behavior is close in time to the events at issue in the case, (2) whether the same decision maker was involved, (3) whether the witness and plaintiff were treated in the same manner, and (4) whether the witness and plaintiff were otherwise similarly situated.[56] Each factor weighed in favor of admissibility of Dr. Vasille's testimony at Dr. Scott's trial.

First, the past discriminatory behavior against Dr. Vasille occurred either right before or while Dr. Scott was working at Doctors Hospital.[57] Second, the same joint employer decision maker—the Hospital's CEO Meade—was involved in both the situations with Dr. Vasille and Dr. Scott.[58] Third, Dr. Vasille and Dr. Scott, both female physicians, were treated the same way; as it was proffered the Hospital's CEO Meade was also trying to get rid of Dr. Vasille just as he was trying to get rid of Dr. Scott. DE150-2 at 100. Fourth, Dr. Vasille and Dr. Scott were women similarly situated. Dr.

---

[56] *Id*; *Sprint/United Management Co. v. Mendelsohn*, 552 U.S. 379, 388 (2008); *Hasan v. Foley & Lardner LLP*, 552 F.3d 520, 529 (7th Cir. 2008) (noting that the court should have determined if the "me too" evidence was a "relevant component of the 'mosaic' of evidence"); *see also Griffin v. Finkbeiner*, 689 F.3d 584, 598–99 (6th Cir. 2012).

[57] DE150-2 at 99–100. *Compare Cange v. Phila. Parking Auth.*, No. 08-3480, 2010 WL 365468, at *3 (E.D. Pa. Feb. 1, 2010) (admitting events related to other employees occurring one year before the events related to plaintiff) *with Hayes*, 896 F. Supp. 2d at 145 (four-year gap is too large) *and Nuskey v. Hochberg*, 723 F. Supp. 2d 229, 233 (D.D.C. 2010) (ten-year gap is too large).

[58] DE150-2 at 99–100; *see Day v. Sears Holdings Corp.*, No. CV 11-09068 MMM(PJWx), 2013 WL 1010547, at *20 (C.D. Cal. Mar. 13, 2013); *Bell v. Crowne Mgmt., LLC*, 844 F. Supp. 2d 1222, 1236 (S.D. Ala. 2012); *Zelaya v. UNICCO Serv. Co.*, 682 F. Supp. 2d 28, 35 (D.D.C. 2010); *Mugavero v. Arms Acres, Inc.*, No. 03 Civ. 05724(PGG), 2009 WL 1904548, at *9 (S.D.N.Y. July 1, 2009).

Vasille was a Hospitalist placed at the very same Hospital as Dr. Scott, through an EmCare predecessor; was employed in the same capacity as a Hospitalist, with the same responsibilities; was subjected and entitled to the same policies and procedures; and was under the same Hospital and Meade supervision and control.[59]

The Hospital's argument that Dr. Scott and Dr. Vasille were not treated similarly because Dr. Vasille resigned, while Dr. Scott was terminated, and because Dr. Schandorf was not the medical director when Dr. Vasille left misses that this goes to the Hospital's Meade. Dr. Vasille's testimony was that she was constructively discharged from her position.[60] Dr. Scott, through her counsel, further proffered that the testimony would be that, like Dr. Scott, Dr. Vasille was approached by Dr. Schandorf and told of undocumented complaints that the Hospital's CEO Meade had communicated. DE150-2 at 100. When Dr. Vasille spoke to the Hospital's CEO Meade, he said something to the effect of he wanted her gone from the Hospital. DE150-2 at 100. This is the same process, the same communication to Dr. Scott, and in the same form. DE1 at 4; DE64-2 at 10; DE150-2 at 121–22.

Further, Dr. Schandorf had testified in his deposition that he received complaints

---

[59] DE12 at 5; DE64-2 at 29–30. Dr. Schandorf was not the Medical Director when Dr. Vasille ultimately left the Hospital, but the evidence shows he was her supervisor before and received complaints against her. *See* DE64-8 at 24–25. Moreover, Dr. Vasille's testimony would have shown she was subjected to the same Meade oversight. DE150-2 at 99–100.

[60] DE150-2 at 100–01.

EASLEY APPELLATE PRACTICE, PLLC, 1200 BRICKELL AVE., SUITE 1950, MIAMI, FLORIDA 33131  305-444-1599  800-216-6185

about Dr. Vasille similar to those about Dr. Scott, that she was also not a nice female physician, with codes like "rude," "verbally aggressive," "curt," "short," "loud," and "insensitive." DE64-8 at 24. Like Dr. Scott, this was also in stark contrast to the male physician, Dr. Mitteldorf who had been described with the same complaints and yet <u>no one</u> proposed any anger management or counseling for Dr. Vasille, either. DE64-8 at 25. These were complaints against another female Hospitalist, like Dr. Scott, with the same lack of investigatory and remediation procedures followed.[61]

## CONCLUSION

FOR THE REASONS AND LEGAL AUTHORITIES SET FORTH HEREIN, Appellant Dr. Michelle G. Scott, M.D., requests that summary judgment be reversed and the case remanded for a new trial against both Appellees.

