11ᵗʰ CIR. CASE NO. 16-10763-EE
M.D. FLA. CASE NO. 8:14-CV-01762-JSM-TBM

---

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

---

## MICHELLE SCOTT, M.D.

### Plaintiff-Appellant,

### V.

## SARASOTA DOCTOR'S HOSPITAL, INC. ET AL.

### Defendants-Appellees.

---

## ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR
## THE MIDDLE DISTRICT OF FLORIDA

---

## BRIEF OF APPELLEE
## EMCARE, INC.

---

Matthew L. Ransdell, Esquire
Florida Bar No. 70390
Jackson Lewis P.C.
100 South Ashley Drive, Ste. 2200
Tampa, Florida 33602
Telephone: (813) 512-3210
Facsimile: (813) 512-3211
Email:
Matthew.Ransdell@jacksonlewis.com
Attorney for Appellee EmCare, Inc.

John M. Barr, Esquire
Appearing Pro Hac Vice
Law Office of John M. Barr, PC
4105 Stuart Avenue
Richmond, Virginia 23221
Telephone: (804) 269-5078
Facsimile: (571) 499-3796
Email: John.Barr@jmblawoffice.com
Attorney for Appellee EmCare, Inc

## <u>APPELLEE EMCARE, INC.'S CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT</u>

The undersigned counsel of record for EmCare, Inc., certify that the following have an interest in the outcome of this case:

1.    EmCare, Inc. is a corporation foreign to the State of Florida with its principal place of business in Greenwood Village, Colorado.  EmCare, Inc. is wholly owned subsidiary of EmCare Holdings, Inc. which is itself wholly owned by EmCare Hold Co Inc.  EmCare Hold Co Inc. is wholly owned by Emergency Medical Services LP Corporation, which is wholly by Envision Healthcare Corporation, which, in turn, is wholly owned by Envision Healthcare Intermediate Corporation.  Envision Healthcare Intermediate Corporation is a wholly owned subsidiary of Envision Healthcare Holdings, Inc., a publicly traded company (New York Stock Exchange Ticker Symbol: EVHC).

2.    Sarasota Doctors Hospital, Inc. ("SDH") is a Florida Corporation d/b/a Doctors Hospital of Sarasota with its principal office in Nashville, Tennessee.

3.    West Florida Physician Network, LLC d/b/a Healthcare America ("WFPN") is a Florida LLC with its principal office in Nashville, Tennessee.

4.    Dr. Michelle G. Scott is a natural person.

Appellee further certifies that the following persons and entities have some interest in the outcome of this case:

5.      Barr, John Mills (*Pro Hac Vice* Attorney for Defendant-Appellee EmCare, Inc.)

6.      Easley, Dorothy F. (Appellate Attorney for Plaintiff-Appellant)

7.      Easley Appellate Practice PLLC (Appellate Law Firm for Plaintiff-Appellant)

8.      EmCare, Inc. (Defendant-Appellee)

9.       Ford & Harrison, LLP (Trial Law Firm for Defendants SDH and WFPN)

10.      Glenn Rasmussen Fogarty & Hooker, P.A. (Law Firm for Mediator, Mark A. Hanley)

11.      Grilli, Peter J. (Mediator)

12.      Hanley, Mark A. (Mediator)

13.      Jackson Lewis P.C. (Trial Law Firm for Defendant-Appellee EmCare)

14.      Jaensch, Tracey K. (Trial Attorney for Defendants-Appellees SDW and WFPN)

15.      Law Office of John M. Barr, P.C. (Trial Law Firm for Defendant-Appellee EmCare)

16.      Lechner, Jay P. (Former Trial Attorney for Defendant-Appellee EmCare)

17.     Lindberg, Merry E. (Trial Attorney for Defendants-Appellees SDH and WFPN)

18.     Miles, Daniel Kent (Trial Attorney for Defendants SDH and WFPN)

19.     McCoun, The Honorable Thomas B. III (United States Magistrate Judge)

20.     Moody, The Honorable James S. Jr. (United States District Judge)

21.     Peter J. Grilli, PA (Law Firm for Mediator Peter J. Grilli)

22.     Romano, Jay. F. (Former Trial Attorney for Plaintiff-Appellant)

23.     Romano Law Center, PA (Former Trial Law Firm for Plaintiff-Appellant)

24.     Ransdell, Matthew L. (Trial Attorney for Defendant-Appellee EmCare)

25.     Sisco, Dale R. (Mediator)

26.     Sisco-Law (Law Firm for Mediator Dale R. Sisco)

27.     Tilden, Jesse M. (Trial Attorney for Plaintiff-Appellant)

28.     Tilden & Prohidney, P.L. (Trial Law Firm for Plaintiff-Appellant)

Respectfully submitted,

*/s/ Matthew L. Ransdell, Esq.*
Matthew L. Ransdell, Esq.

## <u>STATEMENT REGARDING ORAL ARGUMENT</u>

Oral argument is not necessary.  This case involves the application of well-developed case law to the applicable facts.  There are no novel issues of law or fact, the facts and legal arguments are adequately presented in the briefs and the record, and oral argument would not significantly aid the decisional process.

# **TABLE OF CONTENTS**

Appellee EmCare, Inc.'s Certificate of Interested Persons and Corporate Disclosure Statement. ..................................................................................C-2

Statement Regarding Oral Argument....................................................C-5

Table of Contents. ....................................................................................... i

Table of Authorities ................................................................................. iv

Statement of Jurisdiction........................................................................ vii

I.    Statement of the Issues ...................................................................1

II.    Statement of the Case ....................................................................1

    A.    Procedural Background.......................................................1

        1.    Dr. Scott's Complaint................................................1

        2.    EmCare's Summary Judgment Motion and District Court's Decision ...2

        3.    Dr. Scott's Appeal ....................................................3

    B.    Summary of Undisputed Facts ..........................................3

        1.    The Relevant Contracts............................................3

        2.    The Numerous Complaints Against Dr. Scott ........................5

            a.    Dr. Schandorf's Experience with Dr. Scott ........................5

            b.    Dr. Stern's Experience with Dr. Scott.................................7

            c.    Mr. Meade's Initial Decision that Dr. Scott Should Not Work at the Hospital.......................................................8

3.    The Termination of Dr. Scott's Employment Agreement......................9

III.   Summary of the Argument...............................................................12

IV.   Argument ......................................................................................15

A.   Standard of Review ...................................................................15

1.    General Standard for Summary Judgment.............................15

2.    The *McDonnel Douglas* Burden Shifting Analysis Applies to Dr. Scott's Retaliation Claim ......................................................................16

a.    Dr. Scott Must Demonstrate a *Prima Facie* Case...........................17

b.    If Dr. Scott is Able to Make Out a *Prima Facie* Case, then EmCare in Only Required to Articulate its Legitmate Reasons for its Actions.....17

c.    Dr. Scott Must Show the EmCare's Legitimate Reason was Pretext for Retaliation .........................................................................17

3.    Dr. Scott Must Show "But For" Causation to Prevail in Her Retaliation Claim...........................................................................................18

B.   Dr. Scott Cannot Make a Prima *Facie Case* of Retaliation Against EmCare Because She did not Engage in Statutorily Protected Activity .........................19

C.   EmCare Articulated a Legitimate Good Faith Reason for Terminating Dr. Scott ...........................................................................................23

D.   Dr. Scott Cannot Show that EmCare's Exercise of its Explicit Contractual Right was a Mere Pretext for Retaliation Against Her......................................27

1.    *Smith v. City of New Smyrna Beach* Supports the Grant of Summary Judgment to EmCare.......................................................................................27

