APPEAL NO. 16-10763-E

UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT


DR. MICHELLE G. SCOTT, M.D.

Plaintiff-Appellant

v.

SARASOTA DOCTORS HOSPITAL, INC., ET AL

Defendants-Appellee

_____

ON APPEAL FROM A FINAL JUDGMENT OF THE UNITED STATES
DISTRICT COURT FOR THE MIDDLE DISTRICT OF FLORIDA

CASE NO. 8:14-CV-01762-JSM-TBM

_____

**BRIEF OF DEFENDANT-APPELLEE
SARASOTA DOCTORS HOSPITAL, INC.**
_____

Tracey K. Jaensch, Esquire
Florida Bar No. 907057
Ford & Harrison LLP
101 E. Kennedy Boulevard, Suite 900
Tampa, FL  33602
(813) 261-7800  Telephone
(813) 261-7899  Facsimile

Attorney for Defendant-Appellee
Sarasota Doctors Hospital, Inc.

APPEAL NO. 16-10763-E
*SCOTT V. SARASOTA DOCTORS HOSPITAL, INC., ET AL*

## APPELLEES, SARASOTA DOCTORS HOSPITAL, INC.'S CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Appellees, Sarasota Doctors Hospital, Inc. (hereinafter "Appellee"), through its undersigned counsel and pursuant to Rule 26.1, Fed. R. App. P., and Eleventh Circuit Internal Operating Rules 5-2, 26.1-1, -2 and -3, hereby files its Certificate of Interested Parties and Corporate Disclosure Statement:

1.      Sarasota Doctors Hospital, Inc. is a Florida Corporation d/b/a Doctors Hospital of Sarasota with its principal place of business in Sarasota, Florida.

2.      West Florida Physician Network, LLC d/b/a Healthcare America is a Florida LLC with its principal place of business in Sarasota, Florida, and has been dismissed with prejudice from the case and no longer has an interest in it.

3.      According to filings by Emcare, EmCare, Inc. is a foreign corporation with its principal place of business in Greenwood, Colorado. EmCare, Inc. is a wholly owned subsidiary of EmCare Holdings, Inc. which is itself wholly owned by EmCare Hold Co Inc.  EmCare Hold Co Inc. is wholly owned by Emergency Medical Services LP Corporation, which is wholly owned by Envision Healthcare Corporation, which, in turn, is wholly owned by Envision Healthcare Intermediate Corporation.  Envision Healthcare Intermediate Corporation is a wholly owned

APPEAL NO. 16-10763-E
*SCOTT V. SARASOTA DOCTORS HOSPITAL, INC., ET AL*

subsidiary of Envision Healthcare Holdings, Inc., a publicly traded company

(Stock Ticker Symbol: EVHC).

 4. Dr. Michelle Scott is a natural person.

 Appellee further certifies that the following persons and entities have some

interest in the outcome of the case:

 5. Barr, John Mills (*Pro Hac Vice* Attorney for Defendant-Appellee

EmCare, Inc.)

 6. Basic American Medical, Inc.

 7. Easley, Dorothy F. (Appellate Attorney for Plaintiff-Appellant)

 8. Easley Appellate Practice PLLC (Appellate Law Firm for Plaintiff-

Appellant)

 9. EmCare, Inc. (Defendant-Appellant)

 10. Ford & Harrison, LLP (Counsel of Record and Trial Law Firm for

Defendant-Appellees Sarasota Doctors Hospital, Inc. and West Florida Physician

Network, LLC.)

 11. Glenn Rasmussen Fogarty & Hooker, P.A. (Law Firm for Mediator,

Mark A. Hanley)

 12. Hanley, Mark A. (Mediator)

 13. HCA Holdings, Inc.

APPEAL NO. 16-10763-E

*SCOTT V. SARASOTA DOCTORS HOSPITAL, INC., ET AL*

14.    HCA Inc.

15.    Healthtrust, Inc. – The Hospital Company

16.    Hercules Holding II, LLC

17.    HTI Hospital Holdings, Inc.

18.    Jackson Lewis P.C. (Trial Law Firm for Defendant-Appellee EmCare, Inc.)

19.    Jaensch, Tracey K. (Counsel of Record and Trial Attorney for Defendant-Appellees Sarasota Doctors Hospital, Inc. and West Florida Physician Network, LLC.)

20.    Law Office of John M. Barr, P.C. (Law Firm for Defendant-Appellee EmCare, Inc.)

21.    Lechner, Jay P. (Former Counsel of Record below for Defendant-Appellee EmCare, Inc.)

22.    Lindberg, Mary E. (a counsel of Record below for Defendant-Appellees Sarasota Doctors Hospital, Inc. and West Florida Physician Network, LLC.)

23.    Miles, Daniel K. (a Counsel of Record below and attended trial on behalf of Defendant-Appellees Sarasota Doctors Hospital, Inc. and West Florida Physician Network, LLC.)

APPEAL NO. 16-10763-E
*SCOTT V. SARASOTA DOCTORS HOSPITAL, INC., ET AL*

24.    McCoun, The Honorable Thomas B. III (United States Magistrate Judge)

25.    Moody, The Honorable James S. Jr. (United States District Judge)

26.    Prohidney, Michael J. (Trial Attorney for Plaintiff-Appellant)

27.    Romano, Jay F. (Former Attorney below for Plaintiff-Appellant)

28.    Romano Law Center, PA (Former Trial Law Firm for Plaintiff-Appellant)

29.    Randsell, Matthew L. (Trial Attorney for Defendant-Appellee EmCare, Inc.)

30.    Tilden, Jesse M. (Trial Attorney for Plaintiff-Appellant)

31.    Tilden & Prohidney, P.L. (Trial Law Firm for Plaintiff-Appellant)

DATED this 20th day of July, 2016.

Respectfully submitted,

/s/ Tracey K. Jaensch
FORDHARRISON LLP

## STATEMENT REGARDING ORAL ARGUMENT

Defendant-Appellee ("Hospital") opposes oral argument. The record and briefs reveal that this appeal borders on the frivolous, particularly as to the two issues related to the Hospital. Unless the Court has clarifying questions, oral argument would therefore not significantly aid the decisional process and would constitute a waste of time and resources. It would do no more than afford Plaintiff-Appellant ("Scott") a chance to present her unsuccessful jury argument—on full display in her Brief of Appellant—yet again.

# TABLE OF CONTENTS

**Page**

APPELLEES, SARASOTA DOCTORS HOSPITAL, INC.'S
    CERTIFICATE OF INTERESTED PERSONS AND CORPORATE
    DISCLOSURE STATEMENT ................................................................C-1

STATEMENT REGARDING ORAL ARGUMENT ................................................i

STATEMENT REGARDING ADOPTION OF BRIEFS OF OTHER
    PARTIES .................................................................................. vii

STATEMENT OF SUBJECT MATTER AND APPELLATE
    JURISDICTION ......................................................................... viii

STATEMENT OF THE ISSUES
RELATED TO DEFENDANT-APPELLEE HOSPITAL.......................................1

NATURE OF THE CASE ........................................................................2

COURSE OF PROCEEDINGS AND DISPOSITION BELOW ...........................2

STATEMENT OF FACTS .......................................................................10

STANDARD OF REVIEW ......................................................................23

SUMMARY OF THE ARGUMENT ...........................................................28

ARGUMENT AND CITATIONS OF AUTHORITY ........................................29

1.    THERE WAS MORE THAN SUFFICIENT EVIDENCE TO
      SUPPORT THE JURY'S VERDICT FINDING THAT THE
      HOSPITAL WAS NOT SCOTT'S JOINT EMPLOYER...........................29

2.    THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION
      WHEN IT EXCLUDED SCOTT'S PROFERRED "ME TOO"
      WITNESS, ESPECIALLY BECAUSE THE JURY'S VERDICT
      HAS MADE IT UNNECESSARY TO REACH THE ISSUE THAT
      THE TESTIMONY WAS OFFERED TO ADDRESS...............................38

CONCLUSION .....................................................................................44

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME
LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE
REQUIREMENTS ..........................................................................................45

CERTIFICATE OF SERVICE ................................................................................46

# TABLE OF CITATIONS

**Page**

**Federal Cases**

*Adams v. Austal, U.S.A., L.L.C.,*
   569 F. App'x 732 (11th Cir. 2014)....................................................25

*Adams v. Austal, U.S.A.*, L.L.C.,
   754 F.3d 1240 (11th Cir. 2014) .......................................................43

*Alexander v. Avera St. Luke's Hosp.,*
   768 F.3d 756 (8th Cir. 2014) ...........................................................38

*Amegy Bank Nat'l Ass'n v. Deutsche Bank Alex.Brown,*
   619 F. App'x 923 (11th Cir. 2015)............................................ 25, 26

*Ashkenazi v. S. Broward Hosp. Dist.,*
   607 F. App'x 958 (11th Cir. 2015)............................................ 31, 37

*Bhogaita v. Altamonte Heights Condominium Ass'n, Inc.,*
   765 F.3d 1277 (11th Cir. 2014) .......................................................24

