11TH CIR. CASE NO. 16-10763-E
M.D. FLA. CASE NO. 8:14-CV-01762-JSM-TBM
_____

# In the United States Court of Appeals for the Eleventh Circuit

_____

DR. MICHELLE G. SCOTT, M.D.

*Plaintiff–Appellant,*

v.

SARASOTA DOCTORS HOSPITAL, INC., ET AL.

*Defendants–Appellees.*

_____

**APPELLANT'S REPLY BRIEF**

_____

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA**

DOROTHY F. EASLEY, MS JD BCS APPEALS*
EASLEY APPELLATE PRACTICE PLLC
  1200 BRICKELL AVENUE, STE 1950
  MIAMI, FLORIDA 33131
  T: (305) 444-1599; 800-216-6185
  FLORIDA BAR DESIGNATED E-MAIL:
  administration@EasleyAppellate.com
  (primary)
  admin2@EasleyAppellate.com (secondary)
  www.easleyappellate.com

*Counsel of Record*          *Appellate Counsel for Appellant*

*Scott vs. Sarasota Doctors Hospital, etc., et al,* 11th Cir. Case No. 16-10763

### APPELLANT DR. MICHELLE G. SCOTT, M.D.'S
### CERTIFICATE OF INTERESTED PERSONS & CORPORATE DISCLOSURE

To assist the Court in evaluating potential conflicts, the undersigned counsel, pursuant to Rule 26.1, Fed. R. App. P., and Eleventh Circuit Internal Operating Rules 5-2, 26.1-1, -2 and -3, hereby discloses that, based on the information provided to Appellant DR. MICHELLE G. SCOTT, and the review of the record:

a)      Sarasota Doctors Hospital, Inc. ("SDH") is a Florida Corporation D/B/A as Doctors Hospital of Sarasota with its principal office in Nashville, Tennessee.

b)      West Florida Phsyican Network, LLC D/B/A as Healthcare America ("WFPN") is a Florida LLC with its principal office in Nashville, Tennessee.

c)      EmCare, Inc., ("EmCare") is a foreign profit corporation doing business in the State of Florida with its principal place of business in Greenwood Village, Colorado.

d)      Dr. Michelle G. Scott is a natural person.

Appellant further certifies that the following persons and entities have some interest in the outcome of this case:

1.      Barr, John Mills,

  (*Pro Hac Vice* Trial Attorney for Defendant–Appellee EmCare)

2.      Easley, Dorothy F.,

  (Appellate Attorney for Plaintiff–Appellant)

C-2

*Scott vs. Sarasota Doctors Hospital, etc., et al,* 11th Cir. Case No. 16-10763

3.    Easley Appellate Practice PLLC

(Appellate Law Firm for Plaintiff–Appellant)

4.    Ford & Harrison, LLP

(Trial Law Firm for Defendants SDH and WFPN)

5.    Glenn Rasmussen Fogerty & Hooker, PA

(Law Firm for Mediator Mark A. Hanley)

6.    Grilli, Peter J.

(Mediator)

7.    Hanley, Mark

(Mediator)

8.    Jackson Lewis P.C.

(Trial Law Firm for Defendant–Appellee EmCare)

9.    Jaensch, Tracey K.

(Trial Attorney for Defendants–Appellees SDH and WFPN)

10.    Law Office of John M. Barr, P.C.

(Trial Law Firm for Defendant–Appellee EmCare)

11.    Lechner, Jay P.

(Trial Attorney for Defendant–Appellee EmCare)

12.    Lindberg, Merry E.

(Trial Attorney for Defendants–Appellees SDH and WFPN

C-3

*Scott vs. Sarasota Doctors Hospital, etc., et al,* 11th Cir. Case No. 16-10763

13.   Miles, Daniel Kent

      (Trial Attorney for Defendants SDH and WFPN)

14.   McCoun, The Honorable Thomas B. III,

      (United States Magistrate Judge)

15.   Moody, The Honorable James S. Jr.

      (United States District Judge)

16.   Peter J. Grilli, PA

      (Law Firm for Mediator Peter J. Grilli)

17.   Romano, Jay F.

      (Trial Attorney for Plaintiff–Appellant)

18.   Romano Law Center, PA

      (Trial Law Firm for Plaintiff–Appellant)

19.   Ransdell, Matthew Logan

      (Trial Attorney for Defendant–Appellee EmCare)

20.   Sisco, Dale R.

      (Mediator)

21.   Sisco—Law

      (Law Firm for Mediator Dale Sisco)

22.   Tilden, Jesse M.

      (Trial Attorney for Plaintiff–Appellant)

C-4

*Scott vs. Sarasota Doctors Hospital, etc., et al,* 11th Cir. Case No. 16-10763

22.    Tilden & Prohidney, P.L.

(Trial Law Firm for Plaintiff–Appellant)

24.    Whittel & Melton

(Trial Law Firm for Defendant–Appellee EmCare)

Respectfully submitted,

BY:  /s/ DOROTHY F. EASLEY

C-5

*Scott vs. Sarasota Doctors Hospital, etc., et al,* 11th Cir. Case No. 16-10763

# TABLE OF CONTENTS

APPELLANT DR. MICHELLE G. SCOTT, M.D.'S CERTIFICATE OF INTERESTED PERSONS & CORPORATE DISCLOSURE ................................................................. C-2

TABLE OF CONTENTS ................................................................................. i

TABLE OF AUTHORITIES ........................................................................... iii

OTHER AUTHORITIES ................................................................................ vi

IV.    ARGUMENTS ..................................................................................... 1

ISSUE I: THE GREAT WEIGHT OF THE EVIDENCE—IF NOT ALL THE EVIDENCE—IS THAT, ALONG WITH EMCARE, DOCTORS HOSPITAL CONTROLLED THE TERMS AND CONDITIONS OF DR. SCOTT'S EMPLOYMENT—FROM DR. SCOTT'S HIRING TO FIRING, AND EACH DAY IN BETWEEN—AND WAS, THUS, AN EMPLOYER OF DR. SCOTT. AS SUCH, THE VERDICT FINDING OTHERWISE WAS AGAINST THE GREAT WEIGHT OF THE EVIDENCE AND THE DENIAL OF NEW TRIAL WAS ERROR. ................ 1