Respectfully submitted,

BY:   /S/ DOROTHY F. EASLEY
DOROTHY F. EASLEY, MS, JD, BCS APPEALS
FLA. BAR NO. 0015891
**EASLEY APPELLATE PRACTICE, PLLC**
1200 BRICKELL AVE., SUITE 1950
MIAMI, FLORIDA 33131
T: 305-444-1599; 800-216-6185
Emails: administration@easleyappellate.com
admin2@easleyappellate.com (secondary)
*Appellate Attorneys for Appellant*

Dated this  May 21, 2016  .

---

[61] DE150-1 at 138; DE170 at 23; DE64-2 at 10, 15; DE75-9 at 9; DE100 at 6.

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS AND TYPE STYLE REQUIREMENTS

1.    This brief complies with the type-volume limitation of Fed.R.App.P. 32(a)(7)(B) because this brief contains  13,974  words, excluding the parts of the brief exempted by Fed.R.App.P. 32(a)(7)(B)(iii).

2.    This brief also complies with the typeface requirements of Fed.R.App.P. 32(a)(5) and the type style requirements of Fed.R.App.P. 32(a)(6).  It has been prepared in Word 2010 using a proportionally spaced Times Roman 14 point font.

BY:    /S/ DOROTHY F. EASLEY
DOROTHY F. EASLEY

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of Appellant's Opening-Initial Brief and Appendix were filed using the CM/ECF system and Appellant's Opening-Initial Brief and Appendix were sent to the Eleventh Circuit Court of Appeals and served via **eMail *or* this firm's secure dropbox URL** this  May 21, 2016  to the following attorneys:

BY:    /S/ DOROTHY F. EASLEY
DOROTHY F. EASLEY

RETURN TO TABLE OF CONTENTS            53            RETURN TO TABLE OF AUTHORITIES

*Scott vs. Sarasota Doctors Hospital, etc., et al,* 11th Cir. Case No. 16-10763

## Service List
DR. MICHELLE G. SCOTT  v. SARASOTA DOCTORS HOSPITAL, INC., ET AL.
11TH CIR. CASE NO. 16-10763

MERRY E. LINDBERG, ESQ.
FORDHARRISON, LLP
1450 Centrepark Blvd., Suite 325
West Palm Beach, FL 33401
T: (561) 345-7505
F: (561) 345-7501
mlindberg@fordharrison.com
*Attorneys for Doctors Hospital*

TRACEY K. JAENSCH, ESQ.
FORDHARRISON, LLP
101 E Kennedy Blvd., Suite 900
Tampa, FL 33602-5133
T: (813) 261-7800
F: (813) 261-7899
tjaensch@fordharrison.com
*Attorneys for Doctors Hospital*

MATTHEW L. RANSDELL, ESQ.
JACKSON LEWIS P.C.
100 S Ashley Dr., Suite 2200
Tampa, FL 33602-5311
T: (813) 512-3224
F: (813) 512-3211
matthew.ransdell@jacksonlewis.com
*Trial and Appellate Counsel for EmCare*

JOHN MILLS BARR, ESQ.
LAW OFFICE OF JOHN M. BARR, P.C.
4105 Stuart Avenue
Richmond, VA 23221
T: (804) 269-5078
John.Barr@jmblawoffice.com
*Pro Hac Vice Counsel for EmCare*

JESSE M. TILDEN
TILDEN & PROHIDNEY, P.L.
431 12th Street West, Ste. 204
Bradenton, FL  34205
T: (941) 243-3959
F: (800) 856-5332
service@tildenprohidney.com
*Counsel for Plaintiff Dr. Scott*

DOROTHY F. EASLEY, MS, JD BCS APPEALS
EASLEY APPELLATE PRACTICE PLLC
1200 Brickell Avenue, Suite 1950
Miami, Florida  33131
T: (305) 444-1599; 800-216-6185
administration@EasleyAppellate.com
(primary)
admin2@EasleyAppellate.com
(secondary)
Upload URL for secure service:
https://www.hightail.com/u/Easley-Appellate-Practice-PLLC
www.easleyappellate.com
*Appellate Counsel for Dr. Scott*

RETURN TO TABLE OF CONTENTS    54    RETURN TO TABLE OF AUTHORITIES