2.    EmCare did not Violate its own Procedures When it Immediately Terminated Dr. Scott's Contract ...................................................................30

3.    EmCare had been Aware of Numerous Complaints Against Dr. Scott and had Already Attempted to Replace Her Before She Made Any Complaint of Discrimination .........................................................................31

Conclusion.....................................................................................................33

Certificate of Compliance with Type-Volume Limitation, Typeface Requirements and Type Style Requirements...............................................................................34

Certificate of Service ...........................................................................................35

# TABLE OF AUTHORITIES

CASES

*Celotex Corp. v. Catrett*

477 U.S. 317 (1986) .............................................................................16

*Chapman v. AI Transport*

229 F.3d 1012 (11TH Cir. 2000)(*en banc*)......................................................... *passim*

*Early v. Champion Int'l Corp.*

907 F.2d 1077 (11th Cir. 1990)..............................................................16

*Etienne v. Muvico Theaters, Inc.*

2003 U.S. Dist. LEXIS 14036 (S.D. Fla. 2003), aff'd, 90 Fed. Appx. 383 (11th Cir.

2003) ...................................................................................................25

*Harper v. Blockbuster Entertainment Corp.*

139 F.3d 1385 (11th Cir. 1998)..............................................................16

*Hurlbert v. St. Mary's Health Care Sys., Inc.*

439 F.3d 1286 (11th Cir. 2006)..............................................................18

*King v. Sec'y, United States Department of the Army*

2016 U.S. App. LEXIS 10814 (11th Cir. 2016) ............................................. *passim*

*Krop v. Nicholson*

506 F. Supp. 2d 1170 (M.D. Fla 2007)....................................................16

*Little v. United Technologies, Carrier Transicold Division*

103 F.3d 956 (11th Cir. 1997)......................................................................19

*McDonnel Douglas Corp. v. Green*

411 U.S. 792 (1973).....................................................................................16

*Nix v. WLCY Radio/Rahall Communications*

738  F.2d 1181 (11th Cir. 1984)...................................................................26

*St. Mary's Honor Ctr. v. Hicks*

509 U.S. 502 (1993).....................................................................................18

*Smith v. City of New Smyrna Beach*

588 F. App'x 965 (11th Cir. 2014).................................................... *passim*

*Standard v. A.B.E.L. Services, Inc.*

161 F.3d 1318 (11th Cir. 1998)........................................................... 20, 23

*Texas Dep't of Comty. Affairs v. Burdine*

450 U.S. 248 (1981)............................................................................ 17, 18

*United States v. Al-Arian*

514 F.3d 1184 (11th Cir. 2008)...................................................................15

*United States v. Harris*

608 F.3d 1222 (11th Cir. 2010)...................................................................15

*University of Texas Southwestern Medical Center v. Nassar*

133 S. Ct. 2517 (2013)...................................................................... *passim*

*Walton-Horton v. Hyandai of Alabama*

402 Fed. Appx. 405 (11th Cir. 2010)................................................................ 17, 19

**OTHER AUTHORITIES**

Florida Civil Rights Act of 1992, § 760.1 *et seq.*, Florida Statutes.........................1

Title VII of the Civil Rights Act of 1964 and 1991, as amended.............................1

## **STATEMENT OF JURISDICTION**

This Court has jurisdiction pursuant to 28 U.S.C. § 1291 because this is an appeal of a final decision of the United States District Court for the Middle District of Florida.

I. **STATEMENT OF THE ISSUES**

Did the District Court err in granting EmCare, Inc.'s Motion for Summary Judgment?  Specifically, did the District Court err in holding that Scott failed to show any evidence of pretext on the part of EmCare in making its decision to 1) remove her from providing services at the Hospital as mandated by the Hospital's request and its contract with the Hospital and, 2) terminate her employment pursuant to its explicit contractual right to do so?

II. **STATEMENT OF THE CASE**

   A.     **Procedural Background.**[1]

      1.     **Dr. Scott's complaint.**

Appellant Dr. Michelle Scott ("Dr. Scott") filed suit on July 7, 2014 against Doctors Hospital of Sarasota ("Hospital") and EmCare, Inc. ("EmCare").  In her Complaint, Dr. Scott asserted a claim against the Hospital for disparate treatment on the basis of her gender in violation of Title VII of the Civil Rights Act of 1964 and 1991, *as amended*, 42 U.S.C. §2000e *et seq.* ("Title VII") and the Florida Civil Rights Act of 1992, § 760.1 *et seq.*, Florida Statutes ("FCRA").  DE 1 at 9-11 and 14-15.  Dr. Scott made a claim against EmCare for disparate treatment on the basis

---

[1] "DE __ at __" refers to the record by the District Court's CM/ECF Document Entry number at page number.  Where possible, EmCare also includes a specific description of the document being discussed.

of her gender but only under the FCRA.  DE 1 at 12-14.   Dr. Scott also asserted a claim of retaliation in violation of Title VII against all Defendants.  DE 1 at 15-16.

## 2.    EmCare's Summary Judgment Motion and the District Court's Decision.

After completing discovery, EmCare filed a Motion for Summary Judgement on September 11, 2015.  DE 66.  Dr. Scott filed her Opposition to EmCare's Summary Judgment Motion on October 5, 2015, DE 79, to which EmCare filed a Reply on October 16, 2015.  DE 86.  The District Court granted EmCare's Motion for Summary Judgement by an Order entered November 5, 2015.  DE 90.

In its Order, the District Court granted EmCare summary judgment on any gender discrimination claim Dr. Scott may have had against the company.  DE 90 at 22.  The District Court noted that Dr. Scott had acknowledged at her deposition that she was not pursuing such a claim against EmCare.  Id.; see also DE 66-3 at 31, 33 (Deposition of Dr. Scott ("Scott Dep.") at 123, 132).  Dr. Scott is not challenging the granting of summary judgment for EmCare on the gender discrimination claim.

The District Court also granted summary judgement in EmCare's favor on Dr. Scott's claim of retaliation.  DE 90. The District Court found that EmCare was required by the terms of its contract with the Hospital to remove Dr. Scott from the Hospital once Mr. Meade, the Hospital's CEO, demanded that removal.  DE 90 at

2

25. The District Court found that "once Scott was removed at the Hospital's request, her contract with EmCare permitted her immediate termination." Id. The District Court dismissed Dr. Scott's attempt to use Dr. Mittledorf's receipt of a 90-day notice prior to his termination as evidence of pretext by stating "but it is undisputed in the record that the Hospital did not demand Dr. [Mittledorf's] removal." Id. After discussing the fact that the EEOC charge in question was not even filed against EmCare, the District Court found that EmCare was entitled to summary judgment. Id. Judgement was entered for EmCare on November 5, 2015. DE 91.

### 3.    Dr. Scott's Appeal.

On February 20, 2016, after the trial between the Hospital and Dr. Scott, Dr. Scott filed her Notice of Appeal both as to the Order granting EmCare's Motion for Summary Judgement and the Judgement entered for the Hospital at the conclusion of the trial between the Hospital and Dr. Scott. DE 154. Dr. Scott filed her main brief on May 23, 2016.

### B.    Summary of Undisputed Material Facts.

### 1.    The relevant contracts.

Dr. Scott entered into an employment agreement ("Agreement") with Inpatient Services of Florida, Inc. ("Inpatient") on September 26, 2011. DE 66-1 at 13. Pursuant to the Agreement, Dr. Scott undertook to provide professional

medical services at the Hospital.  DE 66-1 at 1-2 (Agreement at ¶ 3.A.).  Dr. Scott consented to the Agreement being terminated "immediately . . . [i]n the event that the appropriate authorities of a hospital at which Employee is providing services request that the Employee no longer provide such services at the hospital."  DE 66-1 at 6-7 (¶ 10.A.iii.9).