*Brown v. Sheriff of Orange Cnty. Fla.,*
   604 F. App'x 915 (11th Cir. 2015)...................................................25

*Castle v. Sangamo Weston, Inc.,*
   837 F.2d 1550 (11th Cir. 1988) .......................................................24

*Cobb v. Sun Papers, Inc.,*
   673 F.2d 337 (11th Cir. 1982) .........................................................30

*Conroy v. Abraham Chevrolet-Tampa, Inc.,*
   375 F.3d 1228 (11th Cir. 2004) .......................................................26

*Demers v. Adams Homes of Northwest Fla., Inc.,*
   321 F. App'x 847 (11th Cir. 2009)...................................................30

# TABLE OF CITATIONS

**Page**

*Dutton v. United States*,
  621 F. App'x 962 (11th Cir. 2015)........................................................36

*Goldsmith v. Bagby Elevator Co.*,
  513 F.3d 1261 (11th Cir. 2008)............................................................42

*Goulah v. Ford Motor Co.*,
  118 F.3d 1478 (11th Cir. 1997)................................................... 27, 30

*Gowski v. Peake*,
  682 F.3d 1299 (11th Cir. 2012)................................................... 24, 26

*Health First, Inc. v. Hynes*,
  628 F. App'x 723 (11th Cir. 2016)......................................................27

*Hewitt v. B.F. Goodrich Co.*,
  732 F.2d 1554 (11th Cir. 1984)..........................................................26

*Jackson v. United Parcel Serv., Inc.*,
  593 F. App'x 871 (11th Cir. 2014)......................................................43

*King v. Volunteers of Am., N. Ala., Inc.*,
  614 F. App'x 449 (11th Cir. 2015)......................................................43

*Lipphardt v. Durango Steakhouse of Brandon, Inc.*,
  267 F.3d 1183 (11th Cir. 2001).........................................................25

*Llampallas v. Mini-Circuits, Lab. Inc.*,
  163 F.3d 1236 (1lth Cir. 1998).................................................. 31, 36

*Mantiply v. United States*,
  634 F. App'x 431 (5th Cir. 2015).......................................................37

*McGinnis v. American Home Mtge. Servicing, Inc.*,
  817 F.3d 1241 (11th Cir. 2016).................................................. 24, 26

# TABLE OF CITATIONS

**Page**

*Middlebrooks v. Hillcrest Foods, Inc.*,
    256 F.3d 1241 (11th Cir. 2001) ...........................................................24

*Nat'l Fire Ins. Co. of Hartford v. Fortune Constr. Co.*,
    320 F.3d 1260 (11th Cir. 2003) ...........................................................24

*Pardazi v. Cullman Med. Ctr.*,
    838 F.2d 1155 (11th Cir. 1988) ...........................................................31

*Phillips v. Maintenance Servs., Inc.*,
    711 F.2d 1524 (11th Cir. 1983) ...........................................................42

*Ramirez v. E.I. DuPont de Nemours & Co.*,
    579 F. App'x 878 (11th Cir. 2014) .......................................................25

*Reeves v., Sanderson Plumbing Prods., Inc.*,
    530 U.S. 133, 120 S. Ct. 2097 (2000) ......................................... 24, 26

*Rosenfield v. Wellington Leisure Prods., Inc.*,
    827 F.2d 1493 (11th Cir. 1987) ...........................................................24

*Spirides v. Reinhardt*,
    613 F.2d 826 (D.C. Cir. 1979) .............................................................31

*Spulak v. K Mart Corp.*,
    894 F.2d 1150 (10th Cir. 1990) ...........................................................42

*Tsosie v. United States*,
    452 F.3d 1161 (10th Cir. 2006) ...........................................................36

*Vista Marketing, LLC v. Burkett*,
    812 F.3d 954 (11th Cir. 2016) ................................................. 26, 27, 38

*Wojewski v. Rapid City Regional Hosp.*,
    450 F.3d 338 (8th Cir. 2006) ...............................................................38

# TABLE OF CITATIONS

**Page**

*Xie v. University of Utah*,
243 F. App'x 367 (10th Cir. 2007) ......................................................38

**Federal Statutes**

28 U.S.C. § 1291 .................................................................................... vii

28 U.S.C. § 2111 .....................................................................................27

28 U.S.C. §§ 1331 .................................................................................. vii

42 U.S.C. § 2000e ............................................................................. vii, 2

42 U.S.C. § 2000e(f) ...............................................................................30

Fla. Stat. §§ 762.01 .................................................................................3

**Federal Rules**

Fed. R. Civ. P. 59(a).................................................................................8
Fed. R. Evid. 403 ......................................................................... 5, 40, 43
Fed. R. App. P. 3 .................................................................................... vii
Fed. R. App. P. 4 .................................................................................... vii
Fed. R. App. P. 26.1 .................................................................................1
Fed. R. App. P. 32(a)(5)..........................................................................45
Fed. R. App. P. 32(a)(6)..........................................................................45
Fed. R. App. P. 32(a)(7)(B) ....................................................................45
Fed. R. App. P. 32(a)(7)(B)(iii) ..............................................................45

## STATEMENT REGARDING ADOPTION OF BRIEFS
## <u>OF OTHER PARTIES</u>

Appellee Doctors Hospital does not adopt any part of any other party's brief.

## <u>STATEMENT OF SUBJECT MATTER AND APPELLATE JURISDICTION</u>

The district court's subject matter jurisdiction was based on 28 U.S.C. §§ 1331 (federal question) and 1367 (supplemental jurisdiction) as well as 42 U.S.C. § 2000e *et seq.* as Scott's complaint alleged violation of Title VII of the Civil Rights Act of 1964 as amended and the Florida Civil Rights Act of 1992 as amended.

This Court has jurisdiction to hear this appeal pursuant to 28 U.S.C. § 1291 (appeal from final decision of district court) and Rules 3 and 4 of the Federal Rules of Appellate Procedure.

Plaintiff filed timely notices of appeal from final orders disposing of all her claims. (R.154, 169).[1]

---

[1] References to the record on appeal are designated in this brief as "R" (the document number assigned in the Pacer docket sheet) and, if necessary, the page of that document (**R__ - page #**). "**TR**" refers to the trial transcript, filed in the record as documents 157 (Trial Day 1), 158 (Trial Day 2), 161 (Trial Day 3), and 162 (Trial Day 4),followed by page numbers. **TR Ex** refers to trial exhibits.

## STATEMENT OF THE ISSUES
## RELATED TO DEFENDANT-APPELLEE HOSPITAL

**I.    Did the district court abuse its discretion when it denied Plaintiff-Appellant ("Scott") a new trial following a jury verdict against her on a dispositive issue**?

The answer is No. There was overwhelming evidence at trial, most of it adduced by Scott herself, to support the jury's specific fact finding that the Hospital was not Scott's employer, precluding Hospital liability. The jury was properly instructed on the law (as all agree); heard the evidence and arguments; assessed witnesses' credibility; and drew a reasonable conclusion. The district court properly denied Scott a new trial on this basis.

**II.    Did the district court abuse its discretion when it excluded "me too" evidence Scott proferred, and if so, did substantial harm result**?

The answer is No again. The district court acted well within its discretion, and consistently with 11th Circuit authority, when it excluded evidence consisting of the alleged opinions of another female doctor regarding Hospital attitudes. In any event, the evidence as proferred would not have addressed what turned out to be the dispositive issue, Scott's employment status; thus even if its exclusion had been error, it would have been harmless. A new trial was likewise unwarranted on this ground, as the court below properly concluded.

**The Court should affirm the judgment below as to the Hospital in all respects.**

- 1 -

# STATEMENT OF THE CASE

**Nature of the Case**

In this appeal, Plaintiff-Appellant Dr. Michelle Scott ("Scott") seeks to overturn a jury verdict in favor of Defendant-Appellee Sarasota Doctors Hospital ("Hospital") on her claims of sex discrimination and retaliation under Title VII and a parallel Florida statute. The properly instructed jury found as a fact that Scott was not an employee of the Hospital, precluding any finding of Hospital liability. Judgment in favor of the Hospital was entered accordingly.

Arguing that the jury's unanimous verdict was against the great weight of the evidence, Scott insists on appeal that the district court abused its discretion by upholding the verdict and denying her a new trial. She also claims the court abused its discretion by excluding "me too" evidence she proferred from another female physician who once worked at the same Hospital, and also seeks a new trial on that basis.

The judge and jury decided both issues correctly, well within the bounds of their respective discretion and decision-making authority. The judgment below as to the Hospital should be affirmed in all respects.

**Course of Proceedings and Disposition Below**

Scott initiated this litigation on July 21, 2014, with a Complaint (R.1) alleging gender discrimination and retaliation under Title VII of the Civil Rights Act of 1964

("Title VII"), 42 U.S.C. §§ 2000e *et seq.*, and its Florida counterpart, the Florida Civil Rights Act ("FCRA"), Fla. Stat. §§ 762.01 *et seq.*, and demanding a jury. She named as Defendants the Sarasota Doctors Hospital, Inc., ("Hospital"); EmCare, Inc. (EmCare") (Scott's sole employer, as the jury rightly found); and — later dismissed by joint motion and order (R.87-88) — the West Florida Physicians Network. Against EmCare, Scott did not allege discrimination but only asserted a retaliation claim.