ISSUE II: SUMMARY JUDGMENT IN FAVOR OF EMCARE CONCLUDED THAT DR. SCOTT COULD NOT AS A MATTER OF LAW ESTABLISH PRETEXT FOR HER REMOVAL AND SIMULTANEOUS TERMINATION MERELY BECAUSE EMCARE AND DOCTORS HOSPITAL HAD AN AGREEMENT IN WHICH THE HOSPITAL COULD DEMAND THE REMOVAL OF A HOSPITALIST. THAT WAS FACTUAL ERROR BECAUSE IT OVERLOOKED THE PARTIES' RELATIONSHIPS AND CONSTRUED THEM IN FAVOR OF EMCARE. THAT WAS LEGAL ERROR BECAUSE IT ERRONEOUSLY CONSTRUED THE

i

*Scott vs. Sarasota Doctors Hospital, etc., et al,* 11th Cir. Case No. 16-10763

ECONOMIC REALITIES OF EMPLOYMENT IN TODAY'S ECONOMY. SUMMARY JUDGMENT SHOULD BE REVERSED. ............................................................... 15

ISSUE III: IT WAS LEGAL ERROR AND ABUSE OF DISCRETION TO EXCLUDE THE TESTIMONY OF ANOTHER FEMALE HOSPITALIST AT DOCTORS HOSPITAL, DR. VASILLE, WORKING AT THE SAME TIME AND UNDER THE SAME SUPERVISION AS DR. SCOTT. DR. VASILLE'S TESTIMONY WOULD HAVE CONCERNED INCIDENTS RELATED TO DOCTORS HOSPITAL CEO, MR. MEADE, AND THE TREATMENT AND CONTROL OF HER EMPLOYMENT TERMS AND CONDITIONS AND HER SUBSEQUENT CONSTRUCTIVE TERMINATION. ................................................................... 19

CONCLUSION ......................................................................................... 21

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS .......................................... 22

CERTIFICATE OF SERVICE ......................................................................... 22

ii

*Scott vs. Sarasota Doctors Hospital, etc., et al,* 11th Cir. Case No. 16-10763

# TABLE OF AUTHORITIES

## CASES

*Aimable v. Long & Scott Farms,*

　20 F.3d 434 (11th Cir. 1994) ........................................................................9

*Alexander v. Avera St. Luke's Hosp.,*

　768 F.3d 756 (8th Cir. 2014) ........................................................................9

*Ashkenazi v. S. Broward Hosp. Dist.,*

　607 F. App'x 958 (11th Cir. 2015) ....................................................... 12-13

*Brock v. Superior Care, Inc.,*

　840 F.2d 1054 (2d Cir. 1988) ......................................................................11

*Butler v. Drive Automotive Industries of America, Inc.,*

　793 F.3d 404 (4th Cir. 2015) ............................................................. *passim*

*Carter v. Dutchess Community College,*

　735 F.2d 8 (2d Cir. 1984) ..............................................................................1

*Cheney v. Plainfield Healthcare Ctr.,*

　612 F.3d 908 (7th Cir. 2010) ......................................................................18

iii

*Scott vs. Sarasota Doctors Hospital, etc., et al*, 11th Cir. Case No. 16-10763

*Daughtrey v. Honeywell, Inc.,*

    3 F.3d 1488 (11th Cir. 1993) ........................................................................7

*EEOC v. Skanska Bldg., Inc.,*

    550 Fed. Appx. 253 (6th Cir. 2013) ................................................... *passim*

*Fields v. Hallsville Indep. School Dist.,*

    906 F.2d 1017 (5th Cir.1990) ......................................................................7

*Goudeau v. Dental Health Servs., Inc.,*

    901 F. Supp. 1139 (M.D. La. 1995) .............................................................7

*Griffin v. Finkbeiner,*

    689 F.3d 584 (6th Cir. 2012) ......................................................................21

*Hasan v. Foley & Lardner LLP,*

    552 F.3d 520 (7th Cir. 2008) ......................................................................20

*Hayes v. Sebelius,*

    806 F. Supp. 2d 141 (D.D.C. 2011) ...........................................................20

*Hodgson v. Griffin & Brand,*

    471 F.2d 235 (5th Cir. 1973) ........................................................................6

EASLEY APPELLATE PRACTICE, PLLC, 1200 BRICKELL AVE., SUITE 1950, MIAMI, FLORIDA 33131  305-444-1599  800-216-6185

*Scott vs. Sarasota Doctors Hospital, etc., et al,* 11th Cir. Case No. 16-10763

*Hurlbert v. St. Mary's Health Care Sys., Inc.,*

439 F.3d 1286 (11th Cir. 2006) ...................................................................19

*Layton v. DHL Exp. (USA), Inc.,*

686 F.3d 1172 (11th Cir. 2012) ............................................................. *passim*

*Leuenberger v. Spicer,*

2016 WL 355090 (W.D. Va. Jan. 28, 2016) ............................................11

*Ling Nan Zheng v. Liberty Apparel Co.,*

355 F.3d 61 (2d Cir. 2003) ...........................................................................9

*Mantiply v. U.S.,*

634 F. App'x 431 (5th Cir. 2015) .................................................................9

*Martinez–Mendoza v. Champion Int'l Corp.,*

340 F.3d 1200 (11th Cir. 2003) ....................................................................2

*Reich v. Circle C Investments,*

998 F.2d 324 (5th Cir. 1993) .......................................................................11

*Reich v. Priba Corp.,*

890 F. Supp. 586 (N.D. Tex. 2005) ............................................................11

v

*Scott vs. Sarasota Doctors Hospital, etc., et al,* 11th Cir. Case No. 16-10763

*Rudin v. Lincoln Land Community Coll,*

  420 F.3d 712 (7th Cir.2005)......................................................................19


*Salamon v. Our Lady of Victory Hosp.,*

  514 F.3d 217 (2d Cir. 2008)......................................................................7


*Sprint/United Management Co. v. Mendelsohn,*

  552 U.S. 379 (2008) ..................................................................................20


*St. Charles Foods, Inc. v. America's Favorite Chicken Co.,*

  198 F.3d 815 (11th Cir. 1999)...................................................................15


*Tolan v. Cotton,*

  134 S. Ct. 1861 (2014)...............................................................................15


*Torres-Lopez v. May,*

  111 F.3d 633 (9th Cir. 1997)......................................................................4


*Wojewski v. Rapid City Reg'l Hosp., Inc.,*

  450 F.3d 338 (8th Cir. 2006)......................................................................9


*Xie v. Univ. of Utah,*

  243 F. App'x 367 (10th Cir. 2007).............................................................9

Easley Appellate Practice, PLLC, 1200 Brickell Ave., Suite 1950, Miami, Florida 33131  305-444-1599  800-216-6185

# OTHER AUTHORITIES

Department of Labor Regulations, 29 C.F.R.§ 825.106 ...............................................11

Title VII of the Civil Rights Act of 1964 and 1991 ....................................... *passim*