During the relevant time frame, EmCare maintained a contract with the Hospital by which EmCare provided physicians to serve as hospitalists at the facility.  DE 66-2.  In turn, EmCare contracted with Inpatient to obtain the necessary hospitalist physicians.  DE 66-7 at 12 (Deposition of Ted Haumesser ("Haumesser Dep." at 42-43).  EmCare, through a series of management agreements, provided various management services to Inpatient, including, but not limited to, management of its employment relationships with medical providers. DE 66-9.

A hospitalist is a physician who manages the care of a patient once the person has been admitted into a medical facility.  DE 66-3 at 3 (Scott Dep. at 12). EmCare's contract with the Hospital explicitly stated that the right of a physician to work at the facility could be "withdrawn immediately by the Facility's Chief Executive Officer in his or her reasonable discretion at any time with written notice to the Contractor."  DE 66-2 at 1 (¶1.B.iii.a).  Bob Meade was the CEO of the Hospital and he had the authority to withdraw permission for any EmCare supplied

physician to work at the facility.  DE 66-3 at 12 (Scott Dep. at 47).

### 2.    The numerous complaints against Dr. Scott.

### a.    Dr. Schandorf's experience with Dr. Scott.

Dr. Scott reported to Dr. Schandorf while she worked at the Hospital.  DE 66-3 at 4 (Scott Dep. at 38).  Dr. Scott claimed that she had a "great" relationship with Dr. Schandorf.  DE 66-3 at 22 (Scott Dep. at 87).

Starting in early 2012, Dr. Schandorf started to receive informal complaints about Dr. Scott's behavior.    DE 66-5 at 10 (Deposition of Dr. Schandorf ("Schandorf Dep.") at 31.)  Dr. Schandorf received complaints that Dr. Scott was "a little too abrupt or a little too curt with patients and sometimes with nurses."  Id. Some of these early complaints were that Dr. Scott was "verbally aggressive."  Id.

Complaints about Dr. Scott's behavior continued.  DE 66-5 at 11 (Schandorf Dep. at 35).  Dr. Schandorf was informed that Dr. Scott came across as "being insensitive in her phraseology, [and] sometimes her body language."  Id.  People reported that they were intimidated by Dr. Scott and that they were afraid that she would respond to them in manner that "was going to make them uncomfortable or be afraid. . ."  Id. Many of these complaints came from the nurses.  Id. Patients would complain that they did not get along with Dr. Scott and that "they did not like her."  Id.

Many individuals at the Hospital complained to Dr. Schandorf about Dr.

Scott.  For example, Dr. Schandorf relayed a conversation he had with Dr. Romano, the director of the Emergency Department, that "some of the nurses in their emergency department are very uncomfortable calling [Dr. Scott] in the middle of the night because of how she would interact with them."  DE 66-5 at 34 (Schandorf Dep. at 126-127).  Dr. Schandorf also met with the Chief Nursing Officer and other nurses who relayed their own poor experiences with Dr. Scott and the experiences of others.  Id. at 127-128.

Dr. Schandorf followed up with Dr. Scott for each complaint that he felt was concerning enough to be a problem.  DE 66-5 at 15 (Schandorf Dep. at 52).  When Dr. Schandorf became concerned that the numerous complaints against Dr. Scott could lead to a situation where Dr. Scott would be asked to leave the Hospital, he began to share his concerns about her behavior with his superiors at EmCare.  Id. After about a year and a half of working with Dr. Scott, Dr. Schandorf came to the conclusion that Dr. Scott had a pattern of misbehavior and that "the problem was not going away."  DE 66-5 at 12 (Schandorf Dep. at 41).

Further, Mr. Meade spoke to Dr. Schandorf a number of times about Dr. Scott's behavior.  DE 66-5 at 12-13 (Schandorf Dep. at 41-42).  At one point, Mr. Meade informed Dr. Schandorf that he did not think Dr. Scott fit in with the Hospital's culture.  Id.

A partial list of the complaints made against Dr. Scott shows that in the time

period January 1, 2013 to July 1, 2013, she was the subject of four validated staff complaints.  DE 66-4 at 37.  This number put Dr. Scott above the maximum acceptable in the six month threshold for that category and was listed as being due to "Interpersonal Communications Skills" and "Professionalism."  DE 66-4 at 37-38; DE 66-5 at 28 (Schandorf Dep. at 104).  Dr. Scott also had four "Behavior/Citizenship" issues.  DE 66-4 at 37. This number also put Dr. Scott above the maximum acceptable six month threshold for this category.  Id.; DE 66-5 at 28 (Schandorf Dep. at 104). Dr. Schandorf testified that this list did not include the many informal complaints that he also received regarding Dr. Scott's behavior. DE 66-5 at 35 (Schandorf Dep. at 130-131).

### b.    Dr. Stern's experience with Dr. Scott.

Dr. Joel Stern became the Executive Vice President of EmCare's South Division in 2013.  DE 66-6 at 3-4 (Deposition of Dr. Joel Stern ("Stern Dep.") at 8-10).  In this role, Dr. Stern was responsible for managing EmCare's contract with the Hospital.  DE 66-6 at 4 (Stern Dep. at 11-12). Dr. Stern spoke to Mr. Meade and Dr. Schandorf at least once every two weeks.  DE 66-6 at 4, 5 (Stern Dep. at 12, 14).

Dr. Stern first learned about the numerous complaints against Dr. Scott in the spring or summer of 2013.  DE 66-6 at 6 (Stern Dep. at 17). At that time Mr. Meade informed Dr. Stern that both patients and staff had complained about Dr.

Scott.  DE 66-6 at 6 (Stern Dep. at 17-18).  Mr. Meade informed Dr. Stern that Dr. Scott "was not a good fit at [the Hospital] and was generating a lot of complaints." DE 66-6 at 6 (Stern Dep. at 18).  Mr. Meade told Dr. Stern that Dr. Scott was "abrasive and abrupt and patients felt she was not very empathetic. . ."  DE 66-6 at 7 (Stern Dep. at 21).  These concerns about Dr. Scott were an "ongoing topic" between Dr. Stern and the Hospital and were discussed a multiple meetings Dr. Stern attended with Hospital personnel.  DE 66-6 at 8 (Stern Dep. at 27).

### c.    Mr. Meade's initial decision that Dr. Scott should not work at the Hospital.

The first time that Mr. Meade apparently made his wish known that Dr. Scott no longer work at the Hospital came in February 2013.  At that time, Dr. Schandorf informed Dr. Scott that "Bob Meade wants you gone." DE 66-3 at 15 (Scott Dep. at 60).  When Dr. Scott asked Dr. Schandorf the reason for Mr. Meade's position, Dr. Schandorf replied that one of the reasons may have been Dr. Scott's behavior towards an elderly oncology patient.  DE 66-3 at 15-16 (Scott Dep. at 60-61).

A doctor at the Hospital had filed a complaint about Dr. Scott's handling of an 83 year old patient who had been admitted to the Hospital with Leukemic Transformation.  DE 66-3 at 16 (Scott Dep. at 61).  It had been clearly documented that the patient "was very afraid to die, didn't want to die." Id. (Scott Dep. at 63). Dr. Scott admitted that the patient said that "I don't want to know [that she was

going to die].  I want to live in wonderland."  DE 66-3 at 17 (Scott Dep. at 65).  Dr.