Answers with affirmative defenses, denying all wrongdoing and liability, were duly filed by EmCare (R.7) and the Hospital (R.12). Scott replied to the affirmative defenses. (R.16).

In its Answer the Hospital repeatedly stressed that Scott was never a Hospital employee and was thus not eligible for relief under either the federal or state statute. (R.12 at ¶¶ 1, 2, 4, 5, 7, 8, 17, 18, 19, 23, 24, 25, 26, 30, 56, 57, 58, 59, 60, 61, 62, 64, 65, 66, 67, 68, 69). The Hospital noted in its initial pleading that the Hospital had contracted with EmCare for EmCare to provide hospitalist physicians in EmCare's employ to treat patients at the Hospital, and that Scott was one of the hospitalists EmCare assigned to the Hospital. (R.12 at ¶¶ 8, 69).

Following discovery, on September 11, 2015, both the Hospital (R.64) and EmCare (R.66) moved for summary judgment, with various supporting documents. Scott opposed both motions (R.78, 79), and EmCare responded (R.86).

In her opposition to the Hospital's summary judgment motion (R.78), Scott argued that the issue of whether she was an employee of the Hospital was a fact question for the jury to decide: "The weighing of evidence and determination of credibility are functions of the jury, not the judge." (R.78, p. 11). "If the determination of the case rests on which competing version of the facts or events is true, the case should be submitted to the trier of fact." *Id.* (emphasis added).

Scott got her wish. In an Order (R.90) entered November 5, 2015, the district court agreed with her contention that her employment status was a question for the jury to decide (R.90, p. 2), denied summary judgment as to the Hospital, and ultimately submitted her case against the Hospital, including the question of her employment status, to a jury.[2]

On November 24, 2015, the Hospital filed a motion for judgment as a matter of law (R.99), which Scott opposed (R.109) and which on December 16, 2015, the district court denied without prejudice as premature (R.110).

Also on November 24, 2015, the Hospital moved in limine to exclude certain evidence at trial (R.98), which Scott opposed (R.106), and which after a hearing on December 16, 2015, the district court granted in part and denied in part. (R.111).

---

[2] In the same Order (R. 90) the Court granted EmCare summary judgment as to the only claim against it (retaliation), then entered Judgment dismissing EmCare from the suit. (R.91).

More specifically as it relates to Issue No. 2 of this appeal, the Hospital's motion in limine included a request that the court exclude the testimony of Dr. Tracy Vasile, a female hospitalist physician in the Sarasota area who was assigned by her employer (which was not EmCare) to work at the Hospital on two different occasions.[3] This was going to be "me too" testimony of a very broad, impressionistic type: In her deposition, Scott had testified that Vasile (according to what Scott's supervisor, Dr. Schandorf, allegedly told Scott that Vasile told Schandorf) "feels that the [Hospital] is kind of like a big boys club … women clearly are – especially when it comes to Bob Meade, clearly expected to act a little different, be a little nicer, smile a little bit more, you know, certainly remember his name…" (R.98, p. 13, quoting R.68, Scott dep., pp. 135-136). This is what Scott wanted the jury to hear. In its pretrial motion to exclude, the Hospital argued, with supporting citations, that such testimony was not relevant or probative, and that even if it were, its probative value would be "substantially outweighed by the danger of unfair prejudice, confusion of the issues, misleading the jury or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Fed. R. Evid. 403.

---

[3] Like Scott, Vasile was not a Hospital employee but was a physician with Hospital privileges. Unlike Scott, Vasile was not an EmCare employee, nor did she ever assert a claim against the Hospital that she faced gender discrimination or harassment. (TR Day Two, p. 92). It should be noted that "Vasile" is the correct spelling of her name. In the trial transcript it appears as "Vasille," and when quoting from the transcript herein, that misspelling will be corrected.

In her reply arguing for the admission of Vasile's testimony (R.106), Scott contended that it would provide evidence of "similar disparate treatment" of women and of "discriminatory intent" on the part of the Hospital and its CEO, Bob Meade. (R.106, pp. 6-8). Scott's counsel made similar arguments when this question arose at trial: TR Day Two, pp. 91-113. For example, Scott's counsel stated at trial:

> We're simply introducing her testimony, her experiences with Bob Meade and the hospital, and the procedures there to help establish in our own case Mr. Meade's discriminatory intent with respect to Dr. Scott.

(TR Day Two, p. 98). None of Scott's submissions or statements with reference to Vasile's proferred testimony indicated that she knew anything about Scott's employment status in relation to the Hospital, or showed how if at all Vasile's proferred testimony would relate to that dispositive issue. At trial the district judge properly excluded the testimony (TR Day Two, p. 112), a decision he later reaffirmed in denying Scott's post-trial motion for new trial. (R.166, p. 3).

Scott's claim against EmCare having been dismissed on summary judgment, the case proceeded to trial solely against the Hospital. With Hon. James S. Moody, District Judge, presiding, the trial took place over a four-day period, January 19-22, 2016, most of which time was consumed by Scott's case in chief. The Hospital renewed its motion for judgment as a matter of law at the close of Scott's proof, on Day Three of the trial, January 21 (R.133; TR Day Three, pp. 53-57). The court took

the Hospital's motion under advisement (TR Day Three, p. 56) and the trial proceeded to its conclusion.

At trial, most facts were undisputed. Except for Vasile's proferred testimony, there were virtually no objections by either party to the proof presented to the jury. The parties agreed on joint trial exhibits and submitted joint jury instructions (TR Day Three, p. 92). The court gave the instructions the parties submitted, including those describing the legal factors that courts have identified for use in determining a party's employment relationship. (R.139, pp. 8-9).

The district court submitted the case to the jury on a series of interrogatories, and on January 22, after deliberating four hours, the jury returned a verdict in favor of the Hospital. (R.136). Specifically, in response to the first interrogatory on the Verdict Form, the jury found as a fact that Scott had no employment relationship with the Hospital, obviating the need for the jury to answer subsequent interrogatories relating to discrimination and retaliation:

## **VERDICT FORM**

Do you find from a preponderance of the evidence:

1.      That Doctor's Hospital was a joint employer of Dr. Scott?

Answer Yes or No        <u>NO</u>

If your answer is "No" to question 1 that ends your deliberations, and your foreperson should sign and date the last page of this verdict form. [This was done. R136, p. 4.]

On January 22, 2016, the district court entered Judgment accordingly in favor of the Hospital (R.140) with a corresponding Order dismissing the case (R. 141).

On February 19, 2016, Scott moved for a new trial under Fed. R. Civ. P. 59(a) (R.152), which the Hospital opposed (R.165) and the district court denied (R.166) on March 7, 2016. In her new trial motion Scott raised the same issues she now raises on appeal with respect to the Hospital. In its Order the district court held that Scott "has not met the high burden of proving entitlement to a new trial." (R.166, p. 1).

Regarding the jury's finding that the Hospital was not her joint employer, the court in its Order denying a new trial noted that the jury had been properly instructed as to the factors to be weighed in determining joint employment and that there was "ample" and "more than sufficient" proof at trial to support the jury's finding on that issue. (R.166, p. 2). For this conclusion the court cited the testimony of seven witnesses—all called by Scott: Dr. Michael Schandorf, Theodore (Ted) Haumesser, Tamika Baker, Theresa Levering, Bob Meade, Dr. Joel Stern, and Scott herself. *Id.*

As for Scott's claim that a new trial was warranted because the court had excluded a "me too" witness (Dr. Tracy Vasile), the court in its Order denying new trial observed that Scott proferred Vasile to testify only about Vasile's "personal interactions with Bob Meade [the Hospital's CEO] as evidence of gender discrimination." Reaffirming its earlier reasoning for excluding such testimony, the court also held that the exclusion "had no impact on the verdict," explaining, "Simply put, the

jury returned a verdict for [the Hospital] on the sole issue of joint employment. Plaintiff does not establish how Dr. Vasile's testimony would have been relevant to that issue." (R.166, p. 3).[4]

Scott filed timely notices of appeal (R.154, 169) from the Judgment in favor of the Hospital (R.140, 141) based on the jury verdict (R.136); from the denial of Scott's new trial motion (R.166); and from the earlier order and judgment dismissing EmCare on summary judgment (R.90, 91).

---

[4] In her brief for this Court, Scott, informed by hindsight, leaves the impression that she had also proferred Vasile's testimony on the issue of the employment relationship between hospitalists and the Hospital. The record shows otherwise.

## STATEMENT OF FACTS

As indicated, most of the relevant facts the jury received were undisputed. Nearly all came from the mouths of witnesses Scott called, including Scott herself, and from the parties' joint exhibits.

### 1.    Scott signs an employment contract with EmCare and is assigned to hospitals in the Sarasota-Bradenton area, including the Hospital.