# IV. ARGUMENTS

**ISSUE I: THE GREAT WEIGHT OF THE EVIDENCE—IF NOT ALL THE EVIDENCE--IS THAT, ALONG WITH EMCARE, DOCTORS HOSPITAL CONTROLLED THE TERMS AND CONDITIONS OF DR. SCOTT'S EMPLOYMENT—FROM DR. SCOTT'S HIRING TO FIRING, AND EACH DAY IN BETWEEN—AND WAS THUS AN EMPLOYER OF DR. SCOTT. AS SUCH, THE VERDICT FINDING OTHERWISE WAS AGAINST THE GREAT WEIGHT OF THE EVIDENCE AND THE DENIAL OF NEW TRIAL WAS ERROR.**

All the Hospital has accomplished with the tactic used in its Answer–Response Brief is to have simplified and made our case: that EmCare was also a joint employer along with the Hospital and both recklessly engaged in discriminatory conduct. Instead of trying to refute the overwhelming and uncontroverted record evidence of the Hospital's role in Dr. Scott's employment, the Hospital's Answer Brief ["DH AB"] employs two strategies: just ignore the evidence admitted at trial and pluck out choice snippets from the record of what EmCare did to cast this as just factual dispute between to fairly equal bodies of evidence. DH AB at 34–35. Belaboring the law, the question in a *joint* employment case is not who *possessed more* control—such that the "winner" with less or equal control escapes all responsibility for complying with discrimination laws--but who *exercised meaningful* control.[1] A purported employer is deemed by law

---

[1] Appellants Opening-Initial Brief ["IB"] at 21–22. *See, e.g., Layton v. DHL Exp. (USA), Inc.,* 686 F.3d 1172, 1177 (11th Cir. 2012) (question in FLSA cases not which employer is employee more dependent on; "the focus of each inquiry must be on each employment relationship as it exists between the worker and the party asserted to be a joint employer"); *Carter v. Dutchess Community College,* 735 F.2d 8, 11–12 (2d Cir. 1984) (purported employer need not exercise exclusive control, more control or even the same control as another employer to exercise sufficient control).

to take an active role in the control of employees "when it decides such things as how to design the employees['] management structure and whether a worker should be disciplined or retained." *Martinez–Mendoza v. Champion Int'l Corp.,* 340 F.3d 1200, 1209–10 (11th Cir. 2003).* The evidence as trial overwhelming had these facts.

The Hospital repeats that EmCare hired Dr. Scott and that her contract was with EmCare. DH AB at 34. This completely ignores not just some, but the overwhelming, clear evidence of the Hospital's direct control over Dr. Scott's hiring. Dr. Scott's employment began with the Hospital. *See* IB at 5–6, 26–27 and citations therein.

It is not even a debatable point in the evidence that the Hospital was involved in Dr. Scott's screening, interviewing, and hiring process. True, EmCare entered into a formal contract with Dr. Scott, DE150-1 at 104-05, 194; DE150-2 at 117. But Dr. Scott was screened by the Hospital and Dr. Schandorf to determine whether she was a good fit for the Hospital. DE150-1 at 103, 132, 191–93. Only after Dr. Scott was interviewed by the Hospital did the Hospital's top administrators approve Dr. Scott. DE150-1 at 104, 194; DE150-2 at 72, 117, 181. Dr. Scott was hired only after the Hospital administrators approved Dr. Schandorf extending the offer of employment to Dr. Scott. DE66-5 at 9; DE150-1 at 194.

EASLEY APPELLATE PRACTICE, PLLC, 1200 BRICKELL AVE., SUITE 1950, MIAMI, FLORIDA 33131  305-444-1599  800-216-6185

Though the standard for new trial is the great weight, here the overwhelming evidence is also that the Hospital controlled Dr. Scott's hiring. And it controlled her firing notably after she filed her EEOC Charge.

Only after <u>the Hospital's CEO</u> demanded Dr. Scott's removal from the Hospital was she removed. DE150-2 at 19; DE150-1 at 170, 174.  Only after <u>the Hospital</u> made clear it didn't want her working at the Hospital anymore did EmCare terminate its contract with Dr. Scott. DE150-2 at 19, 55; DE150-1 at 170, 174. And as EmCare points out in its Answer Brief, EmCare's contract with the Hospital provided that <u>the Hospital</u> CEO Meade could immediately withdraw permission for Dr. Scott to work at the Hospital. EmCare AB at 23–24.

As EmCare's Dr. Stern put it, EmCare decisions were "really mainly about the fact that . . . [EmCare was] being requested to terminate [Dr. Scott]." DE150-3 at 40. And EmCare's Ted Haumesser conceded he merely had "dotted line authority" as "simply the *delivery* boy." DE150-1 at 228–29.[2] Tellingly, Mr. Haumesser quickly *delivered* a termination letter to Dr. Scott virtually identical to the directions he received

---

[2] *Butler v. Drive Automotive Industries of America, Inc.*, 793 F.3d 404, 408 (4th Cir. 2015) (even though staffing company fired plaintiff, the putative employer had "effective control", especially so given that the manager could not recall an instance when the staffing company denied a request to discipline or terminate a staffing-company employee).

EASLEY APPELLATE PRACTICE, PLLC, 1200 BRICKELL AVE., SUITE 1950, MIAMI, FLORIDA 33131  305-444-1599  800-216-6185

from Hospital CEO Mr. Meade. *See* IB at 28 *comparing* DE137 Trial Ex. 21 *with* DE137 Trial Ex. 22.

Doctors Hospital next points everything to Dr. Schandorf, again misunderstanding "joint employment." DH AB at 34. While Dr. Schandorf was Dr. Scott's supervisor at the Hospital, a joint employer's control needn't be direct; it can be indirect. *See*, *e.g.*, *Torres-Lopez v. May*, 111 F.3d 633, 642 (9th Cir. 1997).

The Hospital skirts the evidence and law that, once the Hospital's administration approved the hiring of its Hospitalists, the Hospital required them to follow all the Hospital's internal policies and procedures, thus further showing the Hospital's control over the terms and conditions of Dr. Scott's employment. *See* IB at 29–30 and citations therein. And the overwhelming evidence is that Dr. Schandorf played his supervisory role of Hospitalists as much on the Hospital's behalf as for EmCare, if not more, playing multiple roles in the Hospital's administration in addition to making sure the Hospital and EmCare's programs were jointly implemented.[3] DE150-1 at 107–80, 124–28, 146, 205–06, 214; DE150-2 at 32, 78, 170–72; DE137 Trial Ex. 30. Hospitalists were managed and reviewed by the Hospital's evaluation committee. *Id.*; DE150-3 at

---

[3] *EEOC v. Skanska Bldg., Inc.*, 550 Fed. Appx. 253 (6th Cir. 2013), Skanska, a general contractor, contracted with a subcontractor, C-1, to provide operators for the construction site. The agreement stated the owner of C-1 would supervise the operators, but Skanska could remove an operator from the site. The Sixth Circuit found that in reality, Skanska had control over the operators as it removed C-1 operators from the site without any challenge, did not report complaints to C-1, and did not consult with C-1.