Scott further admitted that she knew that this 83 year old woman "desperately

wanted to live in la-la land and didn't want to be confronted with the truth. . ." DE

66-3 at 17 (Scott Dep. at 68).

Dr. Scott chose to ignore the elderly woman's wishes and told her directly

that a proposed course of treatment "doesn't make any difference.  You have no

bone marrow."  DE 66-3 at 16 (Scott Dep. at 64).  Dr. Scott admitted that this 83

year old woman was "upset" by these statements.  DE 66-3 at 16 (Scott Dep. at

63).  As a consequence of Dr. Scott ignoring the elderly patient's wishes and

upsetting her, the treating physician requested that Dr. Scott be removed from

patient's care.  <u>Id.</u>

### 3.    The Termination of Dr. Scott's Employment Agreement.

At some point after Dr. Scott was removed from the elderly patient's case,

Mr. Meade requested that EmCare replace her.  DE 66-6 at 9 (Stern Dep. at 30).

This request was not the type of formal written request that would have resulted in

Dr. Scott's immediate removal pursuant to the contract between EmCare and the

Hospital.    At that time EmCare was prepared to offer Dr. Scott a 90-day

termination notice once a replacement had been located.  <u>Id.</u>  On August 1, 2013,

Dr. Scott was informed that she was going to be replaced by a doctor named Steve

Unaeze.  DE 66-3 at 20 (Scott Dep. at 78).  Dr. Scott was being replaced because

"everyone felt, you know, she wasn't going to change the issues that were going on . . ." DE 66-6 at 8 (Stern Dep. at 27). At the time EmCare started attempting to replace Dr. Scott, she had not filed any complaints of discrimination. DE 66-3 at 20 (Scott Dep. at 78).

Dr. Unaeze ultimately did not come to work at the Hospital. DE 66-3 at 21 (Scott Dep. at 82). Nevertheless, EmCare kept looking to replace Dr. Scott. Id. It was only after she learned that EmCare was continuing to try to replace her that Dr. Scott informed Dr. Schandorf that she felt that the Hospital was discriminating against her on the basis of her gender. DE 66-3 at 21 (Scott Dep. at 83).

Toward the end of September 2013 Dr. Scott filed an EEOC complaint against the Hospital and Mr. Meade – but not against EmCare – accusing them of gender-based discrimination. DE 66-3 at 23 (Scott Dep. at 91). After filing her complaint against the Hospital and Mr. Meade, Dr. Scott took a week of vacation. DE 66-3 at 23 (Scott Dep. at 92). During this time, the Hospital and Mr. Meade learned that Dr. Scott had filed the EEOC complaint. DE 66-13 at 75 (Deposition of Robert Meade ("Meade Dep.") at 74). Despite being aware of the complaint, the Hospital took no action regarding Dr. Scott at that time.

On October 3, 2013, Dr. Scott returned to work and asked Dr. Schandorf if he knew that she had filed an EEOC complaint against the Hospital. DE 66-3 at 24 (Scott Dep. at 93). When Dr. Scott found out that Dr. Schandorf had not heard of

her complaint against the Hospital, she went to the Hospital's Human Resources Department.  DE 66-3 at 24 (Scott Dep. at 93-94).  Dr. Scott spent five to ten minutes in the HR Department.  DE 66-3 at 25 (Scott Dep. at 95).  Dr. Scott admitted that while she was at the HR Department she was "upset" and that "my voice might have been a little raised. Certainly I think my conversation was . . .I was saying things quite quickly."  DE 66-3 at 49 (Scott Dep. at 195).

Later that same day, Dr. Stern received a telephone call from Mr. Meade.  DE 66-6 at 9 (Stern Dep. at 32).  Mr. Meade told Dr. Stern that "'[Dr. Scott] walked into my HR director's office today, and she was yelling and screaming and she was being very hostile and aggressive.'"  Id.  Mr. Meade then requested that Dr. Scott leave the Hospital premises immediately.  Id.

Pursuant to the contract between the Hospital and EmCare, Dr. Stern requested that Mr. Meade send a written request to remove Dr. Scott from the Hospital.  DE 66-6 at 11 (Stern Dep. at 38).  Mr. Meade sent an email to Dr. Stern stating:

> Dr. Stern,
>
> Due to ongoing behavior issues with Dr. Scott, I am requesting that she be removed from our facility.  Her behavior in our HR department this morning coupled with numerous contentious interactions with staff and patients lead us to believe that she is not a fit with our culture her at DHS.
>
> Bob

Id.; see also DE 66-8 at 1 (email from Robert Meade to Dr. Joel Stern).  Mr. Meade

made his request to have Dr. Scott removed from the Hospital because:

> . . . we've had a number of complaints already, as you've seen. I've talked
> to Dr. Schandorf a number of times about the complaints, about the behavior
> issues. And now we have a person [Dr. Scott] going ballistic in one of our
> departments, yelling at one of our employees.

DE 66-13 at 80 (Meade Deposition at 79).

After receipt of Mr. Meade's written request, Dr. Stern and Ted Haumesser discussed the status of Dr. Scott's Agreement with Inpatient. DE 66-7 at 14-15 (Haumesser Dep at 52-53). They determined that if the Hospital requested that the Plaintiff be removed, then her Agreement with Inpatient could be terminated immediately. Id.; see also DE 66-1 at 7 (Agreement at ¶ A.iii.9). Accordingly, EmCare sent a letter to Plaintiff on behalf of Inpatient terminating the Agreement. DE 66-6 at 11 (Stern Dep. at 40). The letter stated "[d]ue to ongoing behavioral concerns and your contentious interactions with staff and patients, this letter shall constitute formal notice of [Inpatient's] decision to terminate your Agreement pursuant to Section 10.A.(iii).9, which authorizes [Inpatient] to terminate the Agreement upon written request from the Hospital." DE 66-6 at 47 (termination letter).

## III.    SUMMARY OF THE ARGUMENT

Dr. Scott brings a claim of retaliation under both Title VII and the FCRA against EmCare for removing her from the Hospital and then terminating her Agreement. Dr. Scott alleges that EmCare took these actions to retaliate against

12

her for making a complaint of gender based discrimination against the Hospital. Dr. Scott's claim fails for several reasons.

To successfully bring a claim of retaliation under Title VII – and FCRA – Dr. Scott must meet the higher "but for" standard of causation. Dr. Scott is unable to do so. Dr. Scott cannot make out a *prima facie* case against EmCare because she cannot demonstrate that her discrimination complaint against the Hospital had an objective basis in fact.

Dr. Scott also is unable to demonstrate that EmCare's legitimate non-discriminatory reason for her discharge was a pretext for retaliation. Specifically, EmCare's contract with the Hospital required it to remove any physician from the facility upon the reasonable request from the Hospital's CEO, Mr. Meade. EmCare had been made aware of a series of complaints about Dr. Scott's behavior towards patients and staff at the Hospital in the months that preceded her EEOC compliant. Indeed, the number and seriousness of the complaints EmCare received about Dr. Scott resulted in the company actively trying to replace her about two months before she ever filed with the EEOC.

On October 3, 2013, EmCare received a telephone call and then an email from Mr. Meade complaining of Dr. Scott's outburst in the Hospital's HR Department and insisting that Dr. Scott be removed. Once Dr. Scott was removed from her work at the Hospital's request, EmCare had the contractual right to

terminate the employment agreement immediately. The exercise of explicit contractual rights to end an employment relationship with an employee with a long history of contentious and inappropriate behavior directed towards co-workers and patients is the definition of a legitimate non-discriminatory reason for EmCare's actions.