Scott is a medical doctor specializing in internal medicine. (TR Ex. J-2). During the period in question she practiced as a hospitalist. A hospitalist is a hospital-based primary care physician, admitting patients and managing their care during hospital stays. (TR Day One, pp. 99-100). They serve patients who lack their own primary care physicians, or whose primary care physicians do not have privileges at the Hospital. *Id.*, p. 114.

Through an agency (an entity known as Inpatient Services of Florida) EmCare manages physician practice groups (such as Scott's) with whom it contracts, totaling some 3,000 doctors, and enters contracts with hospitals to provide the hospitals with physicians from the groups as needed. (TR Day One, pp. 185, 220; TR Day Two, pp. 10-11; TR Day Three, p. 14). During the relevant time period, among the Hospitals with which EmCare had such a contract was the Hospital, pursuant to which EmCare supplied the Hospital with hospitalist physicians, such as Scott, as

well as Emergency Room doctors. (TR Day One, p. 221; TR Day Two, pp. 29, 32).[5] Depending on the season, the Hospital might have anywhere from four to six EmCare hospitalists working at its facility. (TR Day Two, p. 77). EmCare has no ownership connection with the Hospital; they are two arms-length entities whose relationship is strictly contractual. (TR Ex. J-61).

The physicians who work at the Hospital and use the Hospital's facilities, whether under contract with a physician group or solely by virtue of privileges, are organizationally independent of the Hospital's administration. Though all doctors who use the Hospital's facilities are subject to Hospital policies, the physicians police themselves and elect their own medical leadership. (TR Day Two, pp. 75-76). The Hospital does not bill patients for EmCare doctors' services. (TR Day One, pp. 235-236).

EmCare is a for-profit enterprise; its director of client administration, Theodore (Ted) Haumesser—a witness Scott called at trial—testified that he ensured EmCare's profitability through controlling expenses and issuing profit-and-loss reports, and he often participated in EmCare's decisions to hire and fire staff and medical providers. (TR Day One, p. 224).

---

[5] EmCare's hospital agreement (TR Ex. 60) was actually with West Florida Division, Inc., of Hospital Corporation of America ("HCA"), the Hospital's parent company. (TR Day Two, pp. 29-31; TR Day Three, p. 14). What began as a contract between EmCare and the Hospital later became an HCA division-wide agreement with EmCare. (TR Day Two, p. 31).

On November 1, 2011, Scott entered into an employment agreement with EmCare, which spells out the physician employee's duties as an EmCare employee and responsibilities to any and all EmCare's customer hospitals to which EmCare assigns him or her. (TR Day One, p. 175; TR Ex. 3). Scott's own trial testimony addressed the central issue:

> **Q.    To be clear, Dr. Scott, you weren't employed by the Hospital in any way, were you?**
>
> **A.    My contract, I guess, was with EmCare.**

TR, Day Two, p. 175. As the jury heard, her deposition answer to the same question was even cleaner: "No." *Id.*, p 177. She readily admitted at trial that the Hospital did not pay her, offer her any insurance or other benefits, or withhold her taxes. *Id.*, pp. 177-178. Nor, as she also conceded, did the Hospital do any performance evaluations on her or submit her to any HR orientation. *Id.*, p. 178. She received an employee handbook from EmCare but none from the Hospital. *Id.*, p. 179.

According to undisputed testimony at trial as well as the pertinent contracts, EmCare alone had the authority to hire and fire its physicians, not the hospitals that are EmCare's customers. *Id.*, p. 232. In fact, EmCare's contract with its physicians specifies that they cannot work directly for any hospital to which EmCare introduces them without affording EmCare a right of first refusal. *Id.*, pp. 232-233. Scott's contract with EmCare contained this noninterference clause. *Id.*, pp. 233-234; TR Ex. 3, p. 3, ¶ 4.

As was undisputed, EmCare alone set the terms of the compensation its physicians (including Scott) received; the hospitals to which EmCare assigns its physicians had no part in compensation decisions. (TR Day One, p. 234; TR Day Three, pp. 5-6). In fact the Hospital's CEO Bob Meade never saw the contracts between EmCare and its doctors and had no idea what they were paid. (TR Day Two, p. 89). It was likewise uncontroverted that EmCare withheld its hospitalists' taxes and offered all their benefits, including health and dental insurance, malpractice insurance, and 401(k) benefits, as Scott admitted at trial. (TR Day One, pp. 235-236; TR Day Three, pp. 4, 9). She also testified that EmCare provided her with business expenses and a reimbursement limitation of $2000.00. (TR Day Three, pp. 4-5).

In December 2011 EmCare assigned Scott to work at the Hospital, where she worked until November 2013. *Id.*, p. 103. During part of the period she was working at the Hospital, EmCare also assigned her to work part-time at the Blake Medical Center ("Blake") in nearby Bradenton, Florida. (TR Day One, pp. 135-137; TR Day Two, pp. 119, 209-210).

### 2.    Dr. Schandorf, an EmCare employee who recruited Scott for EmCare, becomes her supervisor.

Dr. Michael Schandorf ("Schandorf"), himself a hospitalist physician employed by EmCare and assigned to the Hospital, recruited Scott for EmCare and was Scott's direct supervisor while she worked for EmCare, including the entire period she was assigned to the Hospital (TR Day One, pp. 99, 102-103), as well as

the overlapping period when she worked at Blake. *Id.*, pp. 135-137, 187; TR Day Two, p. 180; TR Day Three, p. 9). Schandorf's supervisor was EmCare Vice President Dr. Joel Stern. (TR Day One, pp. 173-174; TR Day Three, p. 15).

As part of his recruiting responsibilities with EmCare, Schandorf was the first to make contact with Scott, and he conducted an initial interview with her. (TR Day One, p. 132; TR Day Two, p. 181). He then referred her to Bob Meade, the Hospital's CEO, and to others in the Hospital's administration, for a second interview. (TR Day One, pp. 103-105, 193-194; TR Day Two, pp. 28, 117, 181). Meade had no part in selecting doctors to be interviewed; Schandorf alone did that. (TR, Day One, pp. 191-192). Nor did Meade ever meet or speak with Scott again after that initial interview other than a brief moment in passing when they were both sitting in the Hospital's doctors' lounge one day. (TR Day Two, pp. 94-95, 182-183).

Schandorf received positive feedback from Scott's interviews, and so it was that he approved Scott for privileges at the Hospital and assigned her to work there. *Id.*, pp. 103-105, 132-133; TR Ex. 40.

As Scott's EmCare supervisor, Schandorf worked with her on a daily basis throughout the time she was assigned to the Hospital. (TR, Day One, p. 134). He also performed performance reviews for EmCare physicians such as Scott. *Id.*, p. 225.

Regardless of who employed them, doctors who regularly worked at the Hospital's facility also served on various committees there. For example, Schandorf served on various committees and in medicine-related leadership capacities at the Hospital. Due to the high regard in which he was held by his professional colleagues, he was chosen as the Hospital's chief of medicine, having been independently selected for that position by all doctors (approximately 500) with privileges at the Hospital—a decision into which Hospital administrators had no input. (TR Day One, pp. 206-207; TR Day Two, pp. 75-76).

Schandorf and another EmCare representative, Dr. Stern, met periodically with EmCare's customer representatives, the Hospital's administrative team, a group known as the "C suite" (*e.g.*, CEO, CNO, COO, CFO), primarily to review such matters as metrics in relation to physician staffing and peer review requirements— such topics as wait times and efficiency issues, and matters connected with professional credentialing and hospital accreditations—which by law and regulations, hospitals and physicians must do. (TR Day One, 116-118; TR Day Two, p. 35-36, 86-87; TR Day Three, pp. 16-18, 95-105).

When it came to medical service matters, Hospital administrators deferred to the physicians, in this case Schandorf and Stern, to handle things and in general did not interfere with their methods or decisions as to such matters, allowing them to exercise their independent medical judgment. (TR Day One, pp. 123, 127, 143; TR

Day Two, pp. 40-41, 48). Contractually, the Hospital essentially only had the power to approve physician placement at the Hospital and to request that a physician assigned to the Hospital be removed. (TR Ex. J-61; TR Day One, pp. 232-238). Hospital administrators did not even know which hospitalists would be assigned to work there on a given day; the administrators more or less stood by until someone showed up. (TR Day One, pp. 190-191).

As a physician who had Hospital privileges and used the Hospital's facilities, Scott herself served on some of its medical committees. (TR Day Two, p. 172; TR Day Three, p. 126).

In addition, for his employer, EmCare, Schandorf served as site medical director at the Hospital. During the general period in question, at various times he was also EmCare's site director for Blake in Bradenton, with which EmCare had a contract, and he also had experience as a site medical director at a Tampa hospital. (TR Day One, pp. 100-103, 187-189). In that capacity as an EmCare representative, he recruited doctors (such as Scott) for EmCare's hospitalist group and supervised them in their patient care, in whatever hospital(s) EmCare assigned them to. *Id.*, p. 100. It was fairly typical for hospitalists in EmCare's employ to provide services at more than one hospital at a time, as Scott did for a time. *Id.*, p. 180.