EASLEY APPELLATE PRACTICE, PLLC, 1200 BRICKELL AVE., SUITE 1950, MIAMI, FLORIDA 33131  305-444-1599  800-216-6185

100. The Hospital's "PI Council Review" Quality Committee--consisting of physicians, Hospital staff, middle managers, and chief officers--reviewed policies, procedures, outcomes, and results. DE150-3 at 100. Dr. Schandorf was the Hospital Committee's chairperson and he signed the Hospital's Behavior and Citizenship policy and Incident Report policy "as a member of the leadership that oversaw the medical staff," not in his role with EmCare. DE150-3 at 100, DE150-1 at 105–07; DE137 Trial Exs. 30, 31. The Hospital investigated and referred to the medical staff any leadership issues related to Hospitalists' poor communication. DE150-3 at 95–97. The Hospitalists' clinical performances were measured by meeting the Hospital metrics, as well as metrics set by EmCare. DE150-2 at 7. The Hospital and EmCare also had a collaborative approach to solving problems in which the administrative team would approve the steps Dr. Schandorf would take. DE150-1 at 124–28; *see also* DE150-1 at 86–87, 115–17 (Schandorf met monthly with the Hospital administration).

In light of both Appellees' evasion of a fundamental fact in the oncology incident--that the Hospital CEO Meade  possessed neither medical expertise nor basic medical training yet vetoed Dr. Scott's expert medical opinions that challenged placing a terminal cancer patient through chemotherapy that could do nothing but drain the patient of her remaining vitality and bolster Hospital financials, which medical opinions Dr. Schandorf found  medically  correct--is  compelling  evidence  of  the  Hospital's

control over Dr. Scott's employment. *See* IB at 32–34 and citations therein. Minimum, this is overwhelming evidence of joint employment and underscores the policy reasons for the joint employment doctrine's continued viability [*id.*]: so that employers cannot manufacture artificial corporate barriers to cavalierly circumvent Title VII's legal requirements and override Congressional anti-discrimination protections in the workplace.

Doctors Hospital incorrectly ignores its role in the supervision of Dr. Scott by pointing to Dr. Schandorf.[4] Dr. Schandorf made decisions in collaboration with or under the direction of Hospital Administrators. DE150-1 at 124–31, 217; *see also* DE150-1 at 86–87, 115–17. The Hospital's control went far beyond standard health and safety concerns, or ensuring worker qualifications, or accreditation requirements, as the incident with the oncology patient best shows [*see* IB at 32–33 and citations therein] the Hospital exercising *actual, direct control* over Dr. Scott's exercise of her educated

---

[4]   *See* *Hodgson v. Griffin & Brand*, 471 F.2d 235, 238 (5th Cir. 1973) (binding precedent that putative employer's field supervisors were constantly in the field giving commands to contractors, contributing to court's finding of joint employment); *EEOC v. Skanska USA Bldg., Inc.*, 550 F. App'x 253 (6th Cir. 2013), Skanska, a general contractor, contracted with a subcontractor, C-1, to provide operators for the construction site. The agreement stated the owner of C-1 would supervise the operators, but Skanska could remove an operator from the site. The Sixth Circuit found that in reality, Skanska had control over the operators as it removed C-1 operators from the site without any challenge, did not report complaints to C-1, and did not consult with C-1..

*medical judgment* can't possibly be cast as "hands off."[5] Further, the Hospital's CEO Meade took steps to ensure compliance with its culture and control over *where and how* Dr. Scott exercised her medical judgment in the work done.[6] *See* IB at 34–35; DE150-2 at 32–33, 44, 83.

The Hospital had the authority to control the hiring, firing, and employment of Dr. Scott. It exercised this authority when it hired, fired, and controlled her employment. That it did so *along with* EmCare simply underscores the essence of the joint employment doctrine and why it should remain a robust doctrine.

In further reply, the Hospital's assertion that there was nothing permanent or exclusive about its relationship with Dr. Scott ignores (1) the settled principle that the parties' contracts are not decisive[7] and (2) all pertinent facts about the nature of her

---

[5] *See, e.g., Salamon v. Our Lady of Victory Hosp.*, 514 F.3d 217, 231 (2d Cir. 2008) (reasonable fact finder could conclude quality assurance standards extended beyond mere health and safety concerns or ensuring physician's qualifications); *cf. Ashkenazi v. S. Broward Hosp. Dist.*, 607 F. App'x 958, 964 (11th Cir. 2015) (physician independent contractor where hospital's instructions were motivated and involved only steps to ensure patient safety and avoid professional liability).

[6] *Goudeau v. Dental Health Servs., Inc.*, 901 F. Supp. 1139, 1142 (M.D. La. 1995) ("The right to control an employee's work means the right to direct the work of the individual not only as to the result, but also as to the details by which that result is achieved.") *citing Fields v. Hallsville Indep. School Dist.*, 906 F.2d 1017, 1019 (5th Cir. 1990).

[7] *Ashkenazi v. S. Broward Hosp. Dist.*, 607 F. App'x 958, 963 (11th Cir. 2015) (contract explicitly stating an independent contractor relationship relevant but not controlling); *Daughtrey v. Honeywell, Inc.*, 3 F.3d 1488, 1492 (11th Cir. 1993) ("While the characterization of the hired party as an independent contractor or employee may be

work, as a <u>Hospital</u>ist, at <u>the Hospital</u>. IB at 37. Dr. Scott's work at the Hospital was onsite. She was not a physician, with just Hospital privileges, to treat her own patients when and how she deemed appropriate. She saw solely <u>the Hospital's patients</u> on behalf of <u>the Hospital</u>. DE150-1 at 113–14. Hospitalists weren't shifted around willy-nilly by EmCare. The fact of Doctors Hospital CEO Meade's obsession with the culture and fitting in shows that temporary, nomadic physicians would not have been acceptable. *See* DE137 Trial Ex. 21, DE150-2 at 32–33, 44, 83. Dr. Scott only signed a contract with EmCare after the Hospital approved her and she was only terminated by EmCare after the Hospital said it wanted her gone. DE66-5 at 9; DE150-2 at 19, 55; DE150-1 at 170, 174, 194. Hospitalists, including Dr. Scott, were integrated into the Hospital through its Committees. DE150-2 at 172–73; DE150-3 at 94. While she worked some part-time hours at Blake, Dr. Scott maintained a regular full-time schedule at the Hospital. DE 150-2 at 130, 175; DE170 at 22. And while EmCare could assign Dr. Scott to different hospitals, the overwhelming evidence is that is just not the economic reality of this relationship on this record. *See id.*