Dr. Scott is unable to introduce evidence that can show that EmCare's actions were a pretext for retaliation. Timing alone cannot salvage Dr. Scott's claims both because EmCare had been trying to replace her for almost two months prior to her EEOC complaint and because it terminated her contract as soon as it received a written request that she be removed from the Hospital immediately due to another inappropriate outburst by Dr. Scott.

Dr. Scott's attempt to compare herself to Dr. Mittledorf is similarly unavailing. Both Dr. Mittledorf and Dr. Scott were terminated for contentious and inappropriate outbursts at the Hospital. The only difference between the two terminations was that Dr. Mittledorf was given 90-days' notice and Dr. Scott was terminated immediately. But the Hospital never requested Dr. Mittledorf's immediate removal from the Hospital and thus the relevant provision in the Agreement permitting immediate termination in the event of a request that an individual be removed from the hospital was never triggered in Dr. Mittledorf's case. With no *prima facie* case and no evidence of pretext to counter EmCare's

14

legitimate reason for terminating the Agreement, the District Court properly granted summary judgment to EmCare.

## IV.    ARGUMENT

### A.    Standard of Review.

#### 1.  General Standard for Summary Judgment.

The Eleventh Circuit Court of Appeals reviews *de novo* a district court's grant of summary judgment, applying the same standards as the district court. *See Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (*en banc*). Summary judgment is appropriate if:

> [T]he evidence before the court shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. In making this determination, the court must review all evidence and make all reasonable inferences in favor of the party opposing summary judgment.
>
> The mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case. The relevant rules of substantive law dictate the materiality of a disputed fact. A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor.

*Id.* (quotations omitted). Moreover, this Court may affirm the District Court for any reason, even those that were not relied upon by that court in rendering its decision. *See United States v. Harris*, 608 F.3d 1222, 1227 (11th Cir. 2010) (quoting *United States v. Al-Arian*, 514 F.3d 1184, 1189 (11th Cir. 2008)).

Although the Court will make all reasonable inferences in favor of the non-moving party, "[e]qually clear, however, is the principle that the non-moving party bears the burden of coming forward with evidence of each essential element of [his] claims, such that a reasonable jury could find in his favor."  *Early v. Champion Int'l Corp.*, 907 F.2d 1077, 1080 (11th Cir. 1990).  "Summary judgments for defendants are not rare in employment discrimination cases."  *Krop v. Nicholson*, 506 F. Supp. 2d 1170, 1174 (M.D. Fla 2007) (citing *Early*, 907 F.2d at 1080).  "The failure of proof concerning an essential element of the non-moving party's case necessarily renders all other fact immaterial and requires the court to grant the motion for summary judgment."  Id. at 1174 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

### 2.    The *McDonnel Douglas* Burden Shifting Analysis Applies to Dr. Scott's Retaliation Claim.

In *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), the Supreme Court created the framework for analyzing Title VII cases that are based on circumstantial evidence.  See also *King v. Sec'y, United States Department of the Army*, 2016 U.S. App. LEXIS 10814 at *3 (11th Cir. 2016) (retaliation claims are reviewed under the *McDonnell Douglas* framework).  Dr. Scott's claims under the FCRA are governed by the same analysis as that used under Title VII.  *Harper v. Blockbuster Entertainment Corp.*, 139 F.3d 1385, 1387 (11th Cir. 1998).

### a.    Dr. Scott must demonstrate a *prima facie* case.

To prove unlawful treatment, Dr. Scott must first establish a *prima facie* case of retaliation.  *King*, 2016 U.S. App. At *3.  To make out her *prima facie* case, Dr. Scott must show that: (1) she engaged in statutorily protected activity; (2) she suffered a materially adverse employment action; and (3) the adverse action was causally related to the protected activity.  *Walton-Horton v. Hyundai of Alabama*, 402 Fed. Appx. 405, 408 (11th Cir. 2010).

### b.    If Dr. Scott is able to make out a *prima facie* case, then EmCare is only required to articulate its legitimate reasons for its actions.

Assuming Dr. Scott can demonstrate a *prima facie* case, and she is unable to do so, then EmCare can come forward with a legitimate non-discriminatory reason for terminating her.  *King*, 2016 U.S. App. LEXIS at *3.  EmCare is not required to persuade the court that it was actually motivated by the proffered reason.  *Texas Dep't of Comty. Affairs v. Burdine*, 450 U.S. 248, 254-256 (1981).  Rather, EmCare is merely required to introduce admissible evidence that is sufficient to warrant a judgement for EmCare.  Id. at 255.  EmCare's only burden is one of "explaining clearly the non-discriminatory reasons for its actions."  Id. at 260.

### c.    Dr. Scott must show that EmCare's legitimate reason was pretext for retaliation.

Once EmCare explains the legitimate reason for its actions, the focus shifts to Dr. Scott to demonstrate that the proffered reason for the action was not the true

reason for the employment decision. Id. at 256. Dr. Scott cannot show that EmCare's reason for its actions was "'a pretext for discrimination' unless she can show *both* that the reason was false and that discrimination was the real reason." *King¸* 2016 U.S. App. LEXIS at * 3 (citing *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 515 (1993) (emphasis in original)). Further, if the reason proffered by EmCare is one that "might motivate a reasonable employer, an employee must meet the reason head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason or showing that the decision was based on erroneous facts. Id. at *3-*4 (citing *Chapman v. AI Transport*, 229 F.3d 1012, 1030 (11th Cir. 2000) (*en banc*)). Close temporal proximity between the protected activity and the adverse employment ". . . is not necessarily sufficient alone to establish pretext." Id. at *5 (citing *Hurlbert v. St. Mary's Health Care Sys., Inc.*, 439 F.3d 1286, 1298 (11th Cir. 2006)).

### 3. Dr. Scott must show "But For" causation to prevail in her retaliation claim.

Dr. Scott is required to produce evidence that "the desire to retaliate was the but-for cause of the challenged employment action." *University of Texas Southwestern Medical Center v. Nassar*, 133 S. Ct. 2517, 2528 (2013) (citation omitted); *King*, 2016 U.S. App. LEXIS at *5. This standard "require[s] proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Nassar*, 133 S. Ct. at 2533. The

*Nassar* Court spelled out, in terms relevant to Dr. Scott's case, the precise reason

why a higher standard was required of Title VII retaliation claims by stating:

> In addition[,] lessening the causation standard [for retaliation claims] could also contribute to the filing of frivolous claims, which would siphon resources from efforts by the employer, administrative agencies, and courts to combat workplace harassment. Consider in this regard the case of the employee who knows that he or she is about to be fired for poor performance, given a lower pay grade, or even just transferred to a different assignment or location. To forestall that lawful action, he or she might be tempted to make an unfounded charge of racial, sexual, or religious discrimination; then, when the unrelated employment action comes, the employee could allege that it is retaliation. . . . Even if the employer could escape judgement after trial, the lessened causation standard would make it far more difficult to dismiss dubious claims at the summary judgement stage.

Id. at 2531-2532 (ellipses supplied).


**B.    Dr. Scott Cannot Make A *Prima Facie* Case of Retaliation Against EmCare Because She Did Not Engage in Statutorily Protected Activity.**

To establish a *prima facie* case, Dr. Scott must show that she engaged in

statutorily protected activity. *Walton-Horton*, 402 Fed. App'x at 408. To engage in

protected activity, "a plaintiff must demonstrate both that he subjectively believed

that the employer was engaged in unlawful employment practices and that his

belief was objectively reasonable in light of that facts and record presented." *Little*

*v. United Technologies, Carrier Transicold Division*, 103 F.3d 956, 960 (11th Cir.