Schandorf also set the daily schedules for EmCare physicians, including Scott's schedule at the Hospital. (TR Day One, pp. 114-115, 189-190). He made

these scheduling decisions on his own; no one at the Hospital dictated the schedules to him or had any involvement in these decisions. *Id.*, pp. 190-191.

Complaints about EmCare doctors under Schandorf's supervision (such as Scott), whatever the primary or secondary source of the complaints—patients, patient families, other doctors, nurses and other staff, and Hospital administration— were directed to Schandorf. (TR Day One, pp. 122-123; TR Day Three, pp. 103, 106). This practice was in accord with Scott's own expectations, as Schandorf was her "boss." (TR Day Three, pp. 11-12). He would look into each complaint and would, depending on the circumstances, usually speak with the doctor in question to try to resolve the matter and determine if further action was warranted. (TR Day One, pp. 101-102, 123-126). Hospital administrators, such as Meade, would generally leave matters involving EmCare physicians to Schandorf to handle, even when complaints mounted against one EmCare physician in particular (Scott). (TR Day Two, pp. 41, 47-50, 73-74).

3.  **Reflecting a workplace culture it wished to maintain, the Hospital has a policy promoting mutual respect among those who work at the Hospital and in their interactions with patients.**

The Hospital has long been known for, and prided itself in, its customer service. (TR Day One, pp. 192-193; TR Day Two, pp. 44, 63, 83-85; TR Day Three, p. 92). That is, it has actively promoted a culture of teamwork, mutual respect, and positive interaction among those who work there, and between those who work there

and the Hospital's patients and patient families, a warm culture for which the Hospital has won public recognition. (TR Day One, pp. 192-193). This emphasis is embodied in its Behavior and Citizenship Policy, a copy of which everyone who works at the Hospital receives and is subject to, including all physicians with Hospital privileges, such as Scott. (TR Day One, pp. 106-108, 204; TR Day Two, pp. 32-34, 175-176; TR Ex. 30). EmCare physicians, such as Scott, are further subject to EmCare policies. (TR Day One, pp. 204-205; TR Day Three, pp. 98-99).

As Meade testified and Scott admitted, this vital aspect of the Hospital's culture was specifically called to her attention when Hospital CEO Meade interviewed her. (TR Day Two, pp. 72-73, 182).

### 4. Many people at the Hospital complain about Scott's intemperate behavior.

While not directly relevant to the dispositive issue of her employment status, a brief summary of the circumstances of Scott's removal from the Hospital is useful by way of background, and also, the responses of the certain key individuals (including Scott's) to those events do go to the issue on appeal of Scott's employment status.

Starting about three months after Scott began working at the Hospital, her supervisor, Schandorf, began receiving complaints about Scott's conduct. Details of the complaints—which came from nurses, patients, patients' families, other doctors, even from members of the public who attended a conference at which Scott was

panel member—are not directly pertinent for present purposes, other than to note that all the complaints were along the same lines: Scott was often rude, abrupt, insulting, and verbally aggressive when interacting with other people. (TR Day One, pp. 137-140, 195-202; TR Day Two, pp. 41, 60-62; TR Day Three, pp. 39-40).[6] Schandorf counseled her about these issues several times and tried to resolve the problem, but her conduct only persisted and grew worse, with complaints becoming more frequent over time. (TR Day One, pp. 140-166). Ten of the complaints, an unusually large number for a doctor working at the Hospital, were documented. (TR Day Two, pp. 201-202; TR Day Three, pp. 109-121).

Eventually Schandorf realized "it wasn't working" and that it was going to be necessary to make a change. (TR Day One, p. 164). He offered Scott a full-time position at Blake, but she told him she did not want to do that. *Id.*, pp. 164-165. Since Scott (like Schandorf) was an EmCare employee, Schandorf spoke with his supervisor at EmCare, Dr. Stern, about the situation. *Id.*, pp. 166, 173-174.

---

[6] The problem potentially impacted patient care. Among other issues, some nurses at the Hospital indicated they were reluctant to call Scott at night about a patient need, because they feared she would respond abrasively to being disturbed at home, as she had done on more than occasion. (TR Day One, pp. 211-214; TR Day Two, pp. 43-45; TR Day Three, pp. 64-66, 77-83).

### 5. Scott angrily bursts into the Hospital's HR office, which had no responsibility for her as an EmCare employee. Her action proves to be the final straw; EmCare terminates her.

What brought matters to a head was an event the morning of October 3, 2013. Scott stormed into the Hospital's Human Resources ("HR") offices—a department which had no connection to her, since she was not a Hospital employee[7]—to complain loudly about her alleged mistreatment by the Hospital and its CEO, Meade. (TR Day Two, pp. 19-20, 24-26). Because the Hospital did not employ Scott, its Vice President in charge of HR, Theresa Levering, had never even met her and was unaware of all the complaints about her behavior until Scott filed an EEOC charge around this same time. *Id.*, pp. 16-19. The unfortunate HR staff member who happened to be present when Scott burst in screaming, HR generalist June Ripley ("Ripley"), was alarmed and confused, both by Scott's unseemly demeanor and because Scott was not an employee under their jurisdiction. *Id.*, pp. 9-11; 27; TR Day Two, pp. 56, 65-68; TR Day Three, pp. 42-43; TR Ex. 27. A non-HR employee was also present to witness the beginning of Scott's outburst and physically moved out of the line of fire, so to speak. (TR Day One, pp. 25-26; TR Day Two, p. 56). Ripley ushered the agitated Scott into Ripley's office, closed the door, and told her

---

[7] EmCare had its own HR department. (TR Day One, p. 173; TR Day Two, pp. 3-4).

she need to take up her complaint with her employer, not the Hospital. (TR Day One, pp. 25-26).

When Levering arrived at the office and learned from Ripley what had transpired, she immediately went to the Hospital's CEO, Bob Meade, to convey the news. (TR Day One, p. 226; TR Day Two, pp. 26, 56; TR Ex. 20). Meade in turn contacted Dr. Joel Stern at EmCare, Schandorf's supervisor, about the matter and about Scott's "numerous contentious interactions with staff and patients" that had previously come to the attention of Meade and Schandorf. (TR Day One, pp. 226-227; TR Day Three, p. 29; TR Ex. 20). Shortly thereafter, Schandorf learned about the HR incident. (TR Day One, pp. 170-174; TR Day Three, p. 30).

Schandorf was "taken aback" by Scott's conduct because, as he explained to the jury, "we, as hospitalists, have nothing to do with the human resources department at the hospital. That's an HCA facility, and the human resources department there dealt with HCA employees. And we were not employed by the hospital or by HCA…." (TR Day One, p. 172).

Right after Scott's rant, Schandorf met with her and, like Ripley, told Scott— whose voice was rising and who was "getting really agitated" and "starting to look very angry"—that if she had an issue with unfair practices, she should have come to him or to someone else at EmCare "because that [the Hospital's] human resources

department has no jurisdiction over our employment, it has nothing to do with us." (TR Day One,  pp. 172-173).

Early in the afternoon the day of Scott's tirade in the Hospital's HR office, behavior that ran directly counter to the Hospital's policy stressing civil interaction in the workplace, Meade—fully aware that Scott was an EmCare employee and not an employee of the Hospital—requested (as he had a right to do under the Hospital's contract with EmCare) that EmCare remove Scott from the Hospital premises and that EmCare no longer assign her to the Hospital. (TR Day One, p. 226; TR Day Two, pp. 57, 63-65, 69; TR Day Three, p. 33, 37, 128-129; TR Ex. 20). Schandorf took Scott's badge and asked her to go home. (TR Day One, pp. 171-173, 227).[8]

At that point, Scott remained an EmCare employee, eligible for assignment to another hospital, as Scott admitted at trial. (TR Day Two, pp. 11-12, 204-205). But EmCare administrators discussed the situation and, given Scott's persistent misconduct, as well as her prior stated lack of interest in working full-time at Blake (a potential site for reassignment), decided to terminate her employment altogether. In the words of her October 3, 2013, termination letter (TR Ex. 7), EmCare let her go due to "ongoing behavioral concerns and contentious interactions with staff and patients." (TR Day One, pp. 180-182, 227-228; TR Day Three, pp. 37-39). No one

---

[8] Since Scott was not a Hospital employee, Meade did not tell EmCare to terminate her employment, and he had no input into whether EmCare terminated her or decided to retain her and assign her to a different hospital. (TR Day Two, p. 89).

at the Hospital participated in this decision, or, as shown, had any authority to terminate Scott's employment in any event.

EmCare ultimately replaced Scott at the Hospital with Dr. Amanda Kowalski, a woman. (TR Day Three, p. 45).

## STANDARD OF REVIEW

On both issues relating to Scott's case against the Hospital, Scott as appellant has a very high mountain to climb. To overcome the jury verdict, she can prevail on appeal only if she can show that the jury had no rational basis for its finding of fact, that its finding was against the great weight of the evidence. On the evidentiary ruling she would only be entitled to a new trial if she could convince this Court that the district court abused its discretion, and that the supposed error resulted in substantial harm to her.