While Doctors Hospital is correct that Dr. Scott's work required an extremely high degree of skill, the Hospital misstates the effect of that here in a joint employment

---

probative of the parties' intent, all of the incidents of the relationship must be assessed and weighed with no one factor being decisive.").

case. The cases to which the Hospital cites for its assertion that this is an "important factor in cases involving physicians" are cases in which the issue concerned whether the plaintiff was an employee or an independent contractor—not the issue of joint employment.[8] As this Court explained, the degree of skill is generally used to determine if a person is an employee or not, not to determine of whom she is an employee. *See Aimable v. Long & Scott Farms*, 20 F.3d 434, 444 (11th Cir. 1994) ("this factor is not relevant as it shows that appellants were employees, but not of whom"); *Layton v. DHL Express (USA), Inc.*, 686 F.3d 1172, 1173 (11th Cir. 2012) (degree of skill required to perform the job only distinguishes whether one was an employee or an independent contractor); *see also Ling Nan Zheng v. Liberty Apparel Co.*, 355 F.3d 61, 67–68 (2d Cir. 2003) (noting degree of skill and independent initiative required of workers are used primarily to distinguish independent contractors from employees and therefore "do not bear directly on whether workers who are already employed by a primary employer are also employed by a second employer").

---

[8] *Ashkenazi v. S. Broward Hosp. Dist.*, 607 F. App'x 958 (11th Cir. 2015); (whether plaintiff who owned his own practice was a independent contractor or employee where he spent 10% of his time as an on-call ER doctor for hospital); *Mantiply v. U.S.*, 634 F. App'x 431, 432 (5th Cir. 2015) ("The issue before the district court was whether Dr. Hoffman qualified as an independent contractor or an employee."); *Alexander v. Avera St. Luke's Hosp.*, 768 F.3d 756 (8th Cir. 2014) (same); *Xie v. Univ. of Utah*, 243 F. App'x 367 (10th Cir. 2007) (same); *Wojewski v. Rapid City Reg'l Hosp., Inc.*, 450 F.3d 338 (8th Cir. 2006) (same).

To be very clear on this point: no one has argued that Dr. Scott is an independent contractor or a doctor floating throughout the Hospital without an employer to answer to—just that both of her employers, the Hospital and EmCare, say "not I".

Quite possibly the Hospital's most blatant attempt to pass the blame to EmCare and minimize its actions is the Hospital's assertion that the "'larger business" for which [Dr. Scott] performed her job was EmCare, not the Hospital." DH DH AB at 38. This ignores that this is a case of *joint employment. See* decisions *supra*. Notably, during the Hospital's discussion of whether Dr. Scott performed a specialty job <u>integral</u> to the business, the Hospital leaves out the operative word "integral". *Id.* Hospital CEO Meade testified that Dr. Scott and other Hospitalists are part of the "core group" that touch most all patients in the hospital. DE150-2 at 37. Dr. Scott also served on various <u>Hospital</u> Committees onsite, including its Patient Care Review Committee that reviewed issues and complaints regarding quality of Hospital patient care by both physicians and nurses there. DE150-2 at 172–73; DE150-3 at 94. She worked at the Hospital full time seeing the hospital's patients. DE150-2 at 118, 130, 175; DE170 at 22; DE150-1 at 113–14. Patently integral to and integrated into the Hospital.

The Hospital also errs in pointing only to what EmCare did regarding payment and wages. DH AB at 35. EmCare did payroll and wages, but did so based on what the Hospitalists did <u>in the Hospital</u>, and EmCare paid different rates depending on the

10

respective hospital and the patients seen at the respective hospital. DE137 Exhibit 4; DE150-3 at 5–6. These facts only support joint employment.[9]

The Hospital makes the same error regarding the entity with the opportunity for profit and loss. DH AB at 36–37. Again, the question is not an either/or, between EmCare or the Hospital. It is between Dr. Scott and the Hospital, in addition to EmCare.[10] Dr. Scott only saw the Hospital's patients that came there. DE150-1 at 113–14. Dr. Scott depended on the Hospital business for the opportunity to render her services.[11] The Hospital set the "culture" that the Hospital represents to all as being what attracts its patients.[12]

---

[9] *See, e.g.*, *Leuenberger v. Spicer*, 2016 WL 355090, at *13 (W.D. Va. Jan. 28, 2016) (following *Butler* to find county's role in managing benefits, disbursing pay, maintaining employment records; and providing her with space, was akin to a payroll administrator, not an employer with control). *See also* Department of Labor Regulations, 29 C.F.R.§ 825.106(b) (citing as classic examples of joint employment relationships temporary placement agencies and professional employer organization contracts).

[10] *See, e.g.*, *Layton v. DHL Exp. (USA), Inc.*, 686 F.3d 1172, 1177 (11th Cir. 2012) (question in FLSA cases not which employer is employee more dependent on; "the focus of each inquiry must be on each employment relationship as it exists between the worker and the party asserted to be a joint employer").

[11] *Cf. Brock v. Superior Care, Inc.*, 840 F.2d 1054, 1059 (2d Cir. 1988) (where nurses depend on someone else to find job assignments, nurses not use skills independently).

[12] DE150-2 at 62–63. *See Reich v. Circle C Investments*, 998 F.2d 324, 328 (5th Cir. 1993) (employer "has a significant role in drawing customers to its nightclubs" as it is responsible for advertisement, location, business hours, maintenance of facilities, aesthetics, and inventory); *Reich v. Priba Corp.*, 890 F. Supp. 586, 593 (N.D. Tex. 2005).

EASLEY APPELLATE PRACTICE, PLLC, 1200 BRICKELL AVE., SUITE 1950, MIAMI, FLORIDA 33131  305-444-1599  800-216-6185

The Hospital hangs its defense primarily on one inapposite independent contractor case, *Ashkenazi v. S. Broward Hosp. Dist.*, 607 F. App'x 958 (11th Cir. 2015), to essentially assert that, because Dr. Scott is a highly skilled doctor, the case is closed. This Court's *Ashkenazi* decision warns against this flawed logic that the Hospital advances: "[T]he important takeaway from existing precedent is that each case is factually specific and context dependent on the precise nature of the working relationship between the parties." *Id.* at 962.

In *Ashkenazi*, the plaintiff himself owned a corporation through which he operated his private practice. *Id.* at 963. He spent 10% of his time providing on-call services to the hospital. *Id.* He decided when and where he worked. *Id.* And, even while on call, he could be seeing his patients at his private practice. *Id.* He could have other surgeons cover for him at the hospital. *Id.* And the hospital could not assign any additional patients or work to him other than those whom he treated during his on-call shifts. *Id.* at 963–64. Thus, the Eleventh Circuit held he was an independent contractor because he controlled his work. *Id.* at 964.