1997). "If the employee's belief is not both objectively reasonable and in good

19

faith, the complaint does not constitute protected activity." *Standard v. A.B.E.L. Services, Inc.*, 161 F.3d 1318, 1329 (11th Cir. 1998).

Dr. Scott admitted that she had no complaint of gender based discrimination against EmCare.  DE 66-3 at 31, 33 (Dr. Scott Dep. at 123, 12).  Therefore, Dr. Scott's *prima facie* case against EmCare can only be based on her discrimination claim against the Hospital.  DE 66-3 at 12, 23 (Dr.  Scott Dep. at 46 ("My concerns were against Bob Meade. . ."), and at 91 (charge of discrimination was "about Bob Meade and the hospital."), which necessarily fails because the Hospital was not her employer.  But assuming *arguendo* that a plaintiff can base a *prima facie* case upon the acts of a party that is not her employer, Dr. Scott cannot demonstrate any objective evidence that she was subjected to gender based discrimination by either the Hospital or Mr. Meade.

Dr. Scott's entire complaint against the Hospital and Mr. Meade is was that he wanted her fired from the Hospital starting in February 2013.  DE 66-3 at 48 (Dr. Scott Dep. at 191-192).  The basis for Dr. Scott's belief that Mr. Meade's actions were motivated by her gender were:

- Mr. Meade did not seek Dr. Scott's opinion regarding her actions in telling the elderly patient – against that patient's express wishes – that she was going to die;

- Dr. Scott was supposed to be replaced in August 2013 by Dr. Unaeze, a male, and then a subsequent male doctor was interviewed for the position when Dr. Unaeze opted to not work at the Hospital;

20

- Dr. Mittledorf was not fired until he was given the opportunity to have anger management training;

- Dr. Vasile, a female, was fired from the Hospital because she did not say hello to Mr. Meade; and

- A Dr. Marousis, a man, allegedly was able to tell Mr. Meade to "fuck off" and he only received a written warning.

DE 66-3 at 84-85 (Dr. Scott's Response to EmCare's Interrogatory No. 5); DE. 66-3 at 33 (Dr. Scott Dep. at 132).

These assertions by Dr. Scott do not support an objective conclusion that Dr. Scott was subjected to gender based discrimination by the Hospital. First, Dr. Scott did not introduce any evidence that Mr. Meade sought the opinions of male doctors when those male doctors were replaced on a case for ignoring a patient's wishes. Indeed, the only record evidence regarding Mr. Meade's actions is that he did not seek to intervene in the matter. Rather, Mr. Meade merely asked Dr. Schandorf look into the issue. DE 66-13 at 48-49 (Meade Dep. at 46-47). Mr. Meade felt it was better for Dr. Schandorf to deal with the issue "physician to physician." DE 66-13 at 49 (Meade Dep. at 48).

Second, Mr. Meade played no role in the decisions regarding Dr. Mittledorf or Dr. Unaeze. Dr. Mittledorf was terminated pursuant to his employment agreement with Inpatient. DE 66-12 at 1 (Termination letter for Dr. Mittledorf). The decision to terminate Dr. Mittledorf was entirely up to EmCare and the Hospital played no role in that decision. DE 66-5 at 18 (Dr. Schandorf Dep. at 64-

21

65).  Similarly, Dr. Scott admitted that Mr. Meade and the Hospital played no role in selecting either Dr. Unaeze or the subsequent male candidate for Dr. Scott's position.  DE 66-3 at 22 (Scott Dep. at 87).  Decisions in which Mr. Meade and the Hospital played no role cannot provide objective evidence to substantiate a claim of gender based discrimination against them.

The same conclusion holds true for Dr. Scott's claim regarding Dr. Vasile.  Despite Dr. Scott's claim that Dr. Vasile was fired, Dr. Scott was aware that Dr. Vasile continued to work at the Hospital.  DE 66-3 at 52 (Scott Dep. at 206-207).  Dr. Vasile, in fact, was the doctor who assumed Dr. Scott's role after Dr. Scott was removed from a case for telling an elderly patient – against that patient's express wishes – that she was going to die.  Id.   Dr. Vasile continued to work at the Hospital with Mr. Meade's knowledge.  DE 66-3 at 53 (Scott Dep. at 210).  Given that Mr. Meade was both aware of Dr. Vasile's continued employment at the Hospital and that she replaced Dr. Scott in caring for the elderly patient, this claim does not provide any objective evidence to support Dr. Scott's belief that she was being subjected to gender based discrimination.

Dr. Scott's final piece of evidence to support her discrimination claim is her allegation that a Dr. Maurorsis was allowed to swear at Mr. Meade on one occasion and escape with only a written warning.  DE 66-3 at 84-85 (Scott's Response to Interrogatory No. 5).  No physician has ever told Mr. Meade to "fuck

off" and so this claim is yet another one of Dr. Scott's allegations that have no basis in fact. DE 66-13 at 120 (Mr. Meade Dep. at 119). Assuming that there is a Dr. Maurorsis and that he did make this statement to Mr. Meade, a single hearsay claim by another person as to his infraction and the type of discipline he received from Mr. Meade is not sufficient evidence to support an objective belief by Dr. Scott of gender discrimination. Dr. Scott was removed because of multiple serious complaints about her treatment of staff, co-workers, and patients that culminated in her explosion at one of the Hospital's employees in the HR Department. She was not removed due to a single instance of swearing.

Events that did not happen cannot form on objective basis for Plaintiff to conclude that she was the subject of gender based discrimination. See *Standard*, 161 F.3d at 22-23 (no *prima facie* case of retaliation under the ADA where employee did not have objective evidence that he had a disability, despite his subjective belief that he did).

### C.    EmCare Articulated a Legitimate Good Faith Reason for Terminating Dr. Scott.

Assuming that Dr. Scott was able to present a *prima facie* case of retaliation to the District Court, EmCare was tasked with explaining its legitimate, non-discriminatory reason for terminating Dr. Scott's Agreement. *King*, 2016 U.S. App. LEXIS at *3.

Under the terms of EmCare's contract with the Hospital, the necessary

permission for Dr. Scott to work at the facility could be "withdrawn immediately by the Facility's Chief Executive Officer in his or her reasonable discretion at any time with written notice to the Contractor."  DE 66-2 at 1 (¶ 1.B.iii.a).  Bob Meade was the individual given the authority to withdrawal Dr. Scott's permission to work at the Hospital.  DE 66-3 at 12 (Scott Dep. at 47).  EmCare received the required written notice on October 3, 2013 when Mr. Meade sent an email to Dr. Stern stating:

> Dr. Stern,
>
> Due to ongoing behavior issues with Dr. Scott, I am requesting that she be removed from our facility.  Her behavior in our HR department this morning coupled with numerous contentious interactions with staff and patients lead us to believe that she is not a fit with our culture her at DHS.
>
> Bob

Id.; see also DE 66-8 at 1 (email from Robert Meade to Dr. Joel Stern).