Because the jury made its decision on the basis of ample competent evidence before it, and because the district court acted well within its sound discretion in all respects, the verdict and judgment should be affirmed.

## Review Standard for Issue No. 1

With respect to Scott's first issue concerning the Hospital, this Court, like appellate courts generally, approaches jury findings with a highly deferential review standard, especially when a trial court has approved the jury verdict by denying the losing party's new trial motion.

This Court "review[s] a ruling on a motion for a new trial for abuse of discretion." *McGinnis v. American Home Mtge. Servicing, Inc.*, 817 F.3d 1241, 1255 (11th Cir. 2016). The review standard is especially restrictive in the context of the present case: "Deference to the district court 'is particularly appropriate where a new trial is denied and the jury's verdict is left undisturbed.'" *Id.*, quoting *Middlebrooks v. Hillcrest Foods, Inc.*, 256 F.3d 1241, 1247-48 (11th Cir. 2001) and *Rosenfield v. Wellington Leisure Prods., Inc.*, 827 F.2d 1493, 1498 (11th Cir. 1987).

Jury verdicts are not overturned "unless no rational trier of fact could have reached the same conclusion based upon the evidence in the record." *Nat'l Fire Ins. Co. of Hartford v. Fortune Constr. Co.*, 320 F.3d 1260, 1267 (11th Cir. 2003); *accord*, *Bhogaita v. Altamonte Heights Condominium Ass'n, Inc.*, 765 F.3d 1277, 1285 (11th Cir. 2014). "Neither the district courts nor the appellate courts are free to reweigh the evidence and substitute their judgment for that of the jury." *Castle v. Sangamo Weston, Inc.*, 837 F.2d 1550, 1559 (11th Cir. 1988). "Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Gowski v. Peake*, 682 F.3d 1299, 1310 (11th Cir. 2012), quoting *Reeves v., Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150, 120 S. Ct. 2097, 2110 (2000).[9]

---

[9] As noted above, Scott made the same point in successfully opposing the Hospital's summary judgment motion. R.78, p. 11.

Along similar lines, this Court has held that "[b]ecause it is critical that a judge does not merely substitute his judgment for that of the jury, new trials should not be granted on evidentiary grounds unless, at a minimum, the verdict is against the great—not merely the greater—weight of the evidence." *Brown v. Sheriff of Orange Cnty. Fla.*, 604 F. App'x 915, 915-16 (11th Cir. 2015) (district court did not abuse its discretion; even if reviewing court might have concluded otherwise *de novo*, "it is not for us to second-guess the jury's credibility determinations," *id.* at 916, quoting *Lipphardt v. Durango Steakhouse of Brandon, Inc.*, 267 F.3d 1183, 1186 (11th Cir. 2001)). "This standard requires a [new trial] movant to show not only that some evidence opposes the verdict, but that the evidence against the verdict greatly outweighs evidence supporting the verdict." *Adams v. Austal, U.S.A., L.L.C.*, 569 F. App'x 732, 734 (11th Cir. 2014). It is not enough for the challenger to show that much evidence was disputed and that some of it supported the challenger's position. *Ramirez v. E.I. DuPont de Nemours & Co.*, 579 F. App'x 878, 884 (11th Cir. 2014).

The reason for these rules is clear: "An appellate court is particularly ill-suited to the task of judging the credibility of a witness because, unlike the district court, we do not have the benefit of observing the witness while he testifies and assessing his demeanor." *Amegy Bank Nat'l Ass'n v. Deutsche Bank Alex.Brown*, 619 F. App'x 923, 927 (11th Cir. 2015). In reviewing a jury verdict—especially one the district judge, who saw and heard the evidence, has approved—the appellate court "must

disregard all evidence favorable to the moving party that the jury is not required to believe." *Gowski*, 682 F.3d at 1311, quoting *Reeves*, 530 U.S. at 151, 120 S. Ct. at 2110. The jury is even entitled to "rely on circumstantial evidence to reach a conclusion in conflict with direct evidence." *Amegy Bank*, 619 F. App'x at 927.

As the district court stressed (R.166, pp. 1-2), a new trial is called for under Rule 59 only when "the verdict is against the clear weight of the evidence . . . or will result in a miscarriage of justice, even though there may be substantial evidence which would prevent the direction of a verdict." *McGinnis*, 817 F.3d at 1254, quoting *Hewitt v. B.F. Goodrich Co.*, 732 F.2d 1554, 1556 (11th Cir. 1984) (alteration in original).

## Review Standard for Issue No. 2

As for Scott's second issue related to the Hospital, this Court also reviews the district court's evidentiary rulings for abuse of discretion. *Vista Marketing, LLC v. Burkett*, 812 F.3d 954, 979 (11th Cir. 2016), citing *Conroy v. Abraham Chevrolet-Tampa, Inc.*, 375 F.3d 1228, 1232 (11th Cir. 2004).

Under this standard, the Court affirms the district court's evidentiary ruling unless it concludes that the court "made a clear error of judgment, or . . . applied an incorrect legal standard." *Vista Marketing*, 812 F.3d at 979, citing *Conroy*, 375 F.3d at 1232. Even if Scott were able to establish that the district court had made such an error, to obtain a reversal and new trial Scott would also have to show that the error

affected substantial rights. *Vista Marketing*, 812 F.3d at 979; *see also* 28 U.S.C. § 2111 ("On the hearing of any appeal . . . in any case, the court shall give judgment after an examination of the record without regard to errors or defects which do not affect the substantial rights of the parties."); *Health First, Inc. v. Hynes*, 628 F. App'x 723, 724 (11th Cir. 2016) ("We will not overturn an evidentiary ruling unless the moving party proves a substantial prejudicial effect," quoting *Goulah v. Ford Motor Co.*, 118 F.3d 1478, 1483 (11th Cir. 1997)).

## SUMMARY OF THE ARGUMENT

This is not a close case. The district court acted properly, and most certainly did not abuse its discretion, when it denied Plaintiff-Appellant ("Scott") a new trial with respect to either issue Scott has raised on appeal.

First, Scott asks this Court to overturn a jury's specific finding of fact, supported by substantial evidence in the record—mostly the testimony of Scott herself and of witnesses she called—on a dispositive issue. Having heard all the evidence and arguments and received proper instructions on which the parties agreed, the jury correctly concluded that Scott was not a Hospital employee. Under Title VII and the corresponding state statute, the Hospital is thus relieved of all liability.

Essentially reiterating her failed jury arguments on appeal, Scott asks this Court to hold that the district court abused its discretion by entering judgment on the jury verdict and not giving her a new trial to try to persuade a different jury of her point of view, based on the same proof. But she cannot show that the great weight of the evidence renders the jury verdict irrational. On the contrary, the great weight of evidence supports the jury's conclusion. The district court and the jury, all of whom saw and heard the proof and assessed the witnesses' credibility, agreed. There is no basis in the record for this Court to second-guess their determination.

Second, Scott asks this Court to hold that the district court abused its discretion by not admitting improper "me too" evidence, evidence which the court properly excluded and which in any event goes to an issue that is not even necessary to reach due to the jury's finding as to the first issue.

Scott stretches the record beyond recognition now to imply that at the trial level she argued for the admission of another female doctor's testimony on the issue of Scott's employment status vis-à-vis the Hospital. Even a cursory glance at the record reveals that Scott sought to introduce the testimony solely to show that the Hospital's CEO, Bob Meade, had a discriminatory intent. The proferred proof would not have shown that and was properly excluded for that reason alone; but now that a jury has resolved the case on the threshold issue of Scott's employment status, the testimony would not be probative in any event.

## ARGUMENT AND CITATIONS OF AUTHORITY

### 1.    There was more than sufficient evidence to support the jury's verdict finding that the Hospital was not Scott's joint employer.

The district court did not abuse its discretion in denying Scott a new trial following a jury verdict in favor of the Hospital on the question of Scott's employment status in relation to the Hospital. Overwhelming evidence at trial, most of it adduced by Scott herself, supported the jury's specific fact finding on that dispositive issue, that the Hospital was not Scott's joint employer.

The jury was properly charged on the law, using instructions the parties jointly submitted; heard the evidence and arguments; assessed witnesses' demeanor and credibility; and drew a reasonable conclusion. The experienced district judge, who saw and heard the same proof, properly denied Scott a new trial. Nothing in this record would justify disturbing the jury's conclusion, especially given the strong deference the appellate court affords jury findings.