*Ashkenazi* doesn't help the Hospital at all. Dr. Scott didn't own a corporation through which she operated her private practice. She didn't spend just 10% of her time providing on-call services to the Hospital. She didn't decide when and where she

worked. *Id.* While at the Hospital, she did not see her own private patients from her private practice. Dr. Scott did not control her work.  EmCare and the Hospital did.

The Hospital's Answer-Response Brief is the best proof that EmCare was a joint employer along with the Hospital. DH AB at 29–38. Like *Butler v. Drive Automotive Industries of America, Inc., 793 F.3d 404, 408 (4th Cir. 2015)* [discussed in full in Dr. Scott's IB at 22–24], the <u>Hospital</u> exhibited high a degree of control over the terms of Dr. Scott's employment, including approving her hiring and demanding her firing, exercising day-to-day supervision of Dr. Scott on the Hospital floor, and seeing the Hospital's patients on behalf of the hospital, central to the Hospital's business. *See also Browning Ferris Industries of California*, 362 NLRB No. 186 (Aug. 27, 2015) [discussed in IB at 24–26]. The great, if not overwhelming, weight of evidence was that Doctors Hospital controlled and supervised Dr. Scott from the time she was hired to the time she was fired.

We briefly address the hysterical and inflammatory tone in the Hospital's Answer Brief about Dr. Scott's interaction with Human Resources ["HR"] and the complaints supposedly lodged against her. First, these purported "facts" clearly aren't relevant to the issue on appeal--and the Hospital admits as much [DH AB at 18]—and they can only be seen as injected to evoke an emotional response from and bias this Court into viewing Dr. Scott as problematic and her claims unworthy of much

deliberation. Beyond this being improper, only <u>one</u> of the purported complaints proffered by the Hospital and by EmCare regarding Dr. Scott's behavior were written up while Dr. Scott was employed, though Hospital policy, for which CEO Meade was a stickler, required any viable complaint be written up so that the physician had an opportunity to respond [DE150-2 at 129–30, 170, 184–203], and, because these proffered complaints were not written up, Dr. Scott had no opportunity to respond to them. *Id.* Also notable, the defendants' report of these supposed complaints about Dr. Scott that they presented at trial was run <u>December 14, 2015</u>—long <u>after</u> Dr. Scott was terminated. DE137 Trial Ex. 66.

Further, Dr. Schandorf only testified that, in early 2012, he began <u>hearing</u> general, informal complaints about Dr. Scott sometimes acting abrupt or curt with patients and nurses that were typical and characteristic of the high-stress environment that Hospitalists work in. DE150-1 at 138–40. So these proffered complaints, never written up while Dr. Scott was employed at the Hospital are both irrelevant and suspect.

What is record evidence is that Dr. Schandorf testified Dr. Scott was an experienced physician who could handle a hefty workload and pressures, while interacting with the other medical and nursing staff. DE66-5 at 10. And EmCare was so confident in Dr. Scott's abilities that she had been earlier asked to help establish a hospitalist program at a different hospital, Blake. DE66-5 at 10.

*Scott vs. Sarasota Doctors Hospital, etc., et al*, 11th Cir. Case No. 16-10763

**ISSUE II. SUMMARY JUDGMENT IN FAVOR OF EMCARE CONCLUDED THAT DR. SCOTT COULD NOT AS A MATTER OF LAW ESTABLISH PRETEXT FOR HER REMOVAL AND SIMULTANEOUS TERMINATION MERELY BECAUSE EMCARE AND DOCTORS HOSPITAL HAD AN AGREEMENT IN WHICH THE HOSPITAL COULD DEMAND THE REMOVAL OF A HOSPITALIST. THAT WAS FACTUAL ERROR BECAUSE IT OVERLOOKED THE PARTIES' RELATIONSHIPS AND CONSTRUED THEM IN FAVOR OF EMCARE. THAT WAS LEGAL ERROR BECAUSE IT ERRONEOUSLY CONSTRUED THE ECONOMIC REALITIES OF EMPLOYMENT IN TODAY'S ECONOMY. SUMMARY JUDGMENT SHOULD BE REVERSED.**

EmCare first asserts that there was no possible way Dr. Scott could make a showing of discrimination against the Hospital. EmCare's Answer Brief ("EC AB") at 20–21. It belies logic that a case for discrimination could go forward against the Hospital, but not be sufficient to show that Dr. Scott believed the Hospital was engaged in an unlawful employment practice and was objectively reasonable in light of that belief.

Further belaboring, this concerns summary judgment entered in favor of EmCare and, as such, all courts must view all evidence and all factual inferences reasonably drawn from the evidence in the light most favorable to the nonmoving party, here Dr. Scott, and all justifiable inferences drawn in her favor.[13] Dr. Scott believed she was being discriminated against because she saw male colleagues treated differently than herself and another rare female colleague, Dr. Vasille. IB at 2 and citations therein; DE78 at 5–8. When Dr. Scott first heard the Hospital wanted to replace her, Dr.

---

[13] *Tolan v. Cotton*, 134 S. Ct. 1861, 1863 (2014); *St. Charles Foods, Inc. v. America's Favorite Chicken Co.*, 198 F.3d 815, 819 (11th Cir. 1999).

Schandorf told her that Mr. Meade had shared with him his belief that "they always revert back to their original behavior". DE78 at 6. Dr. Scott believed at the time, and continues to believe, that the "they" to which Mr. Meade referred were female physicians, as a broad class of employee. *Id.* She saw that the Hospital was interviewing male physicians to replace her, then they were not, then they were, again. *Id.* She then saw the Hospital was slow to fire a male hospitalist whose angry outbursts and sometimes threatening behavior jeopardized patient care. *Id.* at 6–7. And she saw the Hospital was quick to replace her--with no formal complaints, no discussion with her, no opportunity for her to address these complaints, and no concern over her abilities as a physician--shortly after she complained of discrimination. *Id.* at 6–8.

Dr. Scott's beliefs in this regard were not paranoia; they were supported by her experience and knowledge acquired while serving on the Hospitals' Patient Care Committee. *Id.* at 8. While on that Committee, she'd taken part in the resolution of numerous complaints regarding male physicians with privileges at the Hospital, all of whom were provided written notice of the complaints (one of the reasons making so suspect the defendants' after-termination report of supposed complaints against Dr. Scott) against them and an opportunity to respond. *Id.* These Hospital procedures, however, were wholly disregarded when Mr. Meade decided he wanted Dr. Scott gone. *Id.*

While EmCare waxes prolific with a long tale of misbehavior [EC AB at 24–25, 30–32], Dr. Scott has shown this is pretext, because EmCare, over all this time and long tale, had no concerns about Dr. Scott's abilities as a physician and hospitalist. *See* IB at 43–45 and citations therein.