Mr. Meade's request was reasonable.  As numerous witnesses testified, there had been a history of complaints regarding Dr. Scott's interactions with both staff and patients at the Hospital.[2]  Dr. Schandorf testified that after about a year and a

---

[2] Throughout her brief, Dr. Scott attempts to tacitly impute the Hospital's policies to EmCare despite the complete lack of evidence that EmCare ever adopted, or was responsible for, any of the Hospital's policies.  For example, Dr. Scott claims that Hospital policy required "written documentation of an incident. . ."  App. Brief at 7.  Dr. Scott subsequently complains that EmCare terminated her even though "EmCare had no written reports or complaints about Dr. Scott."  Id. at 45.  Dr. Scott appears to hope that this Court will overlook the fact that EmCare does not have a policy requiring written reports and, further, that EmCare was moving to

half of working with Dr. Scott, he came to the conclusion that Dr. Scott had a pattern of misbehavior and that "the problem was not going away."  DE 66-5 at 12 (Schandorf Dep. at 41).  Dr. Stern testified that concerns about Dr. Scott were an "ongoing topic" between Dr. Stern and the Hospital and were discussed at multiple meetings Dr. Stern attended with Hospital personnel.  DE 66-6 at 8 (Stern Dep. at 27).  In fact, the complaints about Dr. Scott were already so numerous and serious that on August 1, 2013, Dr. Scott was informed that she was going to be replaced by Dr. Unaeze.  DE 66-3 at 20 (Scott Dep. at 78).  Dr. Scott was being replaced because "everyone felt, you know, she wasn't going to change the issues that were going on . . ."  DE 66-6 at 8 (Stern Dep. at 27).

With this history of misbehavior on Dr. Scott's part, Mr. Meade's written request to remove Dr. Scott after her explosion in the Hospital's HR department was clearly reasonable.  Dr. Scott may quibble about whether or not she "was yelling and screaming[,]" as Mr. Meade told Dr. Stern, DE 66-6 at 9 (Stern Dep. at 32), or if she was merely "upset."  Appellant's Brief at 11.  This dispute is irrelevant.  "[T]he fact that an employer's decision might have been unwise or based on erroneous facts does not give rise to a Title VII employment discrimination claim."  *Etienne v. Muvico Theaters, Inc.*, 2003 U.S. Dist. LEXIS 14036 at *39 (S.D. Fla. 2003), aff'd, 90 Fed. Appx. 383 (11th Cir. 2003) (citing

terminate Dr. Scott without any written reports of her misconduct nearly two months before she filed her EEOC complaint.

*Chapman v. AI Transport*, 229 F.3d 1012, 1030 (11th Cir. 2000) (ADEA)). "An employer may lawfully fire an employee 'for a good reason, a bad reason, a reason based on erroneous facts, or no reason at all, as long as its action is not for discriminatory reasons.'" Id. (Citing *Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1185 (11th Cir. 1984)). EmCare's contractual obligation to remove Dr. Scott from her position at the Hospital upon receipt of the written request from Mr. Meade was a legitimate, non-discriminatory reason for its action.

EmCare also has a legitimate non-discriminatory reason for its termination of Dr. Scott's Agreement. Pursuant to the terms of the Agreement, EmCare is entitled to terminate it "immediately . . . [i]n the event that the appropriate authorities of a hospital at which Employee is providing services request that the Employee no longer provide such services at the hospital." DE 66-1 at 6-7 (¶ 10.A.iii.9). Accordingly, EmCare sent a letter to Plaintiff on behalf of Inpatient terminating the Agreement. DE 66-6 at 11 (Stern Dep. at 40). The letter stated "[d]ue to ongoing behavioral concerns and your contentious interactions with staff and patients, this letter shall constitute formal notice of [Inpatient's] decision to terminate your Agreement pursuant to Section 10.A.(iii).9, which authorizes [Inpatient] to terminate the Agreement upon written request from the Hospital." DE 66-6 at 47 (termination letter). This was a typical termination letter. DE 66-6 at 11 (Stern Dep. at 40). It is a legitimate, non-discriminatory reason for a company

26

such as EmCare to exercise its contractual rights and terminate a physician such as Dr. Scott who has a history of disruptive behavior upon receipt of a demand from a hospital CEO that she be removed.

### D. Dr. Scott cannot show that EmCare's Exercise of its Explicit Contractual Right was a Mere Pretext for Retaliation Against Her.

Dr. Scott's argument that EmCare's exercise of its contractual rights was actually a pretext for retaliation because of her complaint against the Hospital hinges on two erroneous beliefs. First, Dr. Scott claims that EmCare did not follow its own procedures because it gave Dr. Mittledorf a 90-day notice period before terminating his contract. App. Brief at 44-45. Second, Dr. Scott claims that the timing of her discharge decision shows pretext because it was made the same day that EmCare learned of her complaint against the Hospital and Mr. Meade. Id. App. Brief at 40-41. Neither claim holds water. Dr. Scott also mistakenly relies on the case of *Smith v. City of New Smyrna Beach*, 588 F. App'x 965 (11th Cir. 2014) when that case makes clear that Dr. Scott failed to demonstrate any pretext on the part of EmCare.

### 1. *Smith v. City of New Smyrna Beach* supports the grant of summary judgement to EmCare.

Dr. Scott argues that the *Smith* case supports her case. App. Brief at 42-44. *Smith*, however, supports EmCare's decision. In *Smith*, the plaintiff was subjected to a five year barrage of belittling and discriminatory conduct. Some of the

egregious events that the firefighter plaintiff was forced to endure in *Smith* included: she was forced to scrub the toilets and urine off the walls of the restroom while male firefighters watched, id. at 972, she was subjected to a "no tampon" rule in the fire house which meant she had to change tampons in her car in the parking lot, id at 971, and male fire fighters made repeated sexual comments to her by noting that they would like to "bend her over. Id. at 969. In stark contrast, in this case it was Dr. Scott who verbally abused staff and co-workers and ignored the wishes of a dying patient. See e.g. DE 66-3 at 16-17 (Scott Dep. at 63-68).

Despite the contrasts between factual settings of the two cases, Dr. Scott leans heavily on *Smith* for the proposition that temporal proximity is enough to establish pretext. App. Brief at 42-43. A close reading of *Smith* demonstrates that more than temporal proximity is needed for Dr. Scott to establish pretext. In *Smith*, the court held that a plaintiff could establish the causation prong – which is necessary to state a *prima facie* case of retaliation -- by demonstrating a close proximity between the decision maker becoming aware of protected conduct and the adverse employment decision. *Smith*, 588 Fed. App'x at 981. The *Smith* court, however, specifically separated out temporal proximity as a factor in determining pretext by noting that it was temporal proximity between the protected activity and the disciplinary activity "*as well as* the evidence that the City's reasons were pretextual. . ." that could lead a jury to believe that the plaintiff would not have

been terminated in the absence of retaliation.  Id. at 982 (emphasis supplied).

The *Smith* court pointed to the "discussion of Smith's disparate treatment claims" where there was "more than enough evidence for the jury to find that the City's stated reasons for Smith's termination were pretextual."  Id. at 982. Specifically, the *Smith* court noted that the jury could infer pretext because:

- The supervisors most involved in the plaintiff's termination had made comments "demonstrating antipathy towards women";

- The individual who reported that the plaintiff had performed inadequately during the relevant incident "explicitly testified that he did not recommend Smith's termination and thought that she made a good paramedic aside from the . . . incident[]";

- The city's stated reason for the termination was that the plaintiff was no longer qualified to be an EMT, but she presented her EMT license to the city and the doctor in charge testified he would have cleared her to return to work as an EMT;

- The plaintiff had been disciplined numerous times for actions that no male fire fighter had been disciplined for.

Id. at 977-978.  Notably, in this discussion the *Smith* court did not list the timing of the decision as evidence of pretext.  Id.