Title VII by its terms applies only to "employees," 42 U.S.C. § 2000e(f). It defines "employee" simply as "an individual employed by an employer." *Id.* Of necessity courts have filled in definitional details, starting with the assumption that Congress "intended the term 'employee' to be given its common, everyday meaning." *Demers v. Adams Homes of Northwest Fla., Inc.*, 321 F. App'x 847, 851 (11th Cir. 2009), quoting *Cobb v. Sun Papers, Inc.*, 673 F.2d 337, 340 (11th Cir. 1982). Accordingly, this Court construes "employee" "in light of general common law concepts" taking into account the "economic realities of the relationship." *Cobb*, 673 F.2d at 340. The determinative factors are "common law principles of agency and the right of the employer to control the employee." *Id.*

Courts have addressed the key control factor of the analysis in the specific context of physicians suing hospitals: "Based in part on a doctor's ability to control the manner in which the doctor provides his or her services, many circuits evaluating employment discrimination claims by doctors against hospitals have found that the

doctors were independent contractors and not employees." *Ashkenazi v. S. Broward Hosp. Dist.*, 607 F. App'x 958, 962-63 (11th Cir. 2015) (listing cases).

More generally, to analyze whether an employment relationship exists, courts examine a number of factors:

> (1) the kind of occupation, with reference to whether the work usually is done under the direction of a supervisor or is done by a specialist without supervision; (2) the skill required in the particular occupation; (3) whether the 'employer' or the individual in question furnishes the equipment used and the place of work; (4) the length of time during which the individual has worked; (5) the method of payment, whether by time or by the job; (6) the manner in which the work relationship is terminated, *i.e.,* by one or both parties, with or without notice and explanation; (7) whether annual leave is afforded; (8) whether the work is an integral part of the business of the 'employer'; (9) whether the worker accumulates retirement benefits; (10) whether the 'employer' pays Social Security taxes; and (11) the intention of the parties.

*Pardazi v. Cullman Med. Ctr.*, 838 F.2d 1155, 1156 (11th Cir. 1988), citing *Spirides v. Reinhardt*, 613 F.2d 826, 832 (D.C. Cir. 1979).

No one factor is determinative. *Ashkenazi*, 607 F. App'x at 962. *See also Llampallas v. Mini-Circuits, Lab. Inc.*, 163 F.3d 1236, 1243 (1lth Cir. 1998) ("We believe . . . that only individuals who receive compensation from an employer can be deemed "employees" under [Title VII]."), *cert. denied*, 528 U.S. 930, 120 S. Ct. 327 (1999).

The district court's instruction to the jury on this issue, an instruction the parties agreed on and jointly submitted, incorporated the factors this Court has identified as appropriate for consideration:

## JURY INSTRUCTION NO. 7

### 4.25 Miscellaneous Issues – Joint Employers

It is not always clear whether the law considers someone an "employee," and it is not always clear who the law considers someone's "employer." Some people, for example, perform services for others while remaining self-employed or employed by another entity as independent contractors. Others are clearly employees. But it may not always be clear who is an employer of the employee. Sometimes an employee may have more than one employer at the same time.

So, in this case, you must decide: Was Dr. Scott an employee of Doctors Hospital as well as an employee of EmCare, Inc.? You should answer this question in light of the economic realities of the entire relationship between the parties based on the evidence.

Consider all the following factors to the extent you decide that each applies to this case:

(a)    the nature and degree of control over the employee and who exercises that control;

(b)    the degree of supervision, direct or indirect, over the employee's work and who exercise that supervision;

(c)    who exercises the power to determine the employee's pay rate or method of payment;

(d)    who has the right, directly or indirectly, to hire, fire, or modify the employee's employment conditions;

(e)    who is responsible for preparing the payroll and paying wages;

(f)    who made the investment in the equipment and facilities the employee uses;

(g)    who has the opportunity for profit and loss;

(h)    the employment's permanence and exclusiveness;

(i)    the degree of skill the job requires;

(j)    the ownership of the property or facilities where the employee works; and

(k)    the performance of a specialty job within the production line integral to the business.

Consideration of all the circumstances surrounding the work relationship is essential. No single factor is determinative. Nevertheless, the extent of the right to control the means and manner of the worker's performance is the most important factor.

(R.129, pp. 8-9; TR Day Four, pp. 8-10).

As the court correctly held in denying Scott's new trial motion, in applying these factors the jury had more than sufficient evidence to support its conclusion that the Hospital was not Scott's joint employer. For example:

**(1)    the nature and degree of control over Scott and who exercised that control**

As the jury charge notes, while no single factor is determinative on the issue of employment status, control of the means and manner of Scott's performance is the most important factor. All the proof at trial pointed to EmCare having control over Scott's performance.

EmCare hired her, and she signed an employment contract with EmCare. EmCare assigned her to the two hospitals where worked, the defendant Hospital and Blake, and made the decision to remove her from the Hospital. At all times she reported directly to an EmCare employee, Schandorf, who set her schedule, supervised her on a daily basis, and evaluated her. Complaints about her job performance were all directed to Schandorf. While physicians in their professional capacity have more control over their daily job performance than most employees do, to the extent that anyone controlled Scott's performance, it was EmCare and not the Hospital.

**(2)    the degree of supervision over Scott's work, and who exercised that supervision**

As all agree, Dr. Schandorf—an EmCare employee—was Scott's supervisor. The facts listed under (1) above apply here as well.

**(3)    who exercised the power to determine Scott's pay rate or method of payment**

On this point there was absolutely no dispute. By contract EmCare determined Scott's pay and wrote her paychecks.

**(4)    who had the right, directly or indirectly, to hire and fire Scott and modify her employment conditions**

Again the record is clear and uncontroverted. By contract, EmCare alone had the authority, which it alone exercised, to make the decision to hire Scott and to terminate her employment. EmCare set and modified her employment conditions by assigning her to the hospitals where she worked and setting her schedule, among other things.

**(5)    who was responsible for preparing the payroll and paying wages**

As is likewise undisputed, EmCare set and paid Scott's wages; withheld her taxes; provided her with health and dental insurance, malpractice coverage, and a 401k plan; and even provided an expense account. The Hospital did none of this, and its CEO was not even aware what Scott's compensation and benefits were.

**(6)    who invested in the equipment and facilities Scott used**

EmCare often provided its physicians with uniforms or scrubs. (TR Day One, pp. 237-238). While the Hospital furnished medical equipment and a place of work for Scott—and for all the hundreds of other doctors who had privileges to use its facilities, *id.*—the jury apparently recognized, as this and other courts have, that in the world of modern medicine this factor carries little if any weight in the analysis of employment status, because "[w]hen a physician shows up to work in today's world—either as an independent contractor or a full-fledged employee—he is no longer likely to carry all relevant medical instruments in a black satchel. Instead, it is expected that he will make full use of the hospital's physical facilities during the course of his service." *Dutton v. United States*, 621 F. App'x 962, 965-66 (11th Cir. 2015) (affirming summary judgment on grounds that physician who worked at VA hospital was an independent contractor, not a VA employee, applying many of the factors discussed herein), quoting *Tsosie v. United States*, 452 F.3d 1161, 1164 (10th Cir. 2006).

**(7)    Who had the opportunity for profit and loss**

The Hospital paid EmCare for EmCare doctors assigned to the Hospital at a flat contract rate based on their hours. Only EmCare, in the way it set the contract rate and paid its doctors, had the opportunity to make a profit or

sustain a loss. As shown in the Statement of Facts, EmCare is a private for-profit enterprise, and Ted Haumesser, its director of client administration (a witness Scott called), testified that he specifically takes steps to assure that the company makes a profit.

### (8)    Whether Scott's "employment" was permanent and exclusive

The Hospital had no exclusive claim on Scott's services. Its contract with EmCare called for EmCare to provide it with hospitalists, not with specific hospitalists or with specific hospitalists for a set period of time. Indeed, EmCare assigned Scott herself to two different hospitals. Moreover, she signed a noninterference agreement with EmCare whereby she could not become a Hospital employee without giving EmCare a right of first refusal. There was nothing permanent or exclusive at all about the relationship between the Hospital and Scott.

### (9)    The degree of skill the job requires

Obviously a physician's work requires an extremely high degree of skill, a factor that weighs heavily against an employment relationship with the hospitals where physicians (such as Scott and her EmCare colleagues at the Hospital) have privileges and carry out their daily work. This Court has recognized this as an important factor in cases involving physicians, as have many others. *See*, *e.g.*, *Ashkenazi*, 607 F. App'x at 962-63; *Mantiply v. United States*, 634 F. App'x 431,

433-34 (5th Cir. 2015), citing several other decisions to same effect; *Alexander v. Avera St. Luke's Hosp.*, 768 F.3d 756, 762-63 (8th Cir. 2014); *Xie v. University of Utah*, 243 F. App'x 367, 373-74 (10th Cir. 2007); *Wojewski v. Rapid City Regional Hosp.*, 450 F.3d 338, 343-44 (8th Cir. 2006).

**(10)   the ownership of the place where the individual works**

See comments under factor (6) above.

**(11)   the performance of a specialty job within the larger business**

Again, physicians obviously engage in a specialized profession, and they (including hospitalists such as Scott) perform specialized functions even within the context of a specially focused institution such as a hospital. And the "larger business" for which she performed her job was EmCare, not the Hospital.

By any measure, Scott was an EmCare employee and had no employment relationship with the Hospital. The jury had an easy decision. So does this Court.