Next, EmCare fails to articulate any legitimate good-faith reason for terminating Dr. Scott. EmCare focuses, instead, as it did below, on the clause in its contract that provides the permission for Dr. Scott to work at the <u>facility [the Hospital]</u> could be withdrawn at any time. EC AB at 23–24. That clause does not say "and, by the way, if the Hospital says to remove Dr. Scott, then you are contractually obligated to terminate her from all facilities." EmCare's reliance on a contractual obligation to remove Dr. Scott from her position at <u>the Hospital</u> immediately upon the written request from Mr. Meade is not a legitimate, non-discriminatory reason for its action of removing Dr. Scott from <u>EmCare</u>—from terminating Dr. Scott's contract with <u>EmCare</u> after she complained of discrimination. *See* IB at 39–41 and citations therein. We believe the district court overlooked this key distinction.

To be sure that this is very clear, the act of removing a physician from the Hospital and the act of terminating a physician's contract with EmCare are two separate acts. EmCare cannot circumvent the fundamental problem it has, so it conflates the two to excuse its wrongful termination. EC AB at 30–32. The evidence, in the light most

EASLEY APPELLATE PRACTICE, PLLC, 1200 BRICKELL AVE., SUITE 1950, MIAMI, FLORIDA 33131   305-444-1599   800-216-6185

favorable to Dr. Scott, is that her removal had nothing to do with her medical care and that she could have continued working as a hospitalist for EmCare. DE66-5 at 21. Dr. Schandorf testified Dr. Scott was an experienced physician who could handle a hefty workload and pressures, while interacting with the other medical and nursing staff. DE66-5 at 10. EmCare was so confident in Dr. Scott's abilities that she had been earlier asked to help establish a hospitalist program at a different hospital. DE66-5 at 10. Before the Hospital's CEO Meade demanded she be removed, the concerns were merely that she wasn't a good fit for the Hospital.[14]

Moreover, the cases are legion that a contractual provision allowing for termination does not excuse otherwise illegal behavior.[15] *See* IB at 40–42 and citations therein. Corporations cannot contract in discrimination safety nets.

Added to this is the troubling temporal proximity: Dr. Scott was terminated within hours of her Charge of Discrimination. DE64-3 at 8-9. Added to this is

---

[14] DE66-5 at 21; DE66-6 at 6. Any purported complaints or incidents occurred long before the day that Dr. Scott went to HR to complain about discrimination, and as Dr. Schandorf stated, everything was going fine until the morning Dr. Scott went to HR. DE66-5 at 24. All the Defendants' post-litigation complaints were not even presented until after Dr. Scott's termination in direct violation of the Defendants' policies that a physician against whom a complaint is lodged have an opportunity to review the complaint reduced to writing and to respond in writing.

[15] *See, e.g., Cheney v. Plainfield Healthcare Ctr.,* 612 F.3d 908, 914 (7th Cir. 2010) (noting Title VII does not contain a good-faith defense that allows an employer to make race-based work assignments in line with state law providing long-term care residents to choose their provides in conflict with Title VII ).

EASLEY APPELLATE PRACTICE, PLLC, 1200 BRICKELL AVE., SUITE 1950, MIAMI, FLORIDA 33131  305-444-1599  800-216-6185

EmCare's actual knowledge of her Charge. DE64-3 at 8-9. Added to this is EmCare's deviation from its standard procedure wherein Dr. Scott was not given the 90-day notice before she was terminated from EmCare.[16] DE66-5 at 17–18; DE66 at 6. Added to this is EmCare's letter terminating Dr. Scott's contract that is practically word-for-word identical to the Hospital Meade's email to EmCare's Dr. Stern requesting her removal. *See* DE66 at 8. CEO Meade may as well have been holding EmCare's pen.

And added to the above is Dr. Schandorf's statement to Dr. Scott that he wished she hadn't gone to HR to complain about the discrimination because he knew it "was not good" [*See* DE66-5 at 25, 34], supporting the only reasonable inference that Dr. Schandorf knew she'd be terminated for engaging in a legally protected activity.

On a motion for summary judgment, EmCare cannot cherry pick and skew the record. The evidence, viewed in the light most favorable to Dr. Scott, with all reasonable inferences drawn in her favor, is that EmCare's finger pointing at the Hospital contract is pretext for discrimination.

**ISSUE III: IT WAS LEGAL ERROR AND ABUSE OF DISCRETION TO EXCLUDE THE TESTIMONY OF ANOTHER FEMALE HOSPITALIST AT DOCTORS HOSPITAL, DR. VASILE, WORKING AT THE SAME TIME AND UNDER THE SAME SUPERVISION AS DR. SCOTT. DR. VASILE'S TESTIMONY WOULD HAVE CONCERNED INCIDENTS RELATED TO DOCTORS HOSPITAL CEO, MR.**

---

[16] *Hurlbert v. St. Mary's Health Care Sys., Inc.*, 439 F.3d 1286, 1299 (11th Cir. 2006) (FMLA); *Rudin v. Lincoln Land Community Coll,* 420 F.3d 712, 727 (7th Cir.2005) ("An employer's failure to follow its own internal employment procedures can constitute evidence of pretext.").

EASLEY APPELLATE PRACTICE, PLLC, 1200 BRICKELL AVE., SUITE 1950, MIAMI, FLORIDA 33131  305-444-1599  800-216-6185

### MEADE, AND THE TREATMENT AND CONTROL OF HER EMPLOYMENT TERMS AND CONDITIONS AND HER SUBSEQUENT CONSTRUCTIVE TERMINATION.

It was error for the lower court to exclude Dr. Tracey Vasile's testimony that she was also a victim of gender discrimination at the hands of CEO Meade while at Doctors Hospital. This error is not harmless because it would have added appreciable weight to Dr. Scott's case in two ways: First, by presenting the jury with another Hospitalist whose employment, like Dr. Scott's employment, Meade and the Hospital controlled. Its exclusion hampered the jury's understanding of the joint employment realities. Second, it would have added appreciable weight to demonstrating discriminatory intent. *See* IB at 47–51 and citations therein.