None of this evidence of pretext is present in this case.  There is no evidence of any anti-female remarks by either Dr. Schandorf or Dr. Stern.  Dr. Scott admitted that she had a "great" relationship with Dr. Schandorf.  DE 66-3 at 22 (Scott Dep. at 87).  Further, in contrast to the testimony that the plaintiff should have been returned to work in *Smith*, Dr. Schandorf testified that he came to the

conclusion that Dr. Scott had a pattern of misbehavior and that "the problem was not going away." DE 66-5 at 12 (Schandorf Dep. at 41). Finally, even the Plaintiff concedes that Dr. Mittledorf was disciplined for the same types of behavior that were the basis for the complaints against her. App. Brief at 44; see also DE 66-5 at 18 (Schandorf Dep. at 64). Dr. Scott merely complains that Dr. Mittledorf received a 90 day notice of his termination while she was immediately terminated. Id. This difference does not provide any proof of retaliation because the Hospital did not request Mitteldorf's immediate removal but did request Scott's.

### 2. EmCare did not violate its own procedures when it immediately terminated Dr. Scott's contract.

Dr. Scott claims that EmCare's decision to terminate her contract was a pretext for retaliation because Dr. Mittledorf received a 90-day termination notice. App. Brief at 44. Dr. Scott ignores the material difference between her situation and that of Dr. Mittledorf. The Hospital never had to exercise its right under its contract with EmCare to force Dr. Mittledorf to leave its premises immediately. DE 90 at 25 (". . .it is undisputed in the record that the Hospital did not demand [Dr. Mittledorf]'s removal.") Had Dr. Scott been replaced in August by Dr. Unaeze, she would have received a 90-day notice just like Dr. Mittledorf. DE 66-6 at 9 (Dr. Stern Dep. at 30). Dr. Scott, however, chose to have an angry confrontation with the Hospital's HR department that led directly to Mr. Meade

requesting her removal from the Hospital.[3]

### 3.    EmCare had been aware of numerous complaints against Dr. Scott and had already attempted to replace her before she made any complaint of discrimination.

Dr. Scott would have this Court believe that the decision to terminate her Agreement was a bolt from the blue with EmCare taking no action against her until the day it learned that she had made a complaint against the Hospital and Mr. Meade. See e.g. App. Brief at 39-40. Dr. Scott ignores her own testimony that she was informed on August 1, 2013 – approximately two months before she filed her complaint – that she was to be replaced by Dr. Unaeze. DE 66-3 at 20 (Scott Dep. at 78). Dr. Scott was being replaced because "everyone felt, you know, she wasn't going to change the issues that were going on . . ." DE 66-6 at 8 (Stern Dep. at 27). Even after Dr. Unaeze opted to not come to work at the Hospital, EmCare kept attempting to replace Dr. Scott. DE 66-3 at 21 (Scott Dep. at 82).

In other words, EmCare had already attempted to replace Dr. Scott and end her Agreement because of her behavior two months prior to her ultimate termination. While Mr. Meade had assented to keeping Dr. Scott after Dr. Unaeze

---

[3] Dr. Scott erroneously claims that there is evidence of more than one Hospitalist getting 90-days' notice before termination. Appellate Brief at 44. There is no evidence concerning any doctor other than Dr. Mittledorf. The citation listed in Dr. Scott's brief – DE 65-6 at 5, 17-18 – appears to be a typo as DE 65 is non-related Motion for Extension of time. The actual citation appears to be 66-6 at 5, 17-18 in which the only physician discussed is Dr. Mittledorf.

did not come to the Hospital, that did not stop EmCare from attempting to find a replacement for her. DE 66-3 at 21 (Scott Dep. at 82).

It is true the final decision to terminate Dr. Scott's Agreement was made the same day that EmCare learned of her complaint but that does not provide evidence that the decision was made *because of* her compliant.  The Supreme Court noted in *Nassar* that an employee such as Dr. Scott in some ways controls the timing of when an employer learns of his or her compliant.  *Nassar*, 133 S. Ct. at 2531-2532. As the Court stated "[c]onsider in this regard the case of the employee who knows that he or she is about to be fired for poor performance . . . [t]o forestall that lawful action, he or she might be tempted to make an unfounded charge of racial, sexual, or religious discrimination; then, when the unrelated employment action comes, the employee could allege that it is retaliation." Id. (ellipses supplied).

If mere timing alone were enough to show pretext, then the wise employee facing termination would be sure to constantly complain to force an employer to trial over a retaliation claim when the termination comes.  In a case such as this one, where EmCare knew of the multiple complaints against Dr. Scott, was already in the process of trying to replace her, and received a report that the Hospital insisted that she be removed immediately because of her confrontation in the HR Department, there must be more than timing to show that EmCare's use of its

explicit contractual right was a pretext for retaliation.  Dr. Scott's burden is even greater in this case because the EEOC complaint at issue did not involve EmCare.

## CONCLUSION

Dr. Scott fails to meet the "but for" standard to prevail on her claim of retaliation against EmCare.  Given the lengthy history of complaints regarding her behavior towards patients and staff, EmCare's attempts to terminate her in August 2013, and the eventual decision to terminate her in early October 2013 when EmCare received a written demand that Dr. Scott be removed from the Hospital immediately because she had, yet again, acted inappropriately towards a staff member, there can be no question that EmCare acted well within its right in terminating Dr. Scott's Agreement immediately.  Dr. Scott cannot point to any evidence that EmCare would not have terminated her Agreement "but for" an intent to retaliate against her for filing an EEOC complaint against the Hospital and EmCare respectfully requests that the District Court's decision granting EmCare summary judgment be upheld.

Respectfully submitted this 20th day of July, 2016.

/s/ Matthew L. Ransdell, Esq.
Matthew L. Ransdell, Esq.
Florida Bar No.: 70390
Jackson Lewis P.C.
100 South Ashley Drive
Suite 2200
Tampa, Florida 33602
Tel: (813) 512-3210

Fax: (813) 512-3211
Matthew.Ransdell@jacksonlewis.com
Sarah.Burdon@jacksonlewis.com
Nicole.Villa@jacksonlewis.com

And

John M. Barr, Esq.
LAW OFFICE OF JOHN M. BARR, PC
4105 Stuart Avenue
Richmond, Virginia 23221
Telephone:   (804) 269-5078
Facsimile:    (571) 499-3796
John.Barr@jmblawoffice.com
*Appearing via Pro Hac Vice*
*Attorneys for Defendant EmCare, Inc.*

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS AND TYPE STYLE REQUIREMENTS

1.      This brief complies with the type-volume limitation of Fed.R.App.P. 32(a)(7)(B) because this brief contains 8,445 words, excluding the parts of the brief exempted by Fed.R.App. 32(a)(7)(B)(iii).

2.      This brief also complies with the typeface requirements of Fed.R.App.P. 32(a)(5) and the type style requirements of Fed.R.App.P. 32(a)(6).  It has been prepared in Word 2013 using a proportionally spaced Times New Roman 14 point font.

*/s/ Matthew L. Ransdell*
Matthew L. Ransdell, Esq.

34

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on the 20th day of July, 2016, Appellee EmCare, Inc.'s Initial Brief was filed using the CM/ECF system and Appellee EmCare, Inc.'s Initial Brief was sent to the Eleventh Circuit Court of Appeals and served on the following parties via electronic mail: Dorothy F. Easley, Esq., Easley Appellate Practice PLLC, attorneys for Plaintiff-Appellant (administration@easleyappellate.com); Jesse M. Tilden, Esq., Tilden & Prohidney, P.L., attorneys for Plaintiff-Appellant (service@tildenprohidney.com); and, Merry E. Lindberg, Esq., Tracey K. Jaensch, Esq., and Daniel K. Miles, Esq., Ford & Harrison LLP, attorneys for Sarasota Doctors Hospital, Inc. and West Florida Physician Network, LLC (mlindberg@fordharrison.com, tjaensch@fordharrison.com, dmiles@fordharrison.com).

*/s/ Matthew L. Ransdell*
Matthew L. Ransdell, Esq.