**2.    The district court did not abuse its discretion when it excluded Scott's proferred "me too" witness, especially because the jury's verdict has made it unnecessary to reach the issue that the testimony was offered to address.**

Scott has failed to meet her heavy burden of showing why this is the rare case in which an appellate court should reverse a trial court's evidentiary ruling and order a new trial on that basis. She has not demonstrated that the district court "made a clear error of judgment, or...applied an incorrect legal standard." *Vista Marketing*, 812 F.3d at 979. Further, even if she could meet either of those stringent tests, most

obviously, given the grounds for the jury's verdict—that Scott was not even a Hospital employee—she cannot show that the district court's alleged error had a substantial prejudicial effect on her. *Health First*, 639 F. App'x at 734. In other words, there was no error, but if there were, it did not affect the result and was therefore harmless. On this issue, too, this Court should affirm.

The district court acted well within its discretion by excluding the "me too" evidence Scott offered in the form of nebulous opinion testimony by another female physician, Dr. Vasile, about, for example, the Hospital being "kind of like a big boys club." For starters, this hearsay (what Schandorf supposedly told Scott that Vasile supposedly told Schandorf) came from a doctor who was not similarly situated to Scott. Vasile was a hospitalist who once worked at (but not for) the Hospital. Unlike Scott, she was not employed by EmCare. Unlike Scott, Vasile had regular direct inter-actions with Bob Meade, who never asked anything of her. Unlike Scott, Vasile made no claim of gender discrimination or harassment against the Hospital, and in fact she still has privileges there. Also unlike Scott, when Vasile stopped working at the Hospi-tal for a time, she did so voluntarily. All this is in addition to the plain fact that her proferred testimony would not have been competent or probative.

The district court considered Vasile's proferred testimony extensively on three separate occasions. The court first encountered the issue in the context of the Hospi-tal's pretrial motion in limine (R.98), for which the court had a special

hearing. Next, the judge patiently entertained lengthy argument on the question at trial. (TR Day Two, pp. 91-113), Finally, the court reconsidered its evidentiary ruling when addressing Scott's new trial motion following the jury's verdict. (R.152). At that time the court properly reaffirmed its earlier decision, both on the original grounds, which were eminently sound, and for the additional reason that the jury's verdict had by that time obviated the need even to address the discrimination claim for which Scott proferred the testimony. (R.166, p. 3).

According to Scott's proffer, Dr. Vasile would have testified as to her personal opinions about the workplace environment at the Hospital, supposedly to show that the Hospital's CEO, Meade, was biased toward women. Aside from the basic question of its competence, the probative value of such testimony would have been extremely thin if not non-existent, and any such value would have been far outweighed by the danger of unfair prejudice and the other factors listed in Fed. R. Evid. 403. The parties reviewed these issues at length with the court, and the district court properly excluded the testimony for those reasons alone. But now that the jury has established that the sole dispositive issue is Scott's employment relationship vis-à-vis the Hospital, Vasile's testimony has no relevance whatsoever. Scott now strains to argue otherwise, but the record shows (and the district court expressly noted – R.166, p. 3) she did not offer Vasile's testimony to address Scott's

employment relationship as between EmCare and the Hospital, nor would Vasile have been competent to address that.

During the trial, when questioned at length by an understandably skeptical district judge on precisely how Vasile's testimony would be at all relevant to the case, Scott's counsel stated at the time of proffer, "We're simply introducing her testimony, her experiences with Bob Meade and the hospital, and the procedures there to help establish in our own case Mr. Meade's **discriminatory intent** with respect to Dr. Scott." (TR Day Two, p. 98) (emphasis added). In other words, Vasile's testimony would supposedly reveal that because Meade did not like Vasile, a woman, he must not have liked Scott, also a woman, though Meade only met Scott briefly on two occasions, once for her interview and a second time in passing in the doctors' lounge. The argument appears to be that Meade did not like these two physicians simply because they were female, though there is no proof to support such a conclusion. These are quasi-facts in search of a quasi-inference.

As if that rationale were not murky enough, Scott's counsel plunged further into the abyss with this explanation:

> "The testimony -- what I understand, based upon my conversations with Dr. Vasile, is that, again, in an undocumented manner Dr. Schandorf approached Dr. Vasile based upon complaints via communicated (sic) through Mr. Meade that her behavior was less than becoming, akin to the behaviors of Mitteldorf and Scott. And this is prior to anything that happened with Dr. Scott -- or at the beginning of Dr. Scott's employment.

Dr. Vasile, at the suggestion of Dr. Schandorf, goes and meets with Mr. Meade to have a conversation with him about how she might better -- how there might be a better system of communication with her directly so that she can understand exactly what's going on and what these complaints are and, you know, why she's not getting them in a concrete fashion.

And Bob Meade told her that -- and I'm paraphrasing somewhat -- but basically something to the effect of, look, I think you're psycho. I need you -- you need to leave the hospital. I want you gone. I want you gone. I want you out of the hospital.

And Dr. Vasile will testify that she felt like, okay, well, my time here is limited, I'm going to get fired. This was, unlike Dr. Scott, Dr. Vasile's first engagement as a doctor, and so instead of getting fired, which she, you know, in her mind that was her perception was, this is what's coming, she resigned. And she left the hospital of her own accord.

So different outcome, right, but that's the testimony that she a -- this woman, who is again hearing nebulous complaints, approaches Bob Meade to sort of try to work through it, and the reaction is not, you know, let's have lunch in the doctors' lounge. The reaction is, you're psycho, get out of here.

And that's going to be her testimony."

(TR Day Two, pp. 99-101).

It hardly requires discussion or citation to understand why the district judge was unpersuaded by these arguments, to the extent he could follow them.

Scott offered three inapposite cases in support of her proffer: *Goldsmith v. Bagby Elevator Co.*, 513 F.3d 1261 (11th Cir. 2008); *Phillips v. Maintenance Servs., Inc.*, 711 F.2d 1524 (11th Cir. 1983), and *Spulak v. K Mart Corp.*, 894 F.2d 1150 (10th Cir. 1990). Consistent with her stated reasons for the proffer, Scott argued that

all three cases stand for the proposition that this type of "me too" evidence was admissible to show discriminatory intent (not, as she now belatedly claims, to show that hospitalist physicians were actually Hospital employees). Perhaps most telling, Scott's counsel even suggested that the court offer a limiting instruction to the jury that Vasile's testimony would be admitted for evidence of the intent to discriminate against Scott. (TR Day Two, p. 104).

In any event, the district court readily distinguished Scott's three cited cases on their facts (TR Day Two, pp. 105-106) and, following law and logic, properly held that the testimony should be excluded. In so doing the court exercised sound discretion, applying the criteria of Fed. R. Evid. 403 and cases interpreting that rule. Now, as stated, the jury's verdict renders all that discussion academic.

Finally, it should be noted that this is not a hostile work environment case, the kind in which "me too" evidence is more often appropriate. In any event, recent cases in which this Court has affirmed the exclusion of "me too" testimony more closely resemble the present case than any Scott has cited. *See*, *e.g.*, *King v. Volunteers of Am., N. Ala., Inc.*, 614 F. App'x 449, 454-56 (11th Cir. 2015); *Jackson v. United Parcel Serv., Inc.*, 593 F. App'x 871, 877 (11th Cir. 2014); *Adams v. Austal, U.S.A.*, L.L.C., 754 F.3d 1240, 1247-48 (11th Cir. 2014).

The district court's evidentiary ruling should be affirmed.

## <u>CONCLUSION</u>

The jury and the district court were correct in all respects. Affirmance is called for as to Defendant-Appellee Sarasota Doctors Hospital, Inc.

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND <u>TYPE STYLE REQUIREMENTS</u>

1.     This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because this brief contains 10,217 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

2.     This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Office Word 2003 in Times New Roman 14.

/s/ Tracey K. Jaensch
Tracey K. Jaensch, Esquire
Florida Bar No. 907057
Ford & Harrison LLP
101 E. Kennedy Boulevard, Suite 900
Tamp, FL  33602
(813) 261-7800  Telephone
(813) 261-7899  Facsimile
E-mail:  tjaensch@fordharrison.com

Attorneys for Defendant-Appellee
Sarasota Doctors Hospital, Inc.

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on the 20th day of July, 2016, the foregoing was electronically filed with the Clerk of the Court by using the Appellate CM/ECF system.  I also certify that the foregoing document is being served on the following parties via electronic mail:  Dorothy F. Easley, Esq., Easley Appellate Practice PLLC (administration@easleyappellate.com); Jesse M. Tilden, Esq., Tilden & Prohidney, P.L. (service@tildenprohidney.com); Matthew L. Ransdell, Esq., Jackson Lewis, P.C. (matthew.ransdell@jacksonlewis.com); and John M. Barr, Esq., Law Office of John M. Barr, PC (john.barr@jmblawoffice.com) and one (1) original and six (6) copies were sent by United States First Class mail to the Clerk of the Court for the United States Court of Appeals for the Eleventh Circuit.

/s/ Tracey K. Jaensch
Tracey K. Jaensch

- 46 -