Courts generally look at (1) whether past discriminatory or retaliatory behavior is close in time to the events at issue in the case, (2) whether the same decision maker was involved, (3) whether the witness and plaintiff were treated in the same manner, and (4) whether the witness and plaintiff were otherwise similarly situated. in *Hayes v. Sebelius*, 806 F. Supp. 2d 141, 144–45 (D.D.C. 2011) (citing *Goldsmith v. Bagby Elevator Co., Inc.*, 513 F.3d 1261 (11th Cir. 2008)).[17]

---

[17] *See also Sprint/United Management Co. v. Mendelsohn,* 552 U.S. 379, 388 (2008); *Hasan v. Foley & Lardner LLP*, 552 F.3d 520, 529 (7th Cir. 2008) (noting that the court should have determined if the "me too" evidence was a "relevant component of the 'mosaic' of evidence"); *see also Griffin v. Finkbeiner*, 689 F.3d 584, 598–99 (6th Cir. 2012).

EASLEY APPELLATE PRACTICE, PLLC, 1200 BRICKELL AVE., SUITE 1950, MIAMI, FLORIDA 33131  305-444-1599  800-216-6185

Once again, the Hospital skirts the <u>relevant</u> ways in which Dr. Vasile and Dr. Scott are similarly situated. The relevancy is that Dr. Vasile was also a hospitalist, like Dr. Scott, employed by the Hospital, like Dr. Scott, and with another entity similar to EmCare, like Dr. Scott. DE12 at 5; DE64-2 at 29–30. Not that Dr. Vasile wasn't employed by EmCare. DH AB at 39. The relevancy is that Dr. Vasile and Dr. Scott, both female physicians, were treated the same way, and it was proffered that the evidence would show the Hospital's CEO Meade was also trying to get rid of Dr. Vasile, just as he was trying to get rid of Dr. Scott. DE150-2 at 100.

And the relevancy is that the outcome was the same—the end of employment at Doctors Hospital. DE150-2 at 100–01. Not that Dr. Vasile left where her testimony would have been that she was constructively discharged from her position. *Id.*

Dr. Vasile's testimony was a relevant component of the mosaic of evidence being presented. Each factor weighed in favor of admissibility of Dr. Vasile's testimony at Dr. Scott's trial. Its exclusion was not harmless.

## CONCLUSION

FOR THE REASONS AND LEGAL AUTHORITIES SET FORTH HEREIN, Appellant Dr. Michelle G. Scott, M.D., requests that summary judgment be reversed and the case remanded for a new trial against both Appellees.

Respectfully submitted,

EASLEY APPELLATE PRACTICE, PLLC, 1200 BRICKELL AVE., SUITE 1950, MIAMI, FLORIDA 33131   305-444-1599   800-216-6185

*Scott vs. Sarasota Doctors Hospital, etc., et al,* 11th Cir. Case No. 16-10763

BY:   /s/ DOROTHY F. EASLEY
DOROTHY F. EASLEY, MS, JD, BCS APPEALS
FLA. BAR NO. 0015891
**EASLEY APPELLATE PRACTICE, PLLC**
1200 BRICKELL AVE., SUITE 1950
MIAMI, FLORIDA 33131
T: 305-444-1599; 800-216-6185
Emails: administration@easleyappellate.com
admin2@easleyappellate.com (secondary)
*Appellate Attorneys for Appellant*

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS AND TYPE STYLE REQUIREMENTS

1.    This brief complies with the type-volume limitation of Fed.R.App.P. 32(a)(7)(B) because this brief contains   5589   words, excluding the parts of the brief exempted by Fed.R.App.P. 32(a)(7)(B)(iii).

2.    This brief also complies with the typeface requirements of Fed.R.App.P. 32(a)(5) and the type style requirements of Fed.R.App.P. 32(a)(6).  It has been prepared in Word 2010 using a proportionally spaced Times Roman 14 point font.

BY:     /s/ DOROTHY F. EASLEY
DOROTHY F. EASLEY

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of Appellant's Reply Brief was filed using the CM/ECF system and was sent to the Eleventh Circuit Court of

Appeals  by U.S. Priority Mail and served via **eMail *or* this firm's secure dropbox URL** this __26 July 2016__ to the following attorneys:

BY: __/s/ DOROTHY F. EASLEY__
        DOROTHY F. EASLEY

EASLEY APPELLATE PRACTICE, PLLC, 1200 BRICKELL AVE., SUITE 1950, MIAMI, FLORIDA 33131  305-444-1599  800-216-6185

*Scott vs. Sarasota Doctors Hospital, etc., et al,* 11th Cir. Case No. 16-10763

## Service List

DR. MICHELLE G. SCOTT *v.* SARASOTA DOCTORS HOSPITAL, INC., ET AL.

11TH CIR. CASE NO. 16-10763

MERRY E. LINDBERG, ESQ.
FORDHARRISON, LLP
1450 Centrepark Blvd., Suite 325
West Palm Beach, FL 33401
T: (561) 345-7505
F: (561) 345-7501
mlindberg@fordharrison.com
*Attorneys for Doctors Hospital*

TRACEY K. JAENSCH, ESQ.
FORDHARRISON, LLP
101 E Kennedy Blvd., Suite 900
Tampa, FL 33602-5133
T: (813) 261-7800
F: (813) 261-7899
tjaensch@fordharrison.com
*Attorneys for Doctors Hospital*

MATTHEW L. RANSDELL, ESQ.
JACKSON LEWIS P.C.
100 S Ashley Dr., Suite 2200
Tampa, FL 33602-5311
T: (813) 512-3224
F: (813) 512-3211
matthew.ransdell@jacksonlewis.com
*Trial and Appellate Counsel for EmCare*

JOHN MILLS BARR, ESQ.
LAW OFFICE OF JOHN M. BARR, P.C.
4105 Stuart Avenue
Richmond, VA 23221
T: (804) 269-5078
John.Barr@jmblawoffice.com
*Pro Hac Vice Counsel for EmCare*

JESSE M. TILDEN
TILDEN & PROHIDNEY, P.L.
431 12th Street West, Ste. 204
Bradenton, FL 34205
T: (941) 243-3959
F: (800) 856-5332
service@tildenprohidney.com
*Counsel for Plaintiff Dr. Scott*

DOROTHY F. EASLEY, MS, JD BCS APPEALS
EASLEY APPELLATE PRACTICE PLLC
1200 Brickell Avenue, Suite 1950
Miami, Florida 33131
T: (305) 444-1599; 800-216-6185
administration@EasleyAppellate.com
(primary)
admin2@EasleyAppellate.com
(secondary)
Upload URL for secure service:
https://www.hightail.com/u/Easley-Appellate-Practice-PLLC
www.easleyappellate.com
*Appellate Counsel for Dr. Scott*

RETURN TO TABLE OF CONTENTS    24    RETURN TO TABLE OF AUTHORITIES

EASLEY APPELLATE PRACTICE, PLLC, 1200 BRICKELL AVE., SUITE 1950, MIAMI, FLORIDA 33131   305-444-1599   800-216